UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| First and Stewart Hotel Owner, LLC,<br><br>Plaintiff-Appellant,<br><br>v.<br><br>Fireman's Fund Insurance Company,<br><br>Defendant-Appellee. | Case No. 21-35637 |

**PLAINTIFF-APPELLANT'S MOTION TO CERTIFY
QUESTIONS TO THE WASHINGTON SUPREME COURT**

Christopher S. Marks, Esq.
Malika Johnson, Esq.
Alice C. Serko, Esq.

TANENBAUM KEALE, LLP
One Convention Place
701 Pike Street, Suite 1575
Seattle WA 98101
Telephone: (206) 889-5150
cmarks@tktrial.com
mjohnson@tktrial.com
aserko@tktrial.com

Joseph D. Jean, Esq.
Scott D. Greenspan, Esq.
Benjamin D. Tievsky, Esq.

PILLSBURY WINTHROP
SHAW PITTMAN LLP
31 West 52nd Street
New York, NY 10019-6131
Telephone: (212) 858-1000
joseph.jean@pillsburylaw.com
scott.greenspan@pillsburylaw.com
benjamin.tievsky@pillsburylaw.com

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................... 1

BACKGROUND.................................................................... 3

    A.    Plaintiff's All-Risk Property Insurance Policies.................. 3

    B.    Plaintiff's Losses ..................................................... 4

    C.    Plaintiff's Claims and Lawsuit ............................ 5

    D.    The Orders in the Consolidated Cases ................................ 6

    E.    The Dismissal of Plaintiff's Claims .................................... 9

ARGUMENT ........................................................................ 9

I.    IN KEEPING WITH BOTH COMITY AND FEDERALISM, CERTIFICATION ALLOWS STATE COURTS TO RESOLVE IMPORTANT ISSUES OF STATE LAW ................... 9

II.    THE PROPOSED QUESTIONS SATISFY THE PREREQUISITES FOR CERTIFICATION ............................... 10

    A.    The Questions Proposed for Certification are Determinative of Key Legal Issues in this Case................ 11

    B.    Washington Law Concerning the Proposed Questions is Unsettled............................................................ 12

III.    THERE ARE COMPELLING REASONS FOR CERTIFYING THE PROPOSED QUESTIONS................................................. 16

CONCLUSION...................................................................... 20

i

# TABLE OF AUTHORITIES

## Cases

*Broad v. Mannesmann Anlagenbau AG*,
    196 F.3d 1075 (9th Cir. 1999)......................................................10, 11

*Bylsma v. Burger King Corp.*,
    676 F.3d 779 (9th Cir. 2012) ........................................................... 10

*Cornhuskers Cas. Ins. Co. v. Kachman*,
    514 F.3d 982 (9th Cir. 2008) ........................................................... 10

*Fujii v. State Farm Fire & Casualty Co.*,
    857 P.2d 1051 (Wash. Ct. App. 1993)............................................8, 16

*Hill and Stout PLLC v. Mut. of Enumclaw Ins. Co.*,
    No. 20-2-07925-1 SEA, 2020 WL 6784271 (Wash. Super.
    Ct., King Cty. Nov. 13, 2020) ............................................7, 13, 14, 15

*Hill and Stout PLLC v. Mut. of Enumclaw Ins. Co.*,
    No. 20-2-07925-1 SEA, 2021 WL 4189778 (Wash. Super
    Ct., King Cty. Sept. 9, 2021)......................................................7, 14, 15

*In re Cty. of Orange*,
    784 F.3d 520 (9th Cir. 2015) ........................................................... 12

*J&J Celcom v. AT&T Wireless*,
    481 F.3d 1138 (9th Cir. 2007)...................................................10, 16, 17

*Keystone Land & Dev. Co. v. Xerox Corp.*,
    353 F.3d 1093 (9th Cir. 2003).......................................................10, 13

*Kremen v. Cohen*,
    325 F.3d 1035 (9th Cir. 2003).......................................................10, 18

*Lehman Bros. v. Schein*,
    416 U.S. 386 (1974) .....................................................................10, 16

*Marler v. Aspen Am. Ins. Co.*,
    No. 2:20-CV-00616 (W.D. Wash. Mar. 3, 2021)................................. 17

ii

# TABLE OF AUTHORITIES
## (continued)

*Nguyen v. Travelers Cas. Ins. Co. of Am.*,
　　No. 2:20-CV-00597-BJR, 2021 WL 2184878 (W.D. Wash.
　　May 28, 2021) ............................................................................*passim*

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
　　294 F.3d 1084 (9th Cir. 2002).............................................. 10

*Perez-Farias v. Glob. Horizons, Inc.*,
　　669 F.3d 927 (9th Cir. 2011) ............................................. 10

*Perry St. Brewing Co., LLC v. Mut. of Enumclaw Ins. Co.*,
　　No. 20-2-02212-32, 2020 WL 7258116 (Wash. Super. Ct.,
　　Spokane Cty. Nov. 23, 2020) .........................................7, 15

*Queen Anne Park Homeowners Ass'n v. State Farm Fire &
Cas. Co.*,
　　763 F.3d 1232 (9th Cir. 2014)............................................. 10

*Snoqualmie Entm't Auth. v. Affiliated FM Ins. Co.*,
　　No. 21-2-03194-0 SEA, 2021 WL 4098938 (Wash. Super.
　　Ct. King Cty. Sept. 2, 2021)..........................................15, 16

*T-Mobile USA, Inc. v. Selective Ins. Co. of Am.*,
　　908 F.3d 581 (9th Cir. 2018)............................................. 10

*U.S. Dep't of Treasury v. Fabe*,
　　508 U.S. 491 (1993) ........................................................ 13

*Vision One, LLC v. Philadelphia Indem. Ins. Co.*,
　　174 Wash. 2d 501 (2012) ..................................................... 8

*Vita Coffee LLC v. Fireman's Fund Ins. Co.*,
　　No. 2:20-CV-01079-BJR, 2021 WL 3077922 (W.D. Wash.
　　July 21, 2021) ................................................................... 8

*Wolstein v. Yorkshire Ins. Co.*,
　　985 P.2d 400 (Wash. Ct. App. 1999)...............................8, 16

iii

# TABLE OF AUTHORITIES
## (continued)

### Statutes

Washington Revised Code
    Section 2.60.010-900................................................................9
    Section 2.60.020...................................................................11

## Other Authorities

*Frequently Asked Questions*,
    http:/www.ca9.uscourts.gov/general/faq (last visited
    October 12, 2021)................................................................19

# INTRODUCTION

This appeal raises significant questions of Washington state insurance law concerning whether a provision widely used in all-risk property insurance policies in Washington covers COVID-19 business interruption losses. The district court acknowledged that Washington law controls these questions and that several Washington trial courts addressing them had found in favor of coverage. Yet the court rejected these Washington state court rulings, deeming their reasoning "unpersuasive," and instead followed federal district court decisions that did not apply Washington law and then relied on its own view of the purpose of all-risk policies.

This Court need not decide whether the district court afforded adequate respect to Washington state courts nor determine how the Washington Supreme Court would likely resolve the questions raised here. Like most states, Washington allows certification of questions to its Supreme Court. The questions raised by this appeal easily satisfy the prerequisites for certification because they are both determinative and unsettled. In addition, certification is appropriate here because the questions are of immense practical importance, certification will avoid

1

further conflicts with the Washington courts over these questions, and certification will conserve judicial resources because the Washington Supreme Court will be able to resolve questions more quickly and efficiently than this Court.

This case turns on whether the loss of functional use, in whole or in part, of insured property—caused either by the presence on the insured premises of a toxic, noxious, or hazardous substance such as the SARS-CoV-2 virus ("Coronavirus") or COVID-19, the disease it causes, or by government orders concerning Coronavirus or COVID-19—cause the type of "physical loss or damage" required to trigger coverage under all-risk property insurance policies. Thus, the following questions should be certified:

1.  When a first-party, all-risk property insurance policy covers all risks of "direct physical loss or damage" to insured property, is coverage triggered when a toxic, noxious, or hazardous substance that is present at that property causes loss, either in whole or in part, of the functional use of the insured property?

2.  When a first-party, all-risk property insurance policy covers all risks of "direct physical loss or damage" to insured property, is coverage triggered when state or local government orders issued because of the presence of SARS-CoV-2 virus or COVID-19 deprive, either in whole or in part, the insured of the functional use of the insured property?

2

# BACKGROUND

## A.     Plaintiff's All-Risk Property Insurance Policies

Plaintiff First and Stewart Hotel Owner, LLC ("First and Stewart") is the owner and operator of the Thompson Seattle Hotel (the "Hotel"), an award-winning luxury boutique hotel in downtown Seattle. ECF No. 19 ¶¶ 1, 27, 57–58. To protect the Hotel, First and Stewart purchased two high-end, all-risk commercial property insurance policies from Fireman's Fund Insurance Company ("FFIC"). *Id.* ¶¶ 1, 26. These policies, issued on a form drafted by FFIC's parent Allianz, provide business interruption insurance covering lost business income and extra expenses resulting from "direct physical loss or damage." *Id.* ¶ 134.

The policy also contains coverage extensions, including Communicable Disease Coverage, which applies to, among other things, lost business income due to the suspension of operations "due to physical loss or damage to property at a location caused by or resulting from a covered communicable disease event[,]"[1] and a Civil Authority Coverage,

---

[1] The policy form at issue here is relatively unique in that it expressly includes virus-related coverage, and therefore shows that the presence of Coronavirus on the insured property is a covered cause of loss and satisfies the "direct physical loss or damage" trigger. This coverage and its impact on the trigger's interpretation is not at issue in this motion.

3

which extends the business interruption insurance to suspensions caused by civil authorities that arise from "direct physical loss or damage" to property within one mile of the Hotel. *Id.* ¶¶ 144, 150. The policies define many terms, but they do not define "direct physical loss or damage."

### B. Plaintiff's Losses

Like many small businesses in Washington, First and Stewart suffered excruciating losses from business interruption following the emergence of Coronavirus and COVID-19 at the Hotel. *Id.* ¶ 4. First and Stewart alleged that Coronavirus was present at the Hotel. *Id.* ¶¶ 31, 42–43, 99–100. Because Coronavirus cannot be removed through routine cleaning, its presence rendered the Hotel unsafe for use, forcing the Hotel initially to close and then to restrict the use of many of its amenities, including its restaurants, as well as to adopt expensive procedures to mitigate the damage and health risk posed by the presence of Coronavirus. *Id.* ¶¶ 31, 38–41, 104, 110, 123–24.

First and Stewart also alleged that it suffered losses due to Washington state and local government orders that limited the physical use of its property. *Id.* ¶¶ 31, 119, 44–45, 118–19, 122. For instance, on March 16, 2020, Washington Governor Jay Inslee issued an order closing

4

all "restaurants, bars, entertainment, and recreational facilities and limiting the size of gatherings." *Id.* ¶ 118. Governor Inslee found that Coronavirus and COVID-19 were, among other things, a "public disaster affecting … property." *Id.* A week later, based on a similar finding, Governor Inslee ordered Washingtonians to stay home except for essential activities, banned social gatherings, and closed non-essential businesses. *Id.* ¶ 119. These orders harmed the Hotel and nearby locations, increasing First and Stewart's losses. *Id.* ¶¶ 120–21.

## C. Plaintiff's Claims and Lawsuit

First and Stewart submitted timely claims for the business income lost and expenses incurred due to the presence of Coronavirus at the Hotel and the government orders. *Id.* ¶¶ 46, 125. After FFIC denied coverage, First and Stewart sued FFIC in King County Superior Court for breach and a declaration of coverage. ECF No. 1-1. FFIC removed to the Western District of Washington, which invited First and Stewart to consolidate its case with a group of Washington plaintiffs, ECF No. 8, but First and Stewart declined, ECF No. 12, and subsequently filed its Amended Complaint, ECF No. 19.

### D. The Orders in the Consolidated Cases

The plaintiffs in the consolidated cases moved to certify questions to the Washington Supreme Court, but the district court denied the motion.[2] A month later, on May 28, 2021, the court dismissed most of the cases. *See Nguyen v. Travelers Cas. Ins. Co. of Am.*, No. 2:20-CV-00597-BJR, 2021 WL 2184878 (W.D. Wash. May 28, 2021). Relying on what it described as the "overwhelming consensus" *of the federal courts*, *id.* at *5 & n.4—albeit in cases *not* applying Washington law—the district court held that the "direct physical loss or damage" requirement is clear and unambiguous and does not cover damages from COVID-19. *Id.* at *9–*12. Noting that "loss" is defined as "the act of losing possession," the court reasoned that a "direct physical loss" requires "the inability to physically own or manipulate the property, such as theft or total destruction" or "the inability to interact with the property because of an alteration to its physical status." *Id.* at *10, *11.

In making this ruling, the district court rejected the two trial court decisions that at that time had applied Washington law to COVID-19

---

[2] The plaintiffs moved to certify, *see Nguyen v. Travelers Cas. Ins. Co.*, No 2:20-cv-00597, ECF No. 79 (W.D. Wash. Feb. 18, 2021) (ECF No. 60), and the district court denied that motion. *See id.* (ECF No. 79).

6

coverage claims under all-risk property insurance policies. *Id*. at *12–*13. In reaching those decisions, two different Washington trial judges considered claims based on government orders restricting the use of property arising from Coronavirus and COVID-19 (but not the presence of Coronavirus on the premises). Both held that the "physical loss" trigger for coverage in all-risk insurance policies is reasonably interpreted to apply when a policyholder is deprived of the ability to physically use property. *See Hill and Stout PLLC v. Mut. of Enumclaw Ins. Co.*, No. 20-2-07925-1 SEA, 2020 WL 6784271, at *3 (Wash. Super. Ct., King Cty. Nov. 13, 2020); *Perry St. Brewing Co., LLC v. Mut. of Enumclaw Ins. Co.*, No. 20-2-02212-32, 2020 WL 7258116, at *3 (Wash. Super. Ct., Spokane Cty. Nov. 23, 2020). *But cf. Hill and Stout PLLC v. Mut. of Enumclaw Ins. Co.*, No. 20-2-07925-1 SEA, 2021 WL 4189778, at *3 (Wash. Super Ct., King Cty. Sept. 9, 2021) (subsequent conflicting trial court ruling).

The district court in *Nguyen* deemed these rulings "unpersuasive" because in its view they "discounted[ed]" the "physical" injury requirement and contradicted the "vast majority of those courts" to address the issue. *Nguyen*, 2021 WL 2184878, at *12. Instead, the court relied on two appellate decisions which the district court admitted "do

not address the specific type of losses COVID-19 causes." *Id.* at *13.[3] And it made no attempt to show the interpretations it rejected were unreasonable or otherwise contrary to Washington state law.

The plaintiffs in some of the consolidated cases moved for reconsideration because the district court ignored other, more favorable definitions of "loss." *See Vita Coffee LLC v. Fireman's Fund Ins. Co.*, No. 2:20-CV-01079-BJR, 2021 WL 3077922, at *3 (W.D. Wash. July 21, 2021). While not disputing this, the court denied the motion. It again pointed to the "physical" loss requirement and noted that its interpretation fit its understanding of the purpose of property insurance, which it described as "to insure … the business's physical property," *id.* at *3–6, ignoring that the purpose of business interruption insurance is to insure the use and monetization of the business' physical property.

---

[3] In addition, the appellate decisions concerned a homeowner's policy, *see Fujii v. State Farm Fire & Cas. Co.*, 857 P.2d 1051 (Wash. Ct. App. 1993), and a hull-risk policy, *see Wolstein v. Yorkshire Ins. Co.*, 985 P.2d 400 (Wash. Ct. App. 1999), rather than an all-risk policy, which is an exceedingly broad policy that covers everything that is not expressly excluded. *See, e.g.*, *Vision One, LLC v. Philadelphia Indem. Ins. Co.*, 174 Wash. 2d 501, 513 (2012).

8

### E. The Dismissal of Plaintiff's Claims

On July 22, 2021, the district court dismissed First and Stewart's claims. ECF No. 31.[4] The court relied on its rulings in the consolidated cases to reject most of First and Stewart's arguments. *Id.* at 4 n.4. It also ruled that the "voluminous medical and academic literature" concerning COVID-19's transmissibility cited in First and Stewart's pleadings did not distinguish their claims. *Id.* at 4–9. In so doing, the court again relied upon what it described as the "nearly uniform[]" rulings of federal courts and its understanding of the purpose of property insurance. *Id.* at 8–9.

## ARGUMENT

## I. IN KEEPING WITH BOTH COMITY AND FEDERALISM, CERTIFICATION ALLOWS STATE COURTS TO RESOLVE IMPORTANT ISSUES OF STATE LAW

Like most states, Washington allows federal courts to certify unsettled questions of state law to its Supreme Court. *See* WASH. REV. CODE § 2.60.010–900. As the Supreme Court has noted, this procedure "saves time, energy, and resources, and helps build a cooperative judicial

---

[4] For the Court's convenience, a copy of the district court's order is attached as Exhibit 1. In addition, the dismissal order and order denying reconsideration in the consolidated cases are attached as Exhibits 2 and 3.

9

federalism." *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974). In particular, it "strengthens the primacy of the state supreme court in interpreting state law by giving it the first opportunity to rule on an undecided or unclear issue" and thus "fosters values of federalism and comity in a way beneficial to state interests." *Kremen v. Cohen*, 325 F.3d 1035, 1037 n.1 (9th Cir. 2003). Accordingly, this Court has repeatedly certified unsettled questions of insurance law and other matters of Washington law to the Washington Supreme Court.[5]

## II. THE PROPOSED QUESTIONS SATISFY THE PREREQUISITES FOR CERTIFICATION

Washington law permits federal courts to certify questions to the Washington Supreme Court if two prerequisites are satisfied: "it is necessary to ascertain the local law of this state in order to dispose" of

---

[5] *See T-Mobile USA, Inc. v. Selective Ins. Co. of Am.*, 908 F.3d 581, 588 (9th Cir. 2018) (certifying insurance question); *Queen Anne Park Homeowners Ass'n v. State Farm Fire & Cas. Co.*, 763 F.3d 1232, 1235 (9th Cir. 2014) (same); *Cornhuskers Cas. Ins. Co. v. Kachman*, 514 F.3d 982, 988–89 (9th Cir. 2008) (same); *see also Bylsma v. Burger King Corp.*, 676 F.3d 779, 780 (9th Cir. 2012); *Perez-Farias v. Glob. Horizons, Inc.*, 669 F.3d 927, 928 (9th Cir. 2011); *J&J Celcom v. AT&T Wireless*, 481 F.3d 1138, 1142–43 (9th Cir. 2007); *Keystone Land & Dev. Co. v. Xerox Corp.*, 353 F.3d 1093, 1097 (9th Cir. 2003); *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 294 F.3d 1084, 1085 (9th Cir. 2002); *Broad v. Mannesmann Anlagenbau AG*, 196 F.3d 1075, 1076 (9th Cir. 1999).

the proceeding and "the local law has not been clearly determined." WASH. REV. CODE § 2.60.020. Both are satisfied here.

## A. The Questions Proposed for Certification are Determinative of Key Legal Issues in this Case

The first prerequisite for certification is satisfied here because the proposed questions raise controlling questions of Washington state law that may determine the outcome of this case and many others like it. *See, e.g., Broad v. Mannesmann Anlagenbau AG*, 196 F.3d 1075, 1076 (9th Cir. 1999) (certifying that "a question of Washington law is involved in this case which may determine the cause").

These questions—whether the presence of a toxic, noxious, or hazardous substance at the insured property that causes the loss, in whole or in part, of the functional use of the insured property constitutes a "direct physical loss," and whether loss, in whole or in part, of functional use of insured property due to state or local government orders concerning Coronavirus and COVID-19 constitutes such a "direct physical loss"—go to the very heart of the claims of First and Stewart (and a multitude of other Washington policyholders). As the district court noted, both the business interruption provisions and the extended coverages in the standard-form, all-risk policies at issue here "require

11

that coverage be triggered by direct physical loss or damage to covered property (or nearby property) in the first instance." ECF No. 31 at 3. Thus, if the Washington Supreme Court rules that loss, in whole or in part, of functional use due to the presence of a toxic, noxious, or hazardous substance such as Coronavirus at the insured property or due to shutdown orders constitutes "direct physical loss or damage," it will determine plaintiff's claims in this case as well as claims in cases brought by numerous other Washington policyholders. This is because coverage under virtually every all-risk commercial property insurance policy is triggered by some iteration of the "direct physical loss or damage"-type language set out in the proposed questions. Thus, the proposed questions are dispositive under Washington's certification statute and satisfy the first prerequisite for certification.

## B. Washington Law Concerning the Proposed Questions is Unsettled

The second prerequisite for certification is also satisfied because the proposed questions raise issues of local law that have not been clearly determined. Both questions concern the interpretation of insurance contracts, a textbook matter of state law because such contracts are generally governed by state law, *see, e.g.*, *In re Cty. of Orange*, 784 F.3d

12

520, 530 (9th Cir. 2015), and because the "supremacy of the States in the realm of insurance regulation" has been expressly recognized, *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 500 (1993) (discussing the McCarran-Ferguson Act, 15 U.S.C. § 1011, *et seq.*). Also, as explained below, Washington law concerning the proposed questions is unsettled.

As the district court noted, neither the Washington Supreme Court nor any Washington intermediate appellate court has addressed whether loss of the functional use of property, much less loss due to the presence of a substance at the insured property such as Coronavirus, constitutes a "direct physical loss" under an all-risk insurance policy. *See Nguyen*, 2021 WL 2184878, at *9; ECF No. 31 at 7. This absence alone shows that Washington law concerning the proposed questions is not clearly determined. *See Keystone Land & Dev. Co.*, 353 F.3d at 1096 (holding questions not "entirely settled" because "the Washington State Supreme Court has not yet answered [them] definitively").

The proposed questions have been addressed by several Washington trial court judges, which until last month had all found coverage. First, on November 13, 2020, in the *Hill and Stout* case, a King County Superior Court denied the insurer's motion to dismiss and held

13

that government orders restricting the dental practice policyholder's use of its office to emergency procedures only could meet its all-risk policy's requirement of "direct physical loss." *Hill and Stout PLLC*, 2020 WL 6784271. The court reached its holding by finding that the policy's "direct physical loss" trigger can be reasonably interpreted to mean deprivation of the physical use of the property absent any physical alteration to the property. *Id.* at *2. The judge reasoned that loss can be defined as "deprivation" and that, consistent with well-settled principles of interpretation, this definition gives "physical loss" a meaning distinct from "physical damage," which the policy also covered. *Id.* at *3.

Subsequently, a new judge handling the *Hill and Stout* case reversed course at a later stage in the proceedings. In granting the insurer summary judgment, that judge held that the policy required "some external physical force that causes direct physical change to the properties." *Hill and Stout PLLC*, 2021 WL 4189778, at *3. In so doing, the judge did not mention the contrary ruling earlier in the case, much

14

less explain why he was departing from it. *Id. But see id.* (citing *Nguyen v. Travelers Cas. Ins. Co.* on a different point).[6]

Other Washington judges have supported the initial ruling in *Hill and Stout*. On November 23, 2020, ten days after that initial ruling, a Spokane County Superior Court judge granted partial summary judgment to the policyholder and held that a policyholder suffered a covered loss when it "lost the ability to use its property … for its intended purpose" where government orders restricted the onsite operations of the policyholder's bar. *Perry St.*, 2020 WL 7258116, at *3. While not relying on the first *Hill and Stout* ruling, this judge likewise reasoned that loss can be defined as "deprivation," *id.* at *2, and that this definition gives "physical loss" a meaning distinct from "physical damage," *id.* at *3.

On September 3, 2021, after the summary judgment ruling in *Hill and Stout*, another King County judge interpreted a "physical loss" requirement to mean that the insured was "deprived of the ability to physically use, operate, or manipulate its property." *Snoqualmie Entm't*

---

[6] The policyholder plaintiff in *Hill and Stout* has sought direct review in the Washington Supreme Court of this later ruling based on the conflict among trial courts.

*Auth. v. Affiliated FM Ins. Co.*, No. 21-2-03194-0 SEA, 2021 WL 4098938, at *5 (Wash. Super. Ct. King Cty. Sept. 2, 2021). The court considered the intermediate appellate courts upon which the Western District of Washington in *Nguyen* relied in the consolidated cases, *see supra* p. 8 n. 2, but held them "not dispositive" because, among other things, they failed to "address the types of losses caused by the COVID-19 closure orders." *Snoqualmie*, 2021 WL 4098938, at *5 (discussing *Wolstein* and *Fujii*). The court also disagreed with *Nguyen*'s reliance on "other federal district court opinions across the country that applied the laws of other states." *Id.* at *6.

This conflict among the Washington trial courts confirms that the proposed questions have not been "clearly determined" and should be certified. *See J&J Celcom*, 481 F.3d at 1142 (approving certification where state decisions "seem to point in different directions").

## III. THERE ARE COMPELLING REASONS FOR CERTIFYING THE PROPOSED QUESTIONS

When the prerequisites for certification are satisfied, the decision whether to certify a question "rests in the sound discretion of the federal court." *Lehman Bros*, 416 U.S. at 391. That discretion should be exercised here in favor of certification.

16

*First,* the proposed questions raise issues of immense practical significance that should be resolved by Washington courts. Coronavirus and COVID-19 have had a devastating impact on many businesses, and as the "actions of hundreds of businesses" consolidated in the district court demonstrate, many of those businesses sought coverage under all-risk insurance policies. *See Nguyen*, 2021 WL 2184878, at *1. Consequently, resolution of the proposed questions will have "far-reaching effects" on Washington policyholders and insurers, which the Washington Supreme Court, rather than a federal court, should determine. *J&J Celcom*, 481 F.3d at 1142.

*Second*, the proposed questions raise public policy concerns that the Washington Supreme Court should resolve. The district court was under the impression that an "overwhelming majority" of *non-Washington* courts had formed opinions against coverage of COVID-19 claims. *Nguyen*, 2021 WL 2184878, at *9. Indeed, as the insurers in the consolidated cases acknowledged, the proposed questions have been addressed under the laws of thirty states, and the decisions concerning fourteen of them conflict with the others. *Marler v. Aspen Am. Ins. Co.*, No. 2:20-CV-00616 (W.D. Wash. Mar. 3, 2021) (ECF No. 67 at 31).

17

Moreover, Washington, not federal, courts should decide the meaning of the undefined "physical loss or damage" trigger language issued to countless Washington business and individual policyholders who purchased all-risk insurance policies. *See Kremen*, 325 F.3d at 1037 (observing that state law questions "with important public policy ramifications" should be certified). This central trigger issue is the common thread running through the multitude of COVID-19 business interruption actions in Washington's state and federal courts with billions of dollars in coverage hanging in the balance.

*Third*, certification will avoid unnecessary conflict between the state and federal courts. In the consolidated cases, the district court rejected the two then-existing Washington trial court rulings directly addressing COVID-19 business interruption claims because it deemed their reasoning "unpersuasive" and found other Washington decisions not dealing with such claims or all-risk policies more consistent with the views of non-Washington federal courts. *Nguyen*, 2021 WL 2184878, at *12–*13. Such treatment is troubling as a matter of both comity and federalism. By certifying the proposed questions to the Washington Supreme Court, this Court can avoid such issues going forward.

18

*Fourth*, certification will conserve judicial resources. Even before the emergence of Coronavirus and COVID-19, it typically took twelve to twenty months after notice of appeal to hold oral argument in this circuit and another three to twelve months to issue decisions. *Frequently Asked Questions*, http:/www.ca9.uscourts.gov/general/faq (last visited October 12, 2021). Earlier this year, the insurers in the consolidated cases recognized that it would likely take the Washington Supreme Court only nine-to-eleven months to answer certified questions. *See Nguyen*, No. 2:20-CV-00597, ECF No. 71 at 27 & n. 13 (W.D. Wash. Mar. 25, 2021). Thus, if certified to the Washington Supreme Court, the proposed questions would be answered well before oral argument could be held here, which would spare the Court time and effort predicting how the Washington Supreme Court would rule on those questions. But if certification is denied and this Court's prediction proves wrong, it will have prejudiced the rights of First and Stewart and potentially those of hundreds of other policyholders who desperately need coverage if it is, as they allege, available. For these reasons as well, the proposed questions should be certified to the Washington Supreme Court.

19

# CONCLUSION

The questions proposed by First and Stewart should be certified to the Washington Supreme Court. Because these issues are dispositive of other plaintiffs' claims, as well as those of First and Stewart, similar requests have been made in at least one other set of cases. *See, e.g., Nguyen v. Travelers Cas. Ins. Co.*, No. 21-35496, ECF No. 15 (9th Cir. Sept. 14, 2021). If any such requests are granted, First and Stewart asks that the questions proposed here be included in the relevant certification order. Alternatively, this appeal should be stayed pending response to the order or resolution of the appeal pending in *Hill and Stout PLLC v. Mut. of Enumclaw Ins. Co.*, No. 20-2-07925-1 SEA.

Date: October 18, 2021

/s/ Christopher S. Marks

| | |
|---|---|
| PILLSBURY WINTHROP SHAW PITTMAN LLP | TANENBAUM KEALE, LLP |
| Joseph D. Jean, Esq. | Christopher S. Marks, Esq. |
| Scott D. Greenspan, Esq. | Malika Johnson, Esq. |
| Benjamin D. Tievsky, Esq. | Alice C. Serko, Esq. |
| 31 West 52nd Street | One Convention Place |
| New York, NY 10019-6131 | 701 Pike Street, Suite 1575 |
| Telephone: (212) 858-1000 | Seattle WA 98101 |
| | Telephone: (206) 889-5150 |

*Attorneys for Plaintiff-Appellant*

20

# EXHIBIT 1

Order Granting Defendant's Motion to Dismiss

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FIRST AND STEWART HOTEL OWNER, )
LLC, a Delaware limited liability company, )
                             *Plaintiff*, )
                                      v. )
FIREMAN'S FUND INSURANCE )
COMPANY, a California corporation, )
                           *Defendant*. )

CASE NO. 2:21-cv-00344-BJR

ORDER GRANTING DEFENDANT'S
MOTION TO DISMISS

## I.    INTRODUCTION

Before the Court is Defendant's Motion to Dismiss Plaintiff's claims. Def.'s Rule 12(c) Mot. to Dismiss Pl.'s Am. Compl., Dkt. No. 19 ("Mot.").[1] Having reviewed the Motion, the oppositions thereto, the record of the case, and the relevant legal authorities, the Court will grant

---

[1] Plaintiff has requested oral argument. *See* Pl.'s Opp'n to Def.'s Rule 12(c) Mot. to Dismiss Pl.'s Am. Compl., Dkt. No. 27 ("Resp."). The Court determines that oral argument is unnecessary to resolve the Motion and will, therefore, deny the request. *See* Local Rules W.D. Wash. LCR 7(b)(4) ("Unless otherwise ordered by the court, all motions will be decided by the court without oral argument.").

1

Defendant's Motion.

## II.    BACKGROUND

This is one amongst a multitude of cases across the United States in which a business seeks coverage from its insurance company for income lost due to the COVID-19 pandemic. *See* Compl., Dkt. No. 1-1. This District has chosen to assign all such cases to the undersigned who consolidated the earliest of these actions into ten cases. *See, e.g.*, *Chorak v. Hartford Cas. Ins. Co.*, No. 20-cv-00627, 2020 WL 8611291 (W.D. Wash. Nov. 10, 2020). This Court recently published an Order in those cases holding there was no coverage for losses due to COVID-19. *See Nguyen v. Travelers Cas. Ins. Co.*, No. 20-cv-00597, 2021 WL 2184878 (W.D. Wash. May 28, 2021) ("Order on Consolidated Cases").

In that Order, the Court held that all of the relevant policies required "direct physical loss of or damage to" covered property to trigger coverage and COVID-19 did not cause such physical loss or damage. *Id.* at *9–13. Additionally, the Court held that extension provisions, such as Extra Expense or Civil Authority, failed to provide independent grounds for coverage where coverage was not triggered in the first instance. *Id.* at *13–14. The Court addressed the claims of businesses who, like Plaintiff in this case, sought coverage under a policy issued by Fireman's Fund. *Id.* at *26. In finding that the policies did not provide coverage, the Court examined unique Crisis Event Business Income, Communicable Disease Coverage, Dependent Property Coverage, and Business Access Coverage provisions—several of which Plaintiff here invokes—and found the provisions failed to offer independent grounds for coverage. The Court recently affirmed these holdings in an Order on Motion for Reconsideration brought by several Fireman's Fund plaintiffs. *See Vita Coffee LLC v. Fireman's Fund Ins. Co.*, Order on Mot. for Recons., 20-cv-01079, Dkt. No. 85

2

("Order on Mot. for Recons.").

## III. DISCUSSION

This case was filed after consolidation, and thus was not included in the Court's Order on Consolidated Cases. Plaintiff's Amended Complaint points to several provisions in its relevant insurance policies[2] as grounds for coverage. *See* Am. Compl., Dkt. No. 19 ¶¶ 134 (Business Income and Extra Expense Coverage); 144 (Communicable Disease Coverage); 146–47 (Dependent Property Coverage); 150 (Civil Authority Coverage); 152 (Business Access Coverage); 154 (Loss Avoidance or Mitigation Coverage); 156 (Extended Business Income and Extra Expense Coverage).

As the Court has already ruled, these provisions all require that coverage be triggered by direct physical loss or damage to covered property (or nearby property) in the first instance. *See* Policy at 29 (Business Income and Extra Expense Coverage); 44–45 (Communicable Disease Coverage); 41 (Dependent Property Coverage); 41 (Civil Authority Coverage); 41 (Business Access Coverage); 38 (Loss Avoidance or Mitigation Coverage); 42 (Extended Business Income and Extra Expense Coverage); *see also id.* at 75 (defining "covered cause of loss").[3] Given the Court's conclusion that COVID-19 does not cause physical loss or damage, these provisions fail

---

[2] The Parties' insurance agreement spans two policy periods and is contained in two separate policies. The first policy covers April 8, 2019 to April 8, 2020, *see* Decl. of Anthony Todaro, Ex. A, Dkt. No. 26-1 ("Policy"), and the second covers April 8, 2020 to April 8, 2021, *id.*, Ex. B, Dkt. No. 26-2. These policies are identical in their relevant aspects, except that they contain slightly different policy limits, and the Parties treat the common terms found in each policy interchangeably in advancing their arguments. *See, e.g.*, Am. Compl. ¶ 1; Mot. at 4. The Court, therefore, will cite only the first policy when describing the agreement's terms. *See* Policy. Additionally, as the policy uses an inconsistent numbering scheme, the Court will consistently refer to the page numbers derived from the file uploaded to the Court's Case Management/Electronic Case Files system.

[3] The Court has provided excerpts of the relevant policy provisions in Appendix A included at the end of this Order.

3

to provide coverage.

## IV.    FIRST AND STEWART'S ARGUMENTS

Plaintiff claims that there are two grounds that distinguish its case from those previously decided by the Court.[4]  First, that its policy contains an applicable Communicable Disease Coverage provision and, second, that its Amended Complaint is unique because it relies on "extensive reference to the latest scientific findings" to show that COVID-19 causes actual property loss—rather than mere economic loss—by "physically altering indoor air."  Resp. at 1. The Court is unpersuaded by these arguments.[5]

### A.  Communicable Disease Coverage Provision

Plaintiff claims coverage pursuant to the Communicable Disease Coverage provision[6] in

---

[4] Plaintiff reiterates several arguments already rejected by this Court.  *See* Resp. at 4–5 (claiming Washington precedents support finding physical loss or damage); *but see* Order on Consolidated Cases at *12–13 (examining Washington precedents and determining that the "Washington Supreme Court would decide that the term 'physical loss' requires dispossession of property"); Order on Mot. for Recons. at 6–8 (confirming the same); *see also* Resp. at 8–10 (arguing the documented actual presence of COVID-19 on the premises shows physical loss or damage); *but see* Order on Consolidated Cases at *11 (concluding that pleading actual presence is immaterial because COVID-19 harms people not property); Order on Mot. for Recons. at 13 (confirming the same); *see also* Resp. at 12–13 (claiming coverage under Civil Authority Coverage provision); *but see* Order on Consolidated Cases at *14 (rejecting coverage under similar Civil Authority Coverage provisions).  To the extent that Plaintiff repeats arguments already ruled on by the Court, the Court adheres to its previous rulings.

[5] Nor does the Court find convincing arguments that physical loss or damage is achieved by alterations to physical property made by Plaintiffs to mitigate the presence of the disease, such as installation of air filters or barriers.  *See, e.g.*, Resp. at 6 ("Attempting to make property exposed to Coronavirus safe thus requires numerous physical alterations to property . . . .").  In order to trigger coverage under Plaintiff's policies, the physical damage (or alterations) must be caused by the covered event, not by the policyholder.  Policy at 29 ("[W]e will pay for the actual loss of business income and necessary extra expense you sustain due to the necessary suspension of your operations during the period of restoration arising from direct physical loss or damage to property at a location, or within 1,000 feet of such location, *caused by or resulting from* a covered cause of loss.") (emphasis added). Plaintiff's Loss Avoidance or Mitigation Coverage provision does not alter this conclusion as it covers mitigation efforts related to a "covered loss or damage," which the Court has determined COVID-19 is not.  *See* Appendix A.

[6] *See* Appendix A.

4

its policies, pointing out that COVID-19 is unquestionably a communicable disease. *See* Am. Compl. ¶¶ 10, 47, 144–45; Resp. at 10–11, 13–14; *see also* Policy at 75.[7] This Provision is triggered, Plaintiff argues, because Plaintiff has pled the actual presence of COVID-19 on its premises through the confirmed cases of at least four employees and based on the statistical likelihood that additional cases on its premises went undetected. *See* Am. Compl. ¶¶ 31, 34, 42–43, 99–100, 106.

The Court addressed the same Fireman's Fund Communicable Disease Coverage provision—and arguments identical to Plaintiff's—in its Order on Consolidated Cases. *See* Order on Consolidated Cases at *28. As the Court explained in that Order, the Communicable Disease Coverage provision expressly incorporates the requirement for physical loss or damage, which COVID-19 does not cause, even when on the premises. *See* Policy at 44 ("We will pay for *direct physical loss or damage* to Property Insured caused by or resulting from a covered communicable disease event at a location . . . .") (emphasis added).

Furthermore, the Provision requires that operations be suspended as a result of a specific communicable disease event at the premises that forces a public health authority to close the property. Policy at 44, 75 (covering physical loss or damage "caused by or resulting from a covered communicable disease event" and defining a "communicable disease event" as "an event in which a public health authority has ordered that a location be evacuated, decontaminated, or disinfected due to the outbreak of a communicable disease at such location"). As this Court

---

[7] Defining "communicable disease" as "any disease, bacteria, or virus that may be transmitted directly or indirectly from human or animal to a human."

5

concluded, there was no coverage as "no public health authority issued an order specifically evacuating [the plaintiff's] premises in order to decontaminate or disinfect a known outbreak." Order on Consolidated Cases at * 28. The Court's reasoning applies to Plaintiff here.

**B. Physical Alteration of Indoor Air**

Plaintiff asserts that its claims are different from those previously addressed by the Court in that it has gathered voluminous medical and academic literature attesting to the fact that COVID-19 is transmissible through the air and, consequently, Plaintiff argues, the air inside its premises is physically altered causing physical loss and damage. *See* Resp. at 2–3, 5–6; Am. Compl. ¶¶ 71–98.[8] Plaintiff claims this argument is supported by a minority line of cases in which courts have determined that hazardous airborne substances—such as asbestos, ammonia, or noxious fumes—can trigger property coverage. Resp. at 7–8.

The Court finds this contention unpersuasive. Air is not covered property and, therefore, its alteration cannot constitute physical loss or damage. Plaintiff's policies affirmatively define Property Insured to cover only real property. Policy at 82 (defining "Property Insured" as "business real property, business personal property, or both"). To make this even more explicit, the policies exclude air as covered property. Policy at 29 (stating in Property Not Insured provision

_____

[8] The Court examined similar claims regarding the science of COVID-19's transmissibility in its recent Order on Motion for Reconsideration. *See* Order on Mot. for Recons. at 9–10. In that case, the plaintiffs claimed that in its Order on Consolidated Cases the Court overlooked scientific research showing that COVID-19 can be transmitted when virus-containing droplets land on business property with which humans subsequently come into contact. The Court rejected those claims, ruling that even accepting the allegations as true, such transmission only shows harm to the person to whom the virus is transmitted, not the property. To the extent that Plaintiff in this case advances the same arguments regarding transmission through inanimate business property—*see, e.g.*, Resp. at 2 ("As [Plaintiff] pleads in detail, risk of infection by Coronavirus, which causes COVID-19, renders indoor air, *objects, surfaces, and other areas exposed to the virus* dangerous and potentially fatal.") (emphasis added)—the same conclusion applies.

6

"[t]his Coverage Form does not insure any of the following property: . . . air"). Claims based on physical alteration of air are not covered.

Analogizing COVID-19 to other hazardous airborne substances does not alter this conclusion. In making this analogy, Plaintiff relies on a line of cases from out-of-jurisdiction courts which have held that, in some circumstances, hazardous airborne substances can cause physical loss or damage. *See Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002) (holding that the actual presence of asbestos in a building could constitute physical loss where asbestos was present and airborne in such quantities as "to make the structure uninhabitable and unusable"); *Or. Shakespeare Festival Ass'n v. Great Am. Ins. Co.*, No. 15-cv-01932, 2016 WL 3267247 (D. Or. June 7, 2016) (wildfire smoke and ash), *vacated*, No. 15-cv-01932, 2017 WL 1034203 (D. Or. Mar. 6, 2017); *W. Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52 (Colo. 1968) (gasoline fumes); *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.*, No. 12-cv-04418, 2014 WL 6675934 (D.N.J. Nov. 25, 2014) (ammonia). This argument has been addressed by courts across the country examining COVID-19, business property insurance, and physical loss and damage, which have nearly uniformly rejected the comparison. *See, e.g.*, *Kim-Chee LLC v. Phila. Indem. Ins. Co.*, No. 20-cv-1136, 2021 WL 1600831, at *5–6 (W.D.N.Y. Apr. 23, 2021); *Colgan v. Sentinel Ins. Co.*, No. 20-cv-04780, 2021 WL 472964 *3 n.4 (N.D. Cal. Jan. 26, 2021); *4431, Inc. v. Cincinnati Ins. Co.*, 504 F. Supp. 3d 368, 383–86 (E.D. Pa. 2020).

First, there is no indication the either the Ninth Circuit or Washington state caselaw has accepted the view that a "source[] unnoticeable to the naked eye"—such as asbestos—may cause physical loss of covered property. *Port Auth.*, 311 F.3d at 235–36. On the other hand, the Ninth

Circuit has previously rejected a claim that the discovery of asbestos in a building constituted physical loss where the "building remained physically unchanged." *Great N. Ins. Co. v. Benjamin Franklin Fed. Sav. & Loan Ass'n*, 953 F.2d 1387 (9th Cir. 1992) ("While [plaintiff] no doubt sustained consequential loss caused by the necessity of cleaning up the asbestos, we conclude that it did not sustain 'direct physical loss.'").

Furthermore, even accepting this line of cases, the majority of courts looking at this question have held COVID-19 does not cause the sort of all-encompassing loss *Port Authority* equated with physical damage. *See, e.g.*, *Moody v. Hartford Fin. Grp., Inc.*, No. 20-cv-2856, 2021 WL 135897, at *6 (E.D. Pa. Jan. 14, 2021) ("Neither the presence of the virus nor an imminent threat thereof . . . has 'nearly eliminated or destroyed' the property's functionality or rendered it 'useless or uninhabitable.'" (quoting *Motorists Mut. Ins. Co. v. Hardinger*, 131 F. App'x 823, 826–27 (3d Cir. 2005))). Unlike the hazardous airborne substances on which this line of cases focuses, "coronavirus poses a temporary health hazard to the occupants of a building, whose threat to human health dissipates with the passage of time." *Buffalo Xerographix, Inc. v. Sentinel Ins. Co.*, No. 20-cv-520, 2021 WL 2471315, at *4 (W.D.N.Y. June 16, 2021). Unlike such substances as asbestos or noxious, poisonous gases, COVID-19 "can be disinfected and cleaned" without resort to abatement efforts akin to asbestos. *Out W. Rest. Grp. Inc. v. Affiliated FM Ins. Co.*, No. 20-cv-06786, 2021 WL 1056627, at *5 (N.D. Cal. Mar. 19, 2021) (quoting *O'Brien Sales & Mktg., Inc. v. Transp. Ins. Co.*, No. 20-cv-02951, 2021 WL 105772, at *4 (N.D. Cal. Jan. 12, 2021)).

Plaintiff in essence seeks to recover economic losses resulting from the Governor's curtailment of certain businesses and business operations. Property insurance—such as the policies at issue here—is meant to cover the efforts and period of time necessary to restore a

8

business to working order. *See* Policy at 29 (Business Income and Extra Expense provision providing coverage "during the period of restoration").[9] Here, the presence of COVID-19 on Plaintiff's property did not cause damage to the property necessitating rehabilitation or restoration efforts similar to those required to abate asbestos or remove poisonous fumes which permeate property. Instead, all that is required for Plaintiff to return to full working order is for the Governor to lift the decrees and restrictions. *See* Order on Mot. for Recons. at 12 (first citing *Star Buick GMC v. Sentry Ins. Grp.*, No. 20-cv-03023, 2021 WL 2134289, at *6 (E.D. Pa. May 26, 2021); and then citing *Hair Studio 1208, LLC v. Hartford Underwriters Ins. Co.*, No. 20-cv-2171, 2021 WL 1945712, at *9 (E.D. Pa. May 14, 2021)). Plaintiff has not demonstrated a contamination rendering the property's function "nearly eliminated or destroyed, or the structure . . . made useless or uninhabitable . . . ." *Port Auth.*, 311 F.3d at 236. Therefore, there has been no physical loss or damage.

## V. CONCLUSION

Based on the foregoing, the Court hereby GRANTS Defendant's Motion and dismisses Plaintiff's claims with PREJUDICE.

DATED this 22nd day of July, 2021.

BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE

---

[9] *See also* Policy at 81 (defining "period of restoration" as "begin[ning] immediately after the time of direct physical loss or damage caused by a or resulting from a covered cause of loss to property" and ending "the earlier of: (1) the date when such property at the location should be repaired, rebuilt, or replaced with reasonable speed and like kind and quality; or (2) The date when business is resumed at a new permanent location.").

## Appendix A

II. Business Income and Extra Expense Coverage

A. If a Limit of Insurance for Business Income and Extra Expense is shown in the Declarations, then we will pay for the actual loss of business income and necessary extra expense you sustain due to the necessary suspension of operations during the period of restoration arising from *direct physical loss or damage* to property at a location, or within 1,000 feet of such location, caused by or resulting from a covered Cause of Loss.

1. Communicable Disease Coverage

a. (1) We will pay for *direct physical loss or damage* to Property Insured caused by or resulting from a covered communicable disease event at a location including the following necessary costs incurred to: . . .
(2) If the Declarations show a Limit of Insurance for Business Income and Extra Expense Coverage, then we will pay for the actual loss of business income and necessary extra expense you sustain due to [t]he [sic] necessary suspension of operations during the period of restoration[.] [sic] The suspension must be due to *direct physical loss or damage to property* at a location caused by or resulting from a covered communicable disease event.

4. Dependent Property Coverage

a. Dependent Property Coverage
(1) We will pay for the actual loss of business income and necessary extra expense you sustain due to the necessary suspension of operations during the period of restorations at a location.
(2) The suspension must be due to *direct physical loss or damage* at the location of a dependent property, situated inside or outside of the Coverage Territory, caused by or resulting from a covered cause of loss.

1. Business Access Coverage

a. We will pay for the actual loss of business income and necessary extra expense you sustain due to the necessary suspension of operations at a location if access to such location is impaired or obstructed. Such impairment or obstruction must: (1) Arise from *direct physical loss or damage* to property other than at such locations; and (2) Be caused by or result from a covered cause of loss; and (3) Occur within the number of miles stated in the Declarations from such location.

10

9. Loss Avoidance or Mitigation Coverage

    a. We will pay the necessary expense you incur to protect, avoid, or significantly mitigate potential *covered loss or damage* that is actually and imminently threatening Property Insured, including: (1) Removal of ice or snow from the roof or balconies of business real property that has accumulated during and due to a storm; (2) Pumping of standing water away from business real property that has accumulated during and due to a flood, hurricane, named storm, or storm; (3) Application of fire retardant foam or similar fire suppressing or extinguishing material to business real property as protection against an approaching fire; and (4) Boarding up or sandbagging of doors, windows, or other external openings in business real property as protection against approaching flood, hurricane, named storm, or storm. However, we will not pay for any loss, damage, or extra expense caused by or resulting from such loss prevention actions.

6. Extended Business Income and Extra Expense

    a. If a *business income and extra expense loss is covered under this Coverage Form*, then subject to the Limit of Business Income and Extra Expense Coverage: (1) We will pay . . .

13. Covered cause of loss means risks of *direct physical loss or damage* not excluded or limited in this Coverage Form.

    *All emphasis in the proceeding excerpts is added by the Court.

11

# EXHIBIT 2

Order granting MTD in Consolidated Case

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JENNIFER B NGUYEN, *et al.*, | CASE NO. 2:20-cv-00597-BJR |
| *Plaintiffs*, | ORDER GRANTING MOTIONS TO DISMISS |
| v. | |
| TRAVELERS CASUALTY INSURANCE COMPANY OF AMERICA, *et al.*, | |
| *Defendants*. | |
| WADE K MARLER DDC, *et al.*, | CASE NO. 2:20-cv-00616-BJR |
| *Plaintiffs*, | |
| v. | |
| ASPEN AMERICAN INSURANCE COMPANY, | |
| *Defendant*. | |
| PACIFIC ENDODONTICS PS, *et al.*, | CASE NO. 2:20-cv-00620-BJR |
| *Plaintiffs*, | |
| v. | |
| OHIO CASUALTY INSURANCE COMPANY, *et al.*, | |
| *Defendants*. | |

i

| | | |
|---|---|---|
| 1 | MARIO D CHORAK DMD PS, *et al.*, | )      CASE NO. 2:20-cv-00627-BJR |
| 2 |             *Plaintiffs*, | ) |
| 3 |         v. | ) |
| 4 | HARTFORD CASUALTY INSURANCE | ) |
| 5 | COMPANY, *et al.*, | ) |
| |             *Defendants*. | ) |
| 6 | MARK GERMACK DDS, | )      CASE NO. 2:20-cv-00661-BJR |
| 7 | | ) |
| 8 |             *Plaintiff*, | ) |
| 9 |         v. | ) |
| 10 | DENTISTS INSURANCE COMPANY | ) |
| |             *Defendant*. | ) |
| 11 | KARA MCCULLOCH DMD MSD PLLC, | )      CASE NO. 2:20-cv-00809-BJR |
| 12 | *et al.*, | ) |
| 13 |             *Plaintiffs*, | ) |
| 14 |         v. | ) |
| 15 | VALLEY FORGE INSURANCE | ) |
| 16 | COMPANY, *et al.*, | ) |
| 17 |             *Defendants*. | ) |
| 18 | ASPEN LODGING GROUP LLC, *et al.*, | )      CASE NO. 2:20-cv-01038-BJR |
| 19 |             *Plaintiffs*, | ) |
| 20 |         v. | ) |
| 21 | AFFILIATED FM INSURANCE | ) |
| 22 | COMPANY, | ) |
| |             *Defendant*. | ) |
| 23 | VITA COFFEE LLC, *et al.*, | )      CASE NO. 2:20-cv-01079-BJR |
| 24 |             *Plaintiffs*, | ) |
| 25 |         v. | ) |

1  FIREMAN'S FUND INSURANCE )
   COMPANY, *et al.*, )
2  )
   *Defendants*. )
3  _____ )

   LA COCINA DE OAXACA LLC, )          CASE NO. 2:20-cv-01176-BJR
4  )
   *Plaintiff*, )
5  )
   v. )
6  )
7  TRI-STATE INSURANCE COMPANY )
   OF MINNESOTA, )
8  )
   *Defendant*. )
9  _____ )
10 CARLOS O CABALLERO DDS, MS, PS, )   CASE NO. 2:20-cv-05437-BJR
   *et al.*, )
11 )
   v. )
12 )
13 MASSACHUSETTS BAY INSURANCE )
   COMPANY, *et al.*, )
14 )
   *Defendants*. )
15 _____ )

16

17

18

19

20

21

22

23

24

25

iii

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................ 1

II.  BACKGROUND ........................................................................................ 1

  A.  COVID-19 ........................................................................................... 1

  B.  The Structure of the Policies ............................................................. 3

    1.  General Coverage Provisions ........................................................ 4

    2.  Extension Provisions .................................................................... 5

    3.  Exclusion Provisions .................................................................... 6

  C.  Claims Against Insurance Companies ............................................. 6

  D.  Procedural History .......................................................................... 8

III. STANDARDS .......................................................................................... 10

  A.  Dispositive Motions ......................................................................... 10

  B.  Rules Governing Insurance Contract Interpretation ................... 12

IV.  GENERAL FINDINGS ......................................................................... 15

  A.  General Coverage Provisions ......................................................... 15

    1.  Direct Physical Loss or Damage ................................................ 15

      a.  *Direct Physical Damage to Property* ................................... 16

      b.  *Direct Physical Loss of Property* ....................................... 17

    2.  Washington State Precedents .................................................... 22

      a.  *Perry Street and Hill and Stout* ....................................... 22

      b.  *Other Washington Precedents* ........................................... 23

  B.  Extensions ....................................................................................... 25

iv

1. Business Income, Extra Expense, and Extended Business Income Provisions .............. 26

2. Civil Authority Provisions ........................................................................ 26

**C. Exclusions** ............................................................................................ **28**

1. Virus Exclusions ...................................................................................... 28

    *a. Pandemic vs. Virus* .............................................................................. 29

    *b. Efficient Proximate Cause* .................................................................. 29

    *c. Regulatory Estoppel* ........................................................................... 31

**D. Extra-Contractual Claims** ................................................................... **31**

**E. Leave to Amend** .................................................................................... **33**

**V. INDIVIDUAL CASES** ........................................................................... **34**

    **A. Defendant Affiliated FM Insurance Company (No. 20-cv-01038)** ............... **34**

      1. Case Background ................................................................................. 34

      2. Vancouver Clinic Plaintiff .................................................................. 38

        *a. Coverage* .................................................................................... 38

        *b. Recovery Limitations* ................................................................ 39

        *c. Extra-Contractual Claims* ......................................................... 40

      3. Aspen Lodging Plaintiffs ................................................................... 40

        *a. Choice of Law* ............................................................................ 41

        *b. Coverage* .................................................................................... 42

        *c. Extra-Contractual Claims* ......................................................... 43

    **B. Defendant Aspen American Insurance Company (20-cv-00616)** ............... **43**

      1. Case Background ................................................................................. 43

2. Disposition ...................................................................................... 44

    a. *Coverage* ................................................................................ 44

    b. *Plaintiff Tabaraie's Extra-Contractual Claims* ...................... 46

**C. Defendant CNA Financial Corporation (20-cv-00809)** .................................. **46**

1. Case Background ............................................................................. 46

2. Disposition ...................................................................................... 49

    a. *Coverage* ................................................................................ 49

    b. *Business Income for Interruption of Practice Endorsement* ...... 49

    c. *Extra-Contractual Claims* ...................................................... 51

**D. Defendant Fireman's Fund Insurance Company (20-cv-01079)** .................... **51**

1. Case Background ............................................................................. 51

2. Disposition ...................................................................................... 53

    a. *Coverage* ................................................................................ 53

    b. *ES Restaurant and Naccarato's Crisis Event Business Income Provision* ................. 54

    c. *Communicable Disease Coverage, Dependent Property Coverage, and Business Access Coverage Extensions* ........................ 55

3. Extra-Contractual Claims ................................................................ 57

**E. Defendant Hanover Insurance Group, Inc. (20-cv-05437)** ........................... **58**

1. Case Background ............................................................................. 58

2. Disposition ...................................................................................... 58

**F. Defendant The Hartford Financial Services Group (20-cv-00627)** ............. **59**

1. Case Background ............................................................................. 59

2.   Coverage ........................................................................................... 62

3.   Seattle Symphony's Virus Exclusion ............................................... 63

4.   Piroshky Plaintiffs' Additional Grounds for Coverage ................... 65

     *a.  Food Contamination Coverage*................................................ 65

     *b.  Dependent Property Coverage* ............................................... 67

5.   Extra-Contractual Claims .................................................................. 68

**G.  Defendant Liberty Mutual Holding Company Inc. (20-cv-00620) ............................... 68**

1.   Case Background ............................................................................... 68

2.   Disposition ........................................................................................ 69

**H.  Defendant Dentists Insurance Company (20-cv-00661) ...................................... 69**

1.   Case Background ............................................................................... 69

2.   Disposition ........................................................................................ 70

**I.  Defendant The Travelers Companies, Inc. (20-cv-00597)................................. 71**

1.   Case Background ............................................................................... 71

2.   Disposition ........................................................................................ 71

**J.  Defendant Tri-State Insurance Company of Minnesota (20-cv-01176).................... 72**

1.   Case Background ............................................................................... 72

2.   Disposition ........................................................................................ 72

**VI. CONCLUSION ............................................................................................ 73**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## I.    INTRODUCTION

Before the Court are the consolidated actions of hundreds of businesses from across Western Washington State who have turned to their insurance policies to cover lost income stemming from the COVID-19 pandemic.  In response to the numerous cases being filed, and the commonality of their claims, this District assigned all such matters to the undersigned, who ordered consolidation and coordinated briefing on dispositive motions.

While the Court is sympathetic to the plight of businesses in this difficult time, today it joins the majority of those courts around the country who have addressed similar claims and finds that the businesses in question are not entitled to coverage under their insurance policies.  Like the overwhelming consensus that has formed, this Court determines that COVID-19 does not cause the physical loss or damage to property required as a condition precedent to trigger coverage in all the relevant policies.  As such, the Court will grant the motions for dismissal before it in accordance with the following.[1]

## II.    BACKGROUND

### A.  COVID-19

COVID-19 is a viral illness that has reached pandemic proportions throughout the world. *See* *Covid-19*, CENTERS FOR DISEASE CONTROL AND PREVENTION,

---

[1] Many of the Parties have requested oral argument.  The Court determines that oral argument is unnecessary to resolve the motions and will, therefore, deny the requests.  *See* Local Rules W.D. Wash. LCR 7(b)(4) ("Unless otherwise ordered by the court, all motions will be decided by the court without oral argument.").

1

https://www.cdc.gov/coronavirus/2019-nCoV/index.html (last visited May 28, 2021).[2]  In Washington State, the Governor responded to the pandemic caused by COVID-19's spread by issuing a series of Proclamations declaring a state of emergency and severely limiting, or closing, businesses, schools, and public gatherings.  *See Proclamations*, OFFICE OF THE GOVERNOR OF WASHINGTON, https://www.governor.wa.gov/office-governor/official-actions/proclamations (last visited May 28, 2021).

All types of businesses were affected, including dentists, *see Germack v. Dentists Ins. Co.*, No. 20-cv-00661, restaurants, *see La Cocina de Oaxaca LLC v. Tri-State Ins. Co. of Minn.*, Compl., No. 20-cv-01176, law firms, *see Owen Davies, P.S. v. Nat'l Fire Ins. Co. of Hartford*, No. 20-cv-06155, barbershops, *see J Bells, LLC v. Sentinel Ins. Co. Ltd.*, 20-cv-05820, the Symphony, *see Seattle Symphony Orchestra v. Hartford Fire Ins. Co.*, No. 20-cv-01252, and even the Courthouse itself, *see COVID-19 (Coronavirus) and Court Operations*, UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON, https://www.wawd.uscourts.gov/node/614 (last visited May 28, 2021).

Impacted businesses also span the jurisdiction of the Western District of Washington.  *See, e.g.*, *Mikkelson v. Aspen Am. Ins. Co.*, No. 20-cv-05378 (Olympia); *Prato v. Sentinel Ins. Co. Ltd.*, No. 20-cv-05402 (Tacoma); *Caballero v. Mass. Bay Ins. Co.*, No. 20-cv-05437 (Bremerton); *Vancouver Clinic Inc. P.S. v. Affiliated FM Ins. Co.*, No. 20-cv-05605 (Vancouver); *Canlis Inc. v.*

---

[2] The Court may "take judicial notice of the undisputed and publicly available information displayed on government websites."  *King v. County of Los Angeles*, 885 F.3d 548, 555 (9th Cir. 2018).

*Fireman's Fund Ins. Co.*, 21-cv-00373 (Seattle).

In response to severe limitations on their operations, many businesses turned to their insurance policies to recover lost wages and reduced income. This is a common story across the country as similar governmental restrictions designed to prevent the spread of the disease constricted access to every form of operation. Near uniformly, insurance companies denied the claims.

**B. The Structure of the Policies**

The structure of the insurance policies at issue in these cases is such that their commonalities permit the Court to address the underlying questions raised by this litigation in an inclusive ruling.

The insurance policies issued to the businesses bringing suit before this Court are of a type referred to as "all-risk" policies, in that that they insure against all risks, as compared to specific, enumerated risks. *See, e.g.*, *C. H. Leavell & Co. v. Fireman's Fund Ins. Co.*, 372 F.2d 784, 787 (9th Cir. 1967) ("An 'all risks' policy creates a special type of coverage extending to risks not usually covered under other insurance, and recovery under an 'all risk' policy will be allowed for all fortuitous losses . . . unless the policy contains a specific provision expressly excluding the loss from coverage."); *Vision One, LLC v. Phila. Indem. Ins. Co.*, 276 P.3d 300, 306 (Wash. 2012) (internal quotation and citation omitted) ("All-risk policies . . . provide coverage for all risks unless the specific risk is excluded."); *see also Nature and Scope of Coverage*, 10A Couch on Ins. § 148:50 (3d ed. 2020). All-risk policies, especially the ones before the Court, rely on three general types of provisions to establish what perils the policy does, and does not, cover.

3

*1. General Coverage Provisions*

The first is a general coverage provision, which establishes a condition precedent to trigger coverage in the first instance. In the all-risk business insurance policies before the Court, the trigger is some derivation of the term "direct physical loss of or damage to" the property covered by the policy.

For example, the insurance policy covering Dr. Carlos O. Caballero, who owns and operates Master Orthodontics in Bremerton, Washington, states that

> We [*i.e.*, the insurance company] will pay for the actual loss of Business Income you [*i.e.*, the business] sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by *direct physical loss of or damage to a described premises* shown in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations.

*Caballero*, Decl. of John A. Bennett, Ex. 1, No. 20-cv-05437, Dkt. No. 57 at 66[3] (Policy of Carlos O. Caballero DDS, MS, PS, "Caballero Policy") (emphasis added).

Based on this clause, the policy provides coverage for lost Business Income, which is defined and elaborated elsewhere in the policy, but only where a "direct physical loss of or damage to" the property covered by the policy has occurred.

Not all of the relevant policies use this exact construction. For example, the policy of Dr. Wade K. Marler DDS, who operates a family dentistry practice in Covington, Washington, states that "[w]e will pay for all direct physical damage to covered property at the premises described on the Declarations caused by or resulting from any covered cause of loss." *Marler v. Aspen Am. Ins.*

---

[3] As the policies at issue in this case use inconsistent numbering conventions, the Court will consistently refer to the page number derived from the file uploaded to the Court's Case Management/Electronic Case Files system.

4

*Co.*, Decl. of Robin Wechkin, Ex. A, No. 20-cv-00616, Dkt. No. 51-1 at 8 ("Marler Policy"). The Policy defines "covered cause of loss" as "ALL RISK OF DIRECT PHYSICAL LOSS . . . ." *Id.* at 25 (emphasis in original). Thus, while the Policy does not use the exact phrase "direct physical loss of or damage to," as contained in Dr. Caballero's policy, Dr. Marler's policy incorporates the same requirements of "direct" "physical" "loss" or "damage." All policies in this litigation tie coverage to direct physical loss or damage.

### 2. *Extension Provisions*

The second type of provision is an extension provision. Generally, extension provisions operate so as to either define the benefits an insured is entitled to once coverage has been triggered or to provide additional benefits beyond those covered, so long as coverage is triggered in the first instance and the requirements of the extension are met. The commonality between these two types of extensions is that they extend benefits once the condition precedent of the general coverage provision has been fulfilled. For an example of the former, extension provisions such as Extra Expense or Extended Business Income usually appear in close proximity to a general coverage provision and define the types of losses covered in case of a covered loss, as exemplified by the following from the policy of Stan's Bar-B-Q in Issaquah, Washington:

> b. Extra Expense
> (1) Extra Expense means reasonable and necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss.

*Nguyen v. Travelers Cas. Ins. Co. of Am.*, Defs.' Revised Mot. to Dismiss the Consolidated Am. Class Action Compl., Ex. F., No. 20-cv-00597, Dkt. No. 53-6 at 20 ("Stan's Bar-B-Q Policy").

The latter type of extension provision provides additional criteria which must be met before

5

its benefits are available.  A common example of this type of extension is a Civil Authority

provision, as exemplified by the following, also from the policy of Stan's Bar-B-Q:

> G. Civil Authority
> (1) When the Declarations show that you have coverage for Business Income and
> Extra Expense, you may extend that insurance to apply to the actual loss of Business
> Income you sustain and reasonable and necessary Extra Expense you incur caused
> by action of civil authority that prohibits access to the described premises. The civil
> authority action must be due to direct physical loss of or damage to property at
> locations, other than described premises, that are within 100 miles of the described
> premises, caused by or resulting from a Covered Cause of Loss.

*Id.* at 32.

### 3. *Exclusion Provisions*

The final type of relevant provisions are exclusion clauses.  These provisions remove from

coverage types of losses, or causes of losses, that would otherwise be triggered by a general

coverage provision.  In this litigation, common exclusion provisions include Virus, Consequential

Loss, Ordinance or Law, and Act or Decision clauses.  Of particular relevance here is the Virus

exclusion, which is exemplified by the policy of Dr. Kuzi Hsue, DDS, PS, who owns and operates

a dentistry practice in Tukwila, Washington:

> B. We will not pay for loss or damage caused by or resulting from any virus,
> bacterium or other microorganism that induces or is capable of inducing physical
> distress, illness or disease.

*Nguyen*, Defs.' Revised Mot. to Dismiss the Consolidated Am. Class Action Compl., Ex.
D., No. 20-cv-00597, Dkt. No. 53-4 at 193 ("Hsue Policy").

### C.  Claims Against Insurance Companies

Based primarily on the reasoning that COVID-19, as a virus, does not cause harm to or loss

of physical property, insurance companies across the United States have denied businesses' claims

for lost income pursuant to their all-risk business insurance policies.  *See, e.g.*, *Vita Coffee LLC v.*

*Fireman's Fund Ins. Co.*, Notice of Removal, Ex. 1, 20-cv-01079, Dkt. No. 1-1 ¶ 3.70 (Complaint of Vita Coffee LLC). Many insurance companies also denied coverage based on the exclusion clauses listed above. *See, e.g.*, *id.* In response, the businesses filed suit.

The suits before this Court advance some combination of six separate causes of action. *See, e.g.*, *Owen Davies*, Compl., No. 20-cv-06155, Dkt. No. 1 ¶¶ 70–91. These include (1) Declaratory Relief seeking a determination that the businesses' losses and expenses resulting from interruption of business are covered by the businesses' policies; (2) Breach of Contract based on the insurance companies' denials of coverage; (3) Insurance Bad Faith or Failure to Act in Good Faith based on the claim that the insurance companies unreasonably denied coverage or failed to reasonably investigate the businesses' claims; (4) violation of the Washington Consumer Protection Action ("WCPA"), WASH. REV. CODE § 19.86, *et seq.*; (5) violation of the Washington Insurance Fair Conduct Act ("IFCA"), WASH. REV. CODE § 48.30.015; and (6) Negligence. *Id.*

All of the Complaints before the Court advance at least the first two foregoing causes of action, which the Court will refer to as the "Contractual Claims" as they involve allegations related to the insurance contracts themselves. The "Extra-Contractual Claims," or the other four causes of action, generally address the propriety of the insurance companies' conduct in denying coverage. Additionally, some of the Complaints advance class action allegations seeking to represent similarly situated plaintiffs across the State and country, *see, e.g.*, *Cascadia Dental Specialists, Inc. v. Am. Fire and Cas. Co.*, Compl., No. 20-cv-00732, Dkt. No. 1 ¶¶ 29–39, while others include only the individually named plaintiff, *see, e.g.*, *Strelow v. Hartford Cas. Ins. Co.*, Compl. No. 20-cv-00797, Dkt. No. 1.

As mentioned previously, these lawsuits are prevalent across the country. The Judicial

Panel on Multidistrict Litigation denied consolidation in an order dated August 12, 2020.  *See In re COVID-19 Bus. Interruption Prot. Ins. Litig.*, 482 F. Supp. 3d 1360 (J.P.M.L. 2020).  The University of Pennsylvania Carey Law School's COVID Coverage Litigation Tracker ("CCLT") has been monitoring the number of similar cases filed, and their outcomes.  *See COVID Coverage Litigation Tracker*, University of Pennsylvania Carey School of Law, https://cclt.law.upenn.edu/ (last visited May 28, 2021).  As of the date of this Order, the CCLT has tracked at least 1,766 similar cases filed in federal or state court.  *Id.*  Of those cases which have published rulings on dispositive motions similar to those before this Court, the majority have granted dismissal, finding no coverage.[4]

**D.  Procedural History**

The cases before the Court were transferred to the undersigned on an *ad hoc*, one-by-one basis as they were filed.  *See, e.g.*, *Chorak*, Order Reassigning Case, No. 20-cv-00627, Dkt. No. 18 (issued Sept. 9, 2020).[5]  On September 29, 2020, the Court published its First Scheduling Order directing all of the parties to meet and confer to discuss the commonalities in their cases and

---

[4] As of the date of this Order, of the 292 total orders issued in federal court, 237 have granted full dismissal with prejudice, 30 full dismissal without prejudice, 22 have denied motions to dismiss, and 3 have granted partial dismissal with prejudice.

[5] It is worth briefly noting that the undersigned continues to receive similar cases after ordering consolidation of actions.  Some of these cases named an insurance group involved in the consolidated cases named above and, as such, the Court ordered consolidation and consideration with the already existing consolidated case.  *See, e.g.*, *13 Coins Management LLC v. Nat'l Surety Corp.*, Min. Order, No. 21-cv-00178, Dkt. No. 8.  Other cases named completely new insurance groups.  *See, e.g.*, *Wellington Athletic Club LLC v. Allied World Surplus Lines Ins. Co.*, No. 21-cv-00256.  Several of the newest cases have filed their own Motions to Dismiss, which the Court will rule on separately in accordance with the principles established herein.  *See, e.g.*, *HT-Seattle Owner LLC v. Am. Guar. and Liab. Ins. Co.*, 21-cv-00048; *Cadeceus LLC v. Scottsdale Ins. Co.*, No. 21-cv-00050; *B and F Enter. Nw. LLC v. AMCO Ins. Co.*, 21-cv-00272; *First and Stewart Hotel Owner LLC v. Fireman's Fund Ins. Co.*, 21-cv-00344.

whether consolidation was possible. *See id.*, First Scheduling Order, Dkt. No. 21. The Court held a hearing on consolidation on November 9, 2020. *Id.*, Min. Order, Dkt. No. 27 (setting case management conference).

Subsequently, the Court—with the cooperation of the Parties—issued a series of orders consolidating all the matters before it to date into the ten consolidated actions currently before the Court. *See id.*, Order on Consolidation, Dkt. No. 38. Each consolidated action represents one group of affiliated insurance companies. The ten cases are as follows:

A. *Aspen Lodging Group LLC v. Affiliated FM Ins. Co.*, No. 20-cv-01038 (Affiliated FM Insurance Company);

B. *Marler v. Aspen Am. Ins. Co.*, No. 20-cv-00616 (Aspen American Insurance Company);

C. *McCulloch v. Valley Forge Ins. Co.*, No. 20-cv-00809 (CNA Financial Corporation);

D. *Vita Coffee LLC v. Fireman's Fund Ins. Co.*, No. 20-cv-01079 (Fireman's Fund Insurance Company);

E. *Caballero v. Mass. Bay Ins. Co.*, No. 20-cv-05437 (The Hanover Insurance Group, Inc.);

F. *Chorak v. Hartford Cas. Ins. Co.*, No. 20-cv-00627 (The Hartford Financial Services Group);

G. *Pacific Endodontics PS v. Ohio Cas. Ins. Co.*, No. 20-cv-00620 (Liberty Mutual Holding Company Inc.);

H. *Germack v. Dentists Ins. Co.*, No. 20-cv-00661 (The Dentists Insurance Company);

I. *Nguyen v. Travelers Cas. Ins. Co. of Am.*, No. 20-cv-00597 (The Travelers Companies, Inc.); and

J. *La Cocina de Oaxaca LLC v. Tri-State Ins. Co. of Minn.*, No. 20-cv-01176 (Tri-State Insurance Company of Minnesota).

Each Defendant insurance group filed at least one dispositive motion (either a Motion to

9

Dismiss, Motion for Judgment on the Pleadings, or Motion for Summary Judgment) or adopted a dispositive motion already pending in a pre-consolidation case filed against them. In opposition to the dispositive motions, the Plaintiffs in seven of the ten consolidated cases chose to file the same Omnibus Response in each of their cases, jointly addressing the common issues present in all of their cases. *See Chorak*, Pls.' Omnibus Opp'n to Defs.' Mots. to Dismiss, No. 20-cv-00627, Dkt. No. 64 ("Omnibus Resp.").[6] The Defendants in those seven cases, in turn, filed an Omnibus Reply. *See id.*, Defs.' Omnibus Reply in Support of their Mots. to Dismiss and for J. on the Pleadings, Dkt. No. 73 ("Omnibus Reply").[7] The other cases which did not file the omnibus briefing followed the same timeline as the omnibus group but chose to file individual responses and replies.[8]

## III.  STANDARDS

### A. Dispositive Motions

As mentioned previously, all of the defendant insurance companies in these cases have

---

[6] The Omnibus Response was filed in the following cases: *Marler*, No. 20-cv-00616, Dkt. No. 58; *McCulloch*, No. 20-cv-00809, Dkt. No. 56; *Chorak*, No. 20-cv-00627, Dkt. No. 64; *Pacific Endodontics*, No. 20-cv-00620, Dkt. No. 53; *Caballero*, No. 20-cv-05437, Dkt. No. 63; *Nguyen*, No. 20-cv-00597, Dkt. No. 58; *La Cocina de Oaxaca*, No. 20-cv-01176, Dkt. No. 52.

[7] The Omnibus Reply was filed in the following cases: *Marler*, No. 20-cv-00616, Dkt. No. 67; *McCulloch*, No. 20-cv-00809, Dkt. No. 65; *Chorak*, No. 20-cv-00627, Dkt. No. 73; *Pacific Endodontics*, No. 20-cv-00620, Dkt. No. 64; *Caballero*, No. 20-cv-05437, Dkt. No. 72; *Nguyen*, No. 20-cv-00597, Dkt. No. 67; *La Cocina de Oaxaca*, No. 20-cv-01176, Dkt. No. 61.

[8] Several of the consolidated cases, as well as some of the non-consolidated cases, also filed a Motion to Certify Questions to the Washington State Supreme Court. *See, e.g.*, *Chorak*, Pls.' Mot. to Certify Questions to the Wash. Supreme Ct., No. 20-cv-00627, Dkt. No. 66. On April 23, 2021, this Court issued an order denying that Motion. *See id.*, Order Den. Mot. to Certify Questions to the Wash. Supreme Court, Dkt. No. 85.

1
2
3
4
5
6

filed at least one dispositive motion.[9]  Some filed a Motion to Dismiss Pursuant to FRCP 12(b), *see, e.g.*, *Nguyen*, Defs. Revised Mot. to Dismiss the Consolidated Am. Class Action Compl., No. 20-cv-00597, Dkt. No. 53; others filed a Motion for Judgment on the Pleadings pursuant to FRCP 12(c), *see, e.g.*, *Pacific Endodontics*, Defs.' Mot. for J. on the Pleadings, No. 20-cv-00620, Dkt. No. 46; and others still filed a Motion for Summary Judgment pursuant to FRCP 56, *see, e.g.*, *Germack*, Defs.' Mot. for Summ. J., No. 20-cv-0061, Dkt. No. 35.

7
8
9
10
11
12
13
14
15
16
17
18
19

All three types of motions test the legal sufficiency of a plaintiff's claims.  Under FRCP 12(b), a complaint should be dismissed where the plaintiff "fail[s] to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  Similarly, pursuant to FRCP 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings," which is assessed under the same standard as FRCP 12(b).  FED. R. CIV. P. 12(c); *see also Gregg v. Haw. Dep't of Pub. Safety*, 870 F.3d 883, 887 (9th Cir. 2017) (quoting *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011) ("Because a Rule 12(c) motion is 'functionally identical' to a Rule 12(b)(6) motion, 'the same standard of review applies to motions brought under either rule.'")).  Summary Judgment pursuant to FRCP 56 holds that a motion should be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).

20
21
22

In a motion to dismiss and motion on the pleadings, the Court must "accept the allegations

23
24
25

---

[9] Some Defendants filed more than one dispositive motion if the plaintiffs in their consolidated matter filed separate complaints.

in [the] complaint as true and construe the pleadings in the light most favorable to [the plaintiff]." *Young v. State*, 992 F.3d 765, 778 (9th Cir. 2021); *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). In doing so, the Court is limited to reviewing materials that are submitted with, and attached to, the complaint; matters appropriate for judicial notice; and unattached evidence on which the complaint "necessarily relies." *Beverly Oaks Physicians Surgical Ctr., LLC v. Blue Cross & Blue Shield of Ill.*, 983 F.3d 435, 439 (9th Cir. 2020). During a motion for summary judgment, the Court "view[s] justifiable inferences in the light most favorable to the nonmoving party" but, at the same time, "the nonmoving party 'may not rest upon mere allegations or denials of its pleading.'" *Momox-Caselis v. Donohue*, 987 F.3d 835, 841 (9th Cir. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)).

Most of the cases currently before the Court have not conducted discovery. The Court stayed all discovery at the request of the Parties in most of the cases pending consideration of the dispositive motions. *See, e.g.*, *Chorak*, Scheduling Order, No. 20-cv-00627, Dkt. No. 39 at 1.[10] Based on the lack of discovery, and the fact that the Court directed the Parties to address largely issues of law in their dispositive motions concerning coverage and exclusions, the Court will evaluate all of the Motions according to the FRCP 12(b) and 12(c) standard and consider only the evidence appropriate to those types of motions.

**B. Rules Governing Insurance Contract Interpretation**

Determining whether the insurance policies at issue cover the type of losses claimed by the

---

[10] The Court permitted limited discovery in one case to address a choice of law issue. *See Aspen Lodging*, Min. Entry, No. 20-cv-01038, Dkt. No. 27.

Plaintiffs requires the Court to interpret the terms of the relevant insurance policies.

Federal Courts sitting pursuant to diversity jurisdiction, as here, apply state substantive law, including the state substantive law regarding insurance policy interpretation. *See Indian Harbor Ins. Co. v. City of Tacoma Dep't of Pub. Utilities*, 354 F. Supp. 3d 1204, 1212 (W.D. Wash. 2018) (citing *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996)). Under Washington law, "[c]onstruction of an insurance policy is a question of law for the courts, the policy is construed as a whole, and the policy should be given a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." *Queen Anne Park Homeowners Ass'n v. State Farm Fire & Cas. Co.*, 352 P.3d 790, 792 (Wash. 2015) (quoting *Queen City Farms, Inc. v. Cent. Nat. Ins. Co. of Omaha*, 882 P.2d 703, 712 (Wash. 1994)).

"In construing the language of an insurance policy," the Court looks to "the entire contract, [which] must be construed together so as to give force and effect to each clause." *Boeing Co. v. Aetna Cas. & Sur. Co.*, 784 P.2d 507, 511 (Wash. 1990). Undefined terms within a policy are to be given their "plain, ordinary, and popular meaning." *Xia v. ProBuilders Specialty Ins. Co.*, 400 P.3d 1234, 1240 (Wash. 2017) (quoting *Key Tronic Corp. v. Aetna (CIGNA) Fire Underwriters Ins. Co.*, 881 P.2d 201, 207 (Wash. 1994)). In determining this meaning, the Court may reference standard English language dictionaries. *Kut Suen Lui v. Essex Ins. Co.*, 375 P.3d 596, 601 (Wash. 2016); *see also Feenix Parkside LLC v. Berkley N. Pac.*, 438 P.3d 597, 603 (Wash. Ct. App. 2019).

If an undefined term is ambiguous, it "must be construed against the insurer and in favor of the insured." *Holden v. Farmers Ins. Co. of Wash.*, 239 P.3d 344, 347 (Wash. 2010). A term is considered to be ambiguous where "it is susceptible to more than one reasonable interpretation." *Id.*; *see also McLaughlin v. Travelers Com. Ins. Co.*, 476 P.3d 1032, 1037 (Wash. 2020). In

13

determining whether ambiguity exists, the Court may look to "context and the intent of parties." *Holden*, 239 P.3d at 347. Where, however, the language of a policy is clear and unambiguous, the Court "must enforce the policy as it is written and may not modify the policy or create ambiguity where none exists." *Mass. Bay Ins. Co. v. Walflor Indus., Inc.*, 383 F. Supp. 3d 1148, 1157 (W.D. Wash. 2019) (citing *Pub. Util. Dist. No. 1 of Klickitat Cnty. v. Int'l Ins. Co.*, 881 P.2d 1020, 1025 (Wash. 1994)).[11]

Determining whether coverage exists is a two-step process. *See Overton v. Consol. Ins. Co.*, 38 P.3d 322, 329 (Wash. 2002); *see also Black v. Nat'l Merit Ins. Co.*, 226 P.3d 175, 178 (Wash. Ct. App. 2010). "The burden first falls on the insured to show its loss is within the scope of the policy's insured losses. If such a showing has been made, the insurer can nevertheless avoid liability by showing the loss is excluded by specific policy language." *Overton*, 38 P.3d at 329 (citing *McDonald v. State Farm Fire & Cas. Co.*, 837 P.2d 1000, 1003–04 (Wash. 1992)). In other words, in the two-step process the Court first looks to see if there is coverage under a general coverage provision and then turns to whether an exclusion subsequently removes coverage. In the latter step, exclusionary clauses are "strictly construed against the insurer." *Webb v. USAA Cas. Ins. Co.*, 457 P.3d 1258, 1266 (Wash. Ct. App. 2020).

---

[11] To the extent that Plaintiffs rely on *American Best Food, Inc. v. Alea London, Ltd.*, 229 P.3d 693 (Wash. 2010), to argue that the Washington Supreme Court has established a rule of interpretation requiring courts evaluating Washington law to find ambiguity in an insurance contract where there is conflicting out-of-state precedent on an undecided question within the State, the Court is unconvinced. *See* Omnibus Resp. at 10, 16–20. In that case, the Washington Supreme Court announced no rules or presumptions and did no more than look to out-of-state precedents when no in-state precedent applied to the specific question it sought to answer. *See Am. Best Food*, 229 P.3d at 697–99. This Court will do the same.

14

## IV.    GENERAL FINDINGS

The Court divides the remainder of this Order into two sections.  The first will examine applicable questions of coverage and exclusions based on the common terms contained in all the insurance policies at issue.  The Court will then proceed to apply its general findings to the specific cases at issue, addressing any unique aspects of those cases.

### A. General Coverage Provisions

#### 1.   *Direct Physical Loss or Damage*

As noted above, all the insurance policies at issue require some form of the phrase "direct physical loss of or damage to" covered property to trigger coverage in the first instance.  No Washington State appellate court has addressed whether COVID-19, in concert with the Governor's Proclamations, causes direct physical loss or damage.  Two Washington trial courts have examined this question and determined that the term is at least ambiguous as to COVID-19-related losses, and, thus, coverage applies.  *See Perry Street Brewing Co. v. Mut. of Enumclaw Ins. Co.*, No. 20-2-02212-32, 2020 WL 7258116 (Wash. Super. Ct. Nov. 23, 2020); *Hill and Stout PLLC v. Mut. of Enumclaw Ins. Co.*, No. 20-2-07925-1 SEA, 2020 WL 6784271, at *1 (Wash. Super. Ct. Nov. 13, 2020).

Plaintiffs urge the Court to follow these two state court decisions and find that the term is ambiguous and, therefore, coverage exists.  Omnibus Resp. at 1; *see also id.* at 11–27.  In doing so, Plaintiffs rely heavily on the courts' opinions in *Perry Street* and *Hill and Stout*.  *See id.* at 20–22.

Defendants, on the other hand, argue the requirement for direct physical loss or damage is clear, unambiguous, and does not provide coverage for COVID-19-related losses.  *See* Omnibus

15

Reply at 7–23. They further argue that Washington appellate precedent aligns with this interpretation, *id.* at 8–15, and that *Perry Street* and *Hill and Stout* were wrongly decided, *id.* at 15–16. Therefore, Defendants urge the Court to follow the now overwhelming majority of courts who have found no coverage. *Id.* at 17–21.

None of the policies at issue formally defines "direct physical loss of or damage to." Most, if not all, courts that have examined this phrase have recognized that the disjunction between "loss of" and "damage to" leads to the conclusions that (1) the terms "loss" and "damage" must mean something different, giving both distinct meaning, *see, e.g.*, *Frank Van's Auto Tag, LLC v. Selective Ins. Co. of the Se.*, No. 20-cv-2740, 2021 WL 289547, at *4 (E.D. Pa. Jan. 28, 2021); and (2) that the "direct physical" modifies both "loss" and "damage," *see, e.g.*, *Plan Check Downtown III, LLC v. AmGuard Ins. Co.*, 485 F. Supp. 3d 1225, 1229 (C.D. Cal. 2020). Thus, this Court must determine the meaning of the term "direct physical loss of" as well as the term "direct physical damage to" the insured property.

    a. *Direct Physical Damage to Property*

The Court begins with "damage" as it is more straightforward. Most of the Plaintiffs before this Court seem to concede that COVID-19, as an airborne virus that can live only briefly on non-organic surfaces, does not cause damage to those surfaces, such as the buildings, counters, dentist chairs, and other insured property of the businesses at issue. *See, e.g.*, Omnibus Resp. at 11–16 (focusing on arguments that COVID-19 causes "loss of" insured property). Some Plaintiffs, however, have argued that COVID-19 causes "damage to" covered property as "[a]n average purchaser of insurance . . . would understand that the physical presence of COVID-19 causes 'loss' and/or 'damage' because it contaminates and thereby alters physical surfaces in a way that creates

16

1  a risk of serious illness and death for patients and staff." *Aspen Lodging*, Pl. the Vancouver

2  Clinic's Mot. for Partial Summ. J. against Def. Affiliated FM Ins. Co., No. 20-cv-0138, Dkt. No.

3  33 at 18–19.

4     The Court rejects this interpretation of direct physical damage.  As numerous courts have

5  recognized, "COVID-19 hurts people, not property," *Johnson v. Hartford Fin. Servs. Grp., Inc.*,

6  No. 20-cv-02000, 2021 WL 37573, at *7 (N.D. Ga. Jan. 4, 2021), as "the pandemic impacts human

7  health and human behavior, not physical structures," *Uncork & Create LLC v. Cincinnati Ins. Co.*,

8  498 F. Supp. 3d 878, 884 (S.D.W. Va. 2020); *see also, e.g.*, *Select Hosp., LLC v. Strathmore Ins.*

9  *Co.*, No. 20-cv-11414, 2021 WL 1293407, at *3 (D. Mass. Apr. 7, 2021); *Wellness Eatery La Jolla*

10  *LLC v. Hanover Ins. Grp.*, No. 20-cv-1277, 2021 WL 389215, at *7 (S.D. Cal. Feb. 3, 2021).

11  Thus, all that is needed to decontaminate is to "wipe[] [the virus] off the surface with disinfectant,"

12  attesting to the fact that there is no underlying damage.  *Woolworth LLC v. The Cincinnati Ins.*

13  *Co.*, No. 20-cv-01084, 2021 WL 1424356, at *4 (N.D. Ala. Apr. 15, 2021); *see also, e.g.*, *Town*

14  *Kitchen LLC v. Certain Underwriters at Lloyd's, London*, No. 20-cv-22832, 2021 WL 768273, at

15  *7 (S.D. Fla. Feb. 26, 2021) (relying on *Mama Jo's Inc. v. Sparta Ins. Co.*, 823 F. App'x 868 (11th

16  Cir. 2020)).  The Court concludes that COVID-19 does not cause direct physical damage to

17  property as the term is used in the insurance policies.

18         *b.* *Direct Physical Loss of Property*

19     The Parties debate whether COVID-19 causes direct physical loss of property at greater

20  length.  The key term in this context is "loss."  Defendants argue that "loss" means that the property

21  incurred an "actual and discernable physical alteration" or that the insured has been "permanent[ly]

22  and physical[ly] dispossess[ed]" of the property, such as through theft or total destruction.

17

Omnibus Reply at 8. Plaintiffs counter that "loss" means not only a physical alteration of the insured property, but it also includes "the loss of the ability to use property." Omnibus Resp. at 11.

In determining the meaning of "loss" as used in these insurance policies, the Court turns to its common definition. "Loss" is defined as "the act or fact of being unable to keep or maintain something" or "the act of losing possession" of something. *Loss*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/loss (last visited May 28, 2021). "Possess," in turn, is commonly defined as "to have and hold as property," similar to "own," or to "seize and take control of." *Possess*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/possess (last visited May 28, 2021). Thus, "loss of" is best understood as no longer being able to own or control the property in question. When combined with "direct" and "physical" the Court determines that, in its common usage, "loss" means that the alleged peril must set in motion events which cause the inability to physically own or manipulate the property, such as theft or total destruction.

This reasoning aligns with most of the federal courts who have confronted this question and held that "physical loss of" requires tangible, material, discernable, or corporeal dispossession of the covered property, which COVID-19 does not cause. To be certain, the terminology courts have used varies. For example, most California courts have adopted the phrase "distinct, demonstrable, physical alteration," *see, e.g.*, *Island Rests., LP v. Affiliated FM Ins. Co.*, 20-cv-02013, 2021 WL 1238872, at *3 (S.D. Cal. Apr. 2, 2021); *O'Brien Sales & Mktg., Inc. v. Transp. Ins. Co.*, No. 20-cv-02951, 2021 WL 105772, at *3 (N.D. Cal. Jan. 12, 2021); *10E, LLC v. Travelers Indem. Co. of Conn.*, 483 F. Supp. 3d 828, 836 (C.D. Cal. 2020), which derives from the

18

California Court of Appeals' decision in *MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co.*, 115 Cal. Rptr. 3d 27, 37 (Cal. Ct. App. 2010). While that definition derives from a California court applying California law, there is nothing that limits this understanding to California law, as the phrase is popular outside of that State in courts applying the law of their home states.[12] *MRI Healthcare* itself took the phrase from a treatise on insurance law, attesting to its wider applicability. *See MRI Healthcare Ctr.*, 115 Cal. Rptr. 3d at 37 (quoting *Generally; "Physical" loss or damage*, 10A Couch on Ins. § 148:46 (3d ed. 2020)). Other phrases are commonly used by courts, including "tangible alteration,"[13] "material, perceptible destruction or deprivation of possession,"[14] "physical manifestation of loss or damage,"[15] and "physically impact[ed]."[16]

Also common is an understanding of what direct physical loss does not cover, including "purely economic losses." *See, e.g.*, *Equity Plan. Corp. v. Westfield Ins. Co.*, No. 20-cv-01204, 2021 WL 766802, at *10 (N.D. Ohio Feb. 26, 2021); *Rococo Steak, LLC v. Aspen Specialty Ins. Co.*, No. 20-cv-2481, 2021 WL 268478, at *5 (M.D. Fla. Jan. 27, 2021); *Tappo of Buffalo, LLC v. Erie Ins. Co.*, No. 20-cv-754, 2020 WL 7867553, at *4 (W.D.N.Y. Dec. 29, 2020). This Court

---

[12] *See, e.g.*, *Circus Circus LV, LP v. AIG Specialty Ins. Co.*, No. 20-cv-01240, 2021 WL 769660, at *4 (D. Nev. Feb. 26, 2021); *Santo's Italian Cafe LLC v. Acuity Ins. Co.*, No. 20-cv-01192, 2020 WL 7490095, at *7 (N.D. Ohio Dec. 21, 2020); *Hajer v. Ohio Sec. Ins. Co.*, No. 20-cv-00283, 2020 WL 7211636, at *2 (E.D. Tex. Dec. 7, 2020).

[13] *Gerleman Mgmt., Inc. v. Atl. States Ins. Co.*, No. 20-cv-183, 2020 WL 8093577, at *5 (S.D. Iowa Dec. 11, 2020).

[14] *MIKMAR, Inc. v. Westfield Ins. Co.*, No. 20-cv-01313, 2021 WL 615304, at *5 (N.D. Ohio Feb. 17, 2021).

[15] *PSG-Mid Cities Med. Ctr., LLC v. Jarrell*, No. 20-cv-02477, 2021 WL 1894696, at *3 (N.D. Tex. May 11, 2021) (quoting *Hartford Ins. Co. of Midwest v. Miss. Valley Gas Co.*, 181 F. App'x 465, 469–70 (5th Cir. 2006)).

[16] *1 S.A.N.T., Inc. v. Berkshire Hathaway, Inc.*, No. 20-cv-862, 2021 WL 147139, at *6 (W.D. Pa. Jan. 15, 2021).

19

finds that, in arguing that direct physical loss covers loss of income in these circumstances, Plaintiffs conflate *physical* loss with non-physical loss of use. Detrimental economic impact, however, does not trigger coverage under the property insurance here at issue. As numerous courts have held, "economic business impairments caused by COVID-19 safety orders *do not fall within the scope of coverage*." *Caribe Rest. & Nightclub, Inc. v. Topa Ins. Co.*, No. 20-cv-03570, 2021 WL 1338439, at *3 (C.D. Cal. Apr. 9, 2021) (emphasis in original) (citing *10E*, 483 F. Supp. 3d at 836); *see, e.g.*, *Cafe Int'l Holding Co. LLC, v. Westchester Surplus Lines Ins. Co.*, No. 20-cv-21641, 2021 WL 1803805, at *1 (S.D. Fla. May 4, 2021) ("Plaintiff may have lost business because of the pandemic, but a decline in restaurant revenue or profits is merely an economic loss, not a loss covered by the policy."); *see also id.* at *8.

Terminology aside, the result is the same. In order to trigger coverage under a direct physical loss theory, an outside peril must cause an inability to interact with the property because of an alteration to its physical status. COVID-19, and more specifically the Governor's Proclamations, may have limited the uses of the property by preventing certain indoor activities previously conducted on the premises, but they did not cause dispossession of the buildings, chairs, dental tools, etc. As other courts have adeptly summarized, the "property did not change. The world around it did." *Town Kitchen*, 2021 WL 768273, at *5.

Interpreting direct physical loss to include only tangible dispossession aligns with insurance law doctrine which holds that all-risk contracts are intended to cover damage to property, not economic loss. As a commonly cited treatise states,

> The requirement that the loss be "physical," given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable,

20

physical alteration of the property.

*Generally; "Physical" loss or damage*, 10A Couch on Ins. § 148:46 (3d ed. 2020) (footnotes omitted).

Numerous federal courts have followed *Couch* in finding that damages resulting from COVID-19 are not covered by the policies at issue in these COVID cases.[17]  In other words, "Plaintiff[s'] operations are not what is insured—the building and the personal property in or on the building are." *Real Hosp., LLC v. Travelers Cas. Ins. Co. of Am.*, 499 F. Supp. 3d 288 (S.D. Miss. 2020).

Several Plaintiffs seek to distinguish their cases from this conclusion by asserting the actual presence of COVID-19 on their premises, *e.g.*, by visitation from an infected person, rather than merely the threat of exposure.  Given the Court's conclusion that COVID-19 does not cause physical harm or damage to non-organic surfaces, the Court finds that the pleading of actual presence is immaterial.[18]

This Court joins the numerous courts across the country that have held that COVID-19 does not trigger direct physical loss or damage.

---

[17] *See, e.g.*, *SAS Int'l, Ltd. v. Gen. Star Indem. Co.*, No. 20-cv-11864, 2021 WL 664043, at *3 (D. Mass. Feb. 19, 2021); *SA Palm Beach LLC v. Certain Underwriters at Lloyd's, London*, No. 20-cv-80677, 2020 WL 7251643, at *4 (S.D. Fla. Dec. 9, 2020); *Hillcrest Optical, Inc. v. Cont'l Cas. Co.*, 497 F. Supp. 3d 1203, 1211 (S.D. Ala. 2020).

[18] *See, e.g.*, *Bachman's Inc. v. Florists' Mut. Ins. Co.*, No. 20-cv-2399, 2021 WL 981246, at *4 (D. Minn. Mar. 16, 2021); *Legal Sea Foods, LLC v. Strathmore Ins. Co.*, No. 20-cv-10850, 2021 WL 858378, at *2, *3–*4 (D. Mass. Mar. 5, 2021) (granting dismissal despite plaintiff pleading actual presence); *Terry Black's Barbecue, LLC v. State Auto. Mut. Ins. Co.*, No. 20-cv-665, 2021 WL 972878, at *8–*9 (W.D. Tex. Jan. 21, 2021); *Promotional Headwear Int'l v. Cincinnati Ins. Co.*, No. 20-cv-2211, 2020 WL 7078735, at *8 (D. Kan. Dec. 3, 2020); *Uncork & Create*, 498 F. Supp. 3d at 883–84.

## 2. *Washington State Precedents*

The Court turns to Washington precedent and finds that it is consistent with the conclusion that COVID-19 does not cause direct physical loss of or damage to covered property. The Washington State Supreme Court has not yet addressed the question of whether COVID-19 causes direct physical loss or damage. Therefore, this Court's task is to predict how it would. "Where the state's highest court has not squarely addressed an issue, [the Court] 'predict[s] how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance.'" *Judd v. Weinstein*, 967 F.3d 952, 955–56 (9th Cir. 2020) (quoting *Lewis v. Tel. Emps. Credit Union*, 87 F.3d 1537, 1545 (9th Cir. 1996)); *see also Childress v. Costco Wholesale Corp.*, 978 F.3d 664, 665 (9th Cir. 2020) ("If the state's highest appellate court has not decided the question presented, then [the Court] must predict how the state's highest court would decide the question.").

### a. *Perry Street and Hill and Stout*

Both Parties agree, as they must, that Washington trial court decisions are not binding on this Court. *Bauman v. Turpen*, 160 P.3d 1050, 1055 (Wash. Ct. App. 2007) ("the findings of fact and conclusions of law of a superior court are not legal authority and have no precedential value."). Plaintiffs, nevertheless, point to the two Washington trial court decisions in *Perry Street* and *Hill and Stout*, which concluded that the meaning of "direct physical loss of or damage to" covered property is ambiguous and, thus, must be construed in Plaintiffs' favor.

The court in *Perry Street* stressed that "loss" and "damage" must be interpreted to have distinct meanings and loss could be understood to cover situations where "property could not physically be used for its intended purpose." *Perry Street*, 2020 WL 7258116, at *3. Similarly,

22

*Hill and Stout* held that the plaintiffs had been deprived of their dental practice when they were unable to see patients. *Hill and Stout*, 2020 WL 6784271, at *2.

The Court finds this reasoning unpersuasive. The reasoning that "loss" could plausibly mean something akin to "deprivation of use" discounts the preceding term "physical." As stated above, this Court has already determined—in accord with the reasoning of the vast majority of those courts that have addressed the issue—that COVID-19 does not physically alter the insured property. The only change is an intangible restriction of what the property may be used for.

Thus, this Court declines to follow the conclusions reached in *Perry Street* and *Hill and Stout*.

### b. *Other Washington Precedents*

In supporting their arguments that COVID-19-related losses do not trigger direct physical loss or damage to covered property, Defendants rely heavily on at least three Washington State appellate court cases for the position that Washington law requires discernable physical alteration or permanent dispossession of property, including *Villella v. Public Employees Mutual Insurance Company*, 725 P.2d 957 (Wash. 1986); *Fujii v. State Farm Fire & Casualty Company*, 857 P.2d 1051 (Wash. Ct. App. 1993); and *Wolstein v. Yorkshire Insurance Company, Ltd.*, 985 P.2d 400 (Wash. Ct. App. 1999). *See Chorak*, Defs. Hartford Cas. Ins. Co., Hartford Fire Ins. Co., and Sentinel Ins. Co., Ltd.'s Mot. to Dismiss and Mot. for J. on the Pleadings, No. 20-cv-00627, Dkt. No. 56 at 8–11; Omnibus Reply at 8–15.[19]

---

[19] Defendants also refer to several unpublished opinions of the Washington State Court of Appeals. *See Herr v. Forghani*, No. 64738–5–I, 2011 WL 1833829 (Wash. Ct. App. May 16, 2011); *Wash. Mut. Bank v. Commonwealth*

23

Examining these cases, two conclusions are clear to this Court. First, none is directly on-point as they do not address the specific type of losses COVID-19 causes. Thus, they do not dictate this Court's decision in the present circumstances. At the same time, all three interpret the phrase "direct physical loss of or damage to," or the similar phrase "physical loss to," in a way that emphasizes the physicality of loss, or the requirement of a physical consequence, which supports this Court's conclusion that "physical loss" means dispossession and loss of tangible control, rather than mere loss of use.

The Court finds *Fujii* and *Wolstein* illustrative. *See Fast Trak Inv. Co. v. Sax*, 962 F.3d 455, 465 (9th Cir. 2020) (internal quotations and citations removed) ("An intermediate state appellate court decision is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.").

In *Fujii*, the Washington Court of Appeals examined the case of a married couple whose home was threatened by the prospect of a landslide after heavy rainfall caused soil destabilization upslope. *Fujii*, 857 P.2d at 1051. The court held that, since no damage had yet occurred, there was no coverage pursuant to a policy which required "direct physical loss to the property." *Id.* at 1052–53 ("it is undisputed that there was no discernible physical damage to the dwelling during

---

*Ins. Co.*, No. 56396–3–I, 2006 WL 1731318 (Wash. Ct. App. June 26, 2006); *Borton & Sons, Inc. v. Travelers Insurance Co.*, No. 18100–6–III, 2000 WL 60028 (Wash. Ct. App. Jan. 25, 2000). These unpublished opinions by that court "have no precedential value and are not binding upon any court." Wash. R. Gen. Application 14.1 (citation of unpublished opinions); *see also Oltman v. Holland Am. Line USA, Inc.*, 178 P.3d 981, 988 n.9 (Wash. 2008).

the effective period of the policy.").

Similarly, in *Wolstein*, the Washington Court of Appeals addressed a vessel owner who sought to recover pursuant to a policy covering "all risks of physical loss of or damage to the Vessel." *Wolstein*, 985 P.2d at 407; *see id.* at 403–04. In that case, the original shipbuilder abandoned construction of the insured yacht after running into financial difficulties and declaring bankruptcy. The court held that the physical loss or damage provision did not cover the alleged losses because the shipbuilder's "financial difficulties, while prolonging completion of the [yacht] and increasing the costs of her completion, did not inflict physical damage to the [yacht] or result in the physical loss of the yacht." *Id.* at 407.

Plaintiff's attempts to distinguish these cases are unconvincing. *See* Omnibus Resp. at 22–25. In doing so, they rely heavily on the factual dissimilarities between the circumstances in these cases and the one here. It is already clear, however, that no Washington appellate court has confronted this specific circumstance in relation to this specific term. The Court's charge in this circumstance is not merely to determine whether there is a factually analogous case on-point. Instead, the Court is tasked with predicting how the Washington Supreme Court would rule based on the line of precedent before it. To this end, the Court finds that these precedents are useful indicators that the Washington Supreme Court would decide that the term "physical loss" requires dispossession of property.

**B. Extensions**

Almost all Plaintiffs argue that, should the Court find that the general coverage provisions do not afford them coverage in the COVID-19 situation, the Court should look to the extension provisions contained in their insurance contracts for independent coverage grounds. Plaintiffs

25

contend the following provisions provide coverage.

## 1. *Business Income, Extra Expense, and Extended Business Income Provisions*

None of the extension provisions which define the benefits an insured is entitled offer coverage as they rely on an initial trigger of the general coverage provision discussed above. Often, these extension provisions themselves explicitly incorporate the requirement for physical loss or damage. For example, the provisions found in the policy of Stan's Bar-B-Q, quoted in the footnote below, do not act as independent grounds for finding coverage for these reasons. *See* Stan's Bar-B-Q Policy at 19–20.[20]

## 2. *Civil Authority Provisions*

Plaintiffs contend that the Civil Authority provisions found in their policies entitle them to coverage, either as an extension of the general coverage provision or independently. *See* Omnibus Resp. at 28–44.

---

[20] a. Business Income

(2) We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to property at the described premises.

b. Extra Expense

(1) Extra Expense means reasonable and necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss.

c. Extended Business Income

(1) If the necessary "suspension" of your "operations" produces a Business Income loss payable under paragraph a. above, we will also pay. . .

However, this extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of a Covered Cause of Loss in the area where the described premises are located.

26

As exemplified by the policy of Stan's Bar-B-Q reproduced *supra*, and here in footnote, the Civil Authority provisions only extend benefits covering actual loss of "Business Income" and "reasonable and necessary Extra Expenses" where its terms are met. *See* Stan's Bar-B-Q Policy at 32.[21] Those terms include that (1) coverage is triggered in the first instance ("[w]hen the Declarations show that you have coverage for Business Income and Extra Expense"); (2) the extended losses are caused by the "action of civil authority"; (3) that "prohibits access to the described premises"; and (4) the cause of the civil authority itself must stem from "direct physical loss of or damage to property" other than the business's property within a geographic radius (100 miles in Stan's Bar-B-Q's case), which, in turn, must be caused by a Covered Cause of Loss. *Id.* The archetypal civil authorities that trigger coverage under such a provision are ordinances regulating construction, repair, or right to use property (including destruction of the property), such as evacuation orders during a natural disaster. *See Nature of Provision*, Generally, 10A Couch on Ins. § 152:22 (3d ed. 2020); John DiMugno, *The Implications of COVID-19 for the Insurance Industry and its Customers: 2021 Developments*, 43 No. 3 Insurance Litigation Reporter NL 1 (Mar. 12, 2021).

The Court finds that the Civil Authority provisions do not provide coverage in these

---

[21] G. Civil Authority

   (1) When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to the actual loss of Business Income you sustain and reasonable and necessary Extra Expense you incur caused by action of civil authority that prohibits access to the described premises. The civil authority action must be due to direct physical loss of or damage to property at locations, other than described premises, that are within 100 miles of the described premises, caused by or resulting from a Covered Cause of Loss.

circumstances. First, where the Civil Authority provision is premised on an initial trigger of coverage, there are no independent grounds to find coverage as the Court has found no trigger because COVID-19 does not cause direct physical loss of or damage to insured property. Second, where the Civil Authority provision incorporates the requirement for physical loss or damage to a neighboring building, there is no coverage because the Court has already found COVID-19 does not cause such loss or damage. As demonstrated below, these two deficiencies defeat coverage under every permutation of the Civil Authority provision in these cases. This view has prevailed among federal courts examining whether similar Civil Authority provisions provide coverage as a result of COVID-19. *See, e.g.*, *Aggie Invs., LLC v. Cont'l Cas. Co.*, 21-cv-0013, 2021 WL 1550479, at *5 (E.D. Tex. Apr. 20, 2021); *Mohawk Gaming Enters., LLC v. Affiliated FM Ins. Co.*, No. 20-cv-701, 2021 WL 1419782, at *3–*6 (N.D.N.Y. Apr. 15, 2021); *Select Hosp.*, 2021 WL 1293407, at *4 (D. Mass. Apr. 7, 2021).

## C. Exclusions

While the Court's decision that the term "physical loss or damage" does not provide coverage in the case of COVID-19 is determinative, the Parties expend extensive time contesting the applicability of the Virus exclusion contained in many of their policies. In the interest of completeness, the Court will address this issue.

### 1. *Virus Exclusions*

Plaintiffs argue that the Virus exclusions do not bar coverage. *See* Omnibus Resp. at 55–65. The Virus exclusions state that "[w]e will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease," or something similar. Hsue Policy at 193.

28

a. *Pandemic vs. Virus*

Plaintiffs first argue that the Virus exclusion is not applicable because their losses stem from a pandemic, not a virus, and, thus, the provision is not triggered in the first instance. Omnibus Resp. at 56–58.

It is difficult to see how a pandemic differs from a virus other than in scope. Quite simply, one causes the other. *See Pandemic*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/pandemic (last visited May 28, 2021) ("an outbreak of a disease that occurs over a wide geographic area (such as multiple countries or continents) and typically affects a significant proportion of the population"). The average insured would not be surprised to learn that a Virus exclusion excludes coverage based on measures taken to prevent a pandemic caused by a virus.

b. *Efficient Proximate Cause*

Plaintiffs' invocation of Washington's Efficient Proximate Cause Rule does not change this conclusion. In the exclusion context, as the provision at issue here is the Virus exclusion, the Rule holds that if "an excluded occurrence initiates the causal chain and is itself either the sole proximate cause or the efficient proximate cause of the loss," there is no coverage. *Xia*, 400 P.3d at 1241; *see also, e.g.*, *Boxed Foods Co. v. Cal. Cap. Ins. Co.*, 497 F. Supp. 3d 516, 522 (N.D. Cal. 2020) (internal citations and quotations removed) ("An efficient proximate cause is a cause of loss that predominates and sets the other cause of loss in motion. When loss can be attributed to two causes—a covered and an excluded cause—coverage only exists if the efficient proximate cause of the damage is covered under the policy.").

In this case, the dispute comes down to whether COVID-19 or the Governor's

29

Proclamations predominately caused the businesses' losses. *See* Omnibus Resp. at 58–62. If the virus was the efficient proximate cause of the losses, the Virus exclusion would apply, barring coverage. If, as Plaintiffs argue, the Proclamations were the true efficient proximate cause of the business losses, the exclusion would not apply (so the argument goes) because the Proclamations are not an excluded cause under the Virus exclusions. *See, e.g.*, *Causeway Auto., LLC v. Zurich Am. Ins. Co.*, No. 20-cv-8393, 2021 WL 486917, at \*5–\*6 (D.N.J. Feb. 10, 2021).

Determination of the efficient proximate cause is ordinarily a task for the jury but, "when the facts are undisputed and the inferences therefrom are plain and incapable of reasonable doubt or difference of opinion," then determination of efficient proximate cause is a question of law for the Court. *Graham v. Pub. Emps. Mut. Ins. Co.*, 656 P.2d 1077, 1081 (Wash. 1983).

Here, the underlying facts are undisputed and the line of causation is clear: COVID-19 caused the Governor to issue the Proclamations, which forced Plaintiffs to curtail their business operations. Under such circumstances, the exclusion barring coverage resulting from the virus applies. *See, e.g.*, *Dolsen Cos. v. Bedivere Ins. Co.*, 264 F. Supp. 3d 1083, 1092–95 (E.D. Wash. 2017) (rejecting Efficient Proximate Cause argument where initial peril was an excluded harm and the alleged subsequent peril was "necessarily intertwined" with initial peril).[22]

---

[22] Proximate cause arguments indistinguishable from Plaintiffs' arguments have been rejected by nearly every court. *See, e.g.*, *Carpe Diem Spa, Inc. v. Travelers Cas. Ins. Co. of Am.*, No. 20-cv-14860, 2021 WL 1153171, at \*3 (D.N.J. Mar. 26, 2021); *Downs Ford, Inc. v. Zurich Am. Ins. Co.*, No. 20-cv-08595, 2021 WL 1138141, at \*5 (D.N.J. Mar. 25, 2021); *Westside Head & Neck v. Hartford Fin. Servs. Grp., Inc.*, No. 20-cv-06132, 2021 WL 1060230, at \*5 (C.D. Cal. Mar. 19, 2021).

30

c.  *Regulatory Estoppel*

Plaintiffs argue that the doctrine of Regulatory Estoppel prohibits Defendants from relying on the Virus exclusion because "there are questions about whether insurers were forthcoming" with state insurance regulators, such as the Washington Office of the Insurance Commissioner, when first proposing to add such an exclusion to their policies.  *See* Omnibus Reply at 62–65.

Regulatory Estoppel is a form of equitable estoppel which "prohibits parties from switching legal positions to suit their own ends."  *Brian Handel D.M.D., P.C. v. Allstate Ins. Co.*, 499 F. Supp. 3d 95, *4 (E.D. Pa. 2020) (quoting *Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189, 1192 (Pa. 2001)).  In this context, it would hold that "[i]f an insurer represents to a regulatory agency that new language in a policy will not result in decreased coverage, the insurer cannot assert the opposite position when insureds raise the issue in litigation."  *Id.*

Plaintiffs admit that the Washington Supreme Court has not recognized Regulatory Estoppel but argue that this is not the same thing as formally rejecting it.  Omnibus Resp. at 63–64.  This Court will not adopt a rule of law that the Washington Supreme Court has not adopted.  As such, this Court declines to recognize the doctrine of Regulatory Estoppel on behalf of the State of Washington.

Based on the foregoing, where a policy includes a Virus exclusion, that exclusion also bars coverage for the losses alleged here.

**D.  Extra-Contractual Claims**

The Court's holding construing the terms of the insurance policies resolves the Plaintiffs' Contractual Claims (*i.e.* their causes of action based on Declaratory Judgment and Breach of Contract).  The Court has determined the meaning of the terms in question and established that the

31

Defendants did not breach the terms of their insurance contracts by denying coverage.

The Parties debate, however, whether Plaintiffs' Extra-Contractual Claims (*i.e.*, their causes of action based on Bad Faith, WCPA, IFCA, and Negligence) can survive absent a finding of coverage. Plaintiffs argue their Extra-Contractual Claims should survive, even if no coverage is found, because the insurers may still have acted improperly in handling their claims. Omnibus Resp. at 75–82. As their briefing contends, "[a]t the center of each Plaintiff's extracontractual claims is the well-founded contention that Defendants failed to conduct a reasonable investigation of the facts and the governing law relating to the claims, resulting in coverage determinations that were, in fact, unreasonable and unlawful." *Id.* at 89.

Defendants contend that Plaintiffs' Extra-Contractual Claims should be dismissed along with their Contractual Claims, arguing that once there is a finding that their denial of coverage was justified, Plaintiffs failed to identify independent bad faith, negligence, or unfair practices to support their claims. Omnibus Reply at 72–82.

Reviewing Plaintiffs' operative Complaints, the Court concludes that Plaintiffs rest their Extra-Contractual Claims on nothing more than allegations that denial of coverage was unreasonable, done without sufficient investigation, or simply reiterate the elements of the cause of action. This fails to satisfy the *Twombly-Iqbal* standard. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.").

As to claims premised on unreasonable denial, since the Court has found that COVID-19 does not cause physical loss or damage, denial of coverage on these grounds was reasonable.

32

Therefore, any claims for bad faith, negligence, or under the WCPA or IFCA premised on these grounds must fail.

Plaintiffs' claims based on unreasonable investigation also fail. Defendants' denials of coverage were based on policy interpretations. There was no need for factual investigations. In these circumstances, the Court cannot say the quick denial of claims was unreasonable, frivolous, or unfounded. Defendants were faced with hundreds of identical claims based on the same causal event, namely COVID-19. As one court described,

> because defendant's denials were based on policy interpretations, not factual findings, it is not clear what would make those actions unreasonable under the circumstances. The facts underlying the claims, much like the facts underlying the present lawsuit, are largely, if not entirely, undisputed. And the speed with which defendant denied plaintiffs' claims cannot support a claim for unfair or deceptive trade practices.

*Kamakura, LLC v. Greater N.Y. Mut. Ins. Co.*, No. 20-cv-11350, 2021 WL 1171630, at *14 (D. Mass. Mar. 9, 2021).

Based on the foregoing, the Court determines that Plaintiffs have largely failed to plead acts independent of unreasonable denial of coverage or investigation. Without independent grounds, which Plaintiffs have failed to allege, dismissal of Plaintiffs' Extra-Contractual Claims is appropriate.

### E. Leave to Amend

Ordinarily, "[w]here a complaint is dismissed for failure to state a claim, 'leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *PBTM LLC v. Football Nw., LLC*, No. 19-cv-2081, 2021 WL 37648, at *17 (W.D. Wash. Jan. 5, 2021) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)); *see also Navajo Nation v.*

33

*U.S. Dep't of the Interior*, 996 F.3d 623, *6 (9th Cir. 2021) (quoting *Polich v. Burlington N., Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991)) ("dismissal without leave to amend is improper unless it is clear . . . that the complaint could not be saved by any amendment.").

In the present cases, amendment would be futile. As COVID-19 does not cause direct physical loss of covered property, and such loss is required to trigger coverage, there is no way that Plaintiffs can amend their complaints to cure this deficiency. As such, the Court will deny Plaintiffs' claims with prejudice. *See e.g.*, *Seoul Taco Holdings, LLC v. Cincinnati Ins. Co.*, No. 20-cv-1249, 2021 WL 1889866, at *6 (E.D. Mo. May 11, 2021); *M&E Bakery Holdings, LLC v. Westfield Nat'l Ins. Co.*, No. 20-cv-5849, 2021 WL 1837393, at *5, *7 (N.D. Ill. May 7, 2021); *Jonathan Oheb MD, Inc. v. Travelers Cas. Ins. Co. of Am.*, No. 20-cv-08478, 2020 WL 7769880, at *4 (C.D. Cal. Dec. 30, 2020).

## V.     INDIVIDUAL CASES

The Court now applies its above findings to the ten consolidated cases, listed below by Defendant insurance company.

### A. Defendant Affiliated FM Insurance Company (No. 20-cv-01038)

#### 1. *Case Background*

This matter is made up of two constituent plaintiff groups who are insured by Affiliated FM. The first plaintiff group is Vancouver Clinic Inc. PS. *See Vancouver Clinic Inc PS v. Affiliated FM Ins. Co.*, Order of Consolidation, No. 20-cv-05605, Dkt. No. 24. Vancouver Clinic is a professional association of physicians who operate eight medical clinics in the Vancouver, Washington area. *Id.*, Am. Compl., Dkt. No. 8 ¶ 7 ("Vancouver Clinic Compl."). It has alleged the actual presence of COVID-19 in its clinics and advances causes of action for declaratory relief,

34

breach of contract, anticipatory repudiation of contract, insurance bad faith, and violations of the IFCA and WCPA. *Id.* ¶¶ 4, 33–36, 51–85.

The second plaintiff group is Aspen Lodging Group LLC, which owns and manages several hotels and restaurants under the Provenance Hotels brand. *See Aspen Lodging*, Compl., No. 20-cv-01038, Dkt. No. 1-2 ¶¶ 2, 26 ("Aspen Lodging Compl."). Aspen Lodging has not plead the actual presence of COVID-19 in its hotels and restaurants and its causes of action include declaratory judgment, breach of contract, insurance bad faith, and claims under the IFCA and WCPA. *Id.* ¶¶ 50–77. The Court consolidated these actions under Case No. 20-cv-01038.

Both Plaintiff groups' insurance policies are substantially similar[23] and include a general coverage provision based on physical loss or damage, entitled "Insurance Provided."[24] The Policies also contain two unique Communicable Disease provisions—one for Business

---

[23] *See Aspen Lodging*, Decl. of Jerry H. Stein, Ex. A, No. 20-cv-01038, Dkt. No. 34-1 ("Vancouver Clinic Policy"); *id.*, Decl. of Richard Sunny, Ex. D., Dkt. No. 41-4 ("Aspen Lodging Policy").

[24] *See* Vancouver Clinic Policy at 10; *see also* Aspen Lodging Policy at 35, stating

E. INSURANCE PROVIDED:

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded

35

Interruption[25] and the other for Property Damage[26] (the "Communicable Disease Provisions")—which provide coverage for losses if a communicable disease is detected at the insured property. Unlike the Insurance Provided provision, the Communicable Disease Provisions do not contain a physical loss trigger and, thus, must be addressed independently. Recovery under the Communicable Disease Provisions is capped according to sub-limits.[27]

---

[25] *See* Vancouver Clinic Policy at 45; *see also* Aspen Lodging Policy at 59, stating

> 3. Communicable Disease – Business Interruption
>
> If a described location owned, leased or rented by the Insured has the actual not suspected presence of communicable disease and access to such described location is limited, restricted or prohibited by:
>
> a) An order of an authorized governmental agency regulating such presence of communicable disease; or
>
> b) A decision of an Officer of the Insured as a result of such presence of communicable disease,
>
> This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability at such described location with such presence of communicable disease.

[26] *See* Vancouver Clinic Policy at 27; *see also* Aspen Lodging Policy at 41, stating

> 5. Communicable Disease – Property Damage
>
> If a described location owned, leased or rented by the Insured has the actual not suspected presence of communicable disease and access to such described location is limited, restricted or prohibited by:
>
> a) An order of an authorized governmental agency regulating or as result of such presence of communicable disease; or
>
> b) A decision of an Officer of the Insured as a result of such presence of communicable disease,
>
> This Policy covers the reasonable and necessary costs incurred by the Insured at such described location for the:
>
> a) Cleanup, removal and disposal of such presence of communicable disease from insured property; and
>
> b) Actual costs or fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from such presence of communicable disease on insured property.

[27] *See* Vancouver Clinic Policy at 11, 12; *see also* Aspen Lodging Policy at 22 ($500,000 cap), 23, stating

> Additional Coverages
> $100,000 Communicable Disease - Property Damage annual aggregate
> Business Interruption Coverage Extensions
>
> $100,000 Communicable Disease - Business Interruption annual aggregate for a 12 Month Period of Liability

36

Additionally, the Policies include a Civil or Military Authority extension[28] that contains a physical loss trigger and a Contamination exclusion that bars coverage of losses associated with a "contamination."[29]

Both groups and Affiliated FM have filed Cross-Motions for Partial Summary Judgment.[30] Additionally, both Vancouver Clinic and Aspen Lodging have submitted Motions for Judicial Notice.[31] As the Court will resolve the Parties' claims without reference to these documents, the Court will deny the Motions for Judicial Notice as moot.

---

[28] *See* Vancouver Clinic Policy at 44–45; *see also* Aspen Lodging Policy at 58–59, stating

    2. Civil or Military Authority

    This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability if an order of civil or military authority prohibits access to a location provided such order is the direct result of physical damage of the type insured at a location or within five (5) statute miles of it.

[29] *See* Vancouver Clinic Policy at 82; *see also* Aspen Lodging Policy at 100, stating

    This policy excludes loss or damage caused by any of the following excluded events . . . 10. Contamination, and any cost due to contamination including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy; nor will the foregoing constitute direct physical loss or damage insured by this policy.

"Contamination" is defined as

    any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew.

    Vancouver Clinic Policy at 62; *see also* Aspen Lodging Policy at 76

[30] *See Aspen Lodging*, Vancouver Clinic's Mot. for Partial Summ. J., No. 20-cv-01038, Dkt. No. 33 ("Vancouver Clinic's Mot."); *id.*, Affiliated FM Cross-Mot. For Partial Summ. J. against Vancouver Clinic, Dkt. No. 36 ("Affiliated FM's Vancouver Clinic Mot."); *id.*, Affiliated FM's Cross-Mot. for Partial Summ. J. against Aspen Lodging, Dkt. No. 39 ("Affiliated FM's Aspen Lodging Mot."); *id.*, Aspen Lodging's Mot. For Partial Summ. J., Dkt. No. 42 ("Aspen Lodging's Mot.").

[31] *See Aspen Lodging*, Vancouver Clinic's Request for Judicial Notice, No. 20-cv-01038, Dkt. No. 35; *id.*, Aspen's Mot. for Judicial Notice, Dkt. No. 44.

2. *Vancouver Clinic Plaintiff*

Affiliated FM admits Vancouver Clinic is entitled to coverage under the Communicable Disease Provisions as Vancouver Clinic has plead the actual presence of COVID-19. *See* Affiliated FM's Vancouver Clinic Mot. at 2. Affiliated FM argues that these Provisions, however, are unique and distinct from coverage under the broader Insurance Provided provision and, thus, Vancouver Clinic's recovery should be limited to the caps associated with the Communicable Disease Provisions, rather than the full policy limit. *See id.* at 20–21. Affiliated FM denies coverage under the general Insurance Provided provision according to the familiar argument that COVID-19 does not cause direct physical loss or damage. *See Id.* at 12–17.

Vancouver Clinic counters that it should be entitled to the full policy limit. *See* Vancouver Clinic's Mot. at 1–5. Specifically, it argues that COVID-19 causes direct physical loss or damage, *see id.* at 16–26, and that the policy does not limit Vancouver Clinic's recovery exclusively to the Communicable Disease provisions once a single peril implicates coverage under multiple provisions, *see id.* at 10–12, 15–16.

a. *Coverage*

As the Court has determined that COVID-19 does not cause physical loss or damage, coverage is not triggered under the general Insurance Provided provision. Thus, Vancouver Clinic's recovery is limited to the Communicable Disease provisions, which, by their terms, do not include a physical loss or damage requirement.

Additionally, the Court is unpersuaded by Vancouver Clinic's argument that Affiliated FM's admission of coverage under the Communicable Disease provisions necessarily means that there is coverage under the Insurance Provided provision. *See* Vancouver Clinic's Mot. at 12–15.

38

The Communicable Disease provisions apply when the disease is present, making it distinct from the Insurance Provided provision, which requires physical loss or damage. Thus, the fact that the Communicable Disease Provisions are applicable does not reverse-activate the Insurance Provided provision.[32]

### b. *Recovery Limitations*

Once determined that coverage is limited to the caps associated with the Communicable Disease provisions, the Parties debate the exact amount Vancouver Clinic is entitled to recover. Each Provision has a $100,000 sub-limit cap. Vancouver Clinic argues that it is entitled to these sub-limits for each location with the reported presence of COVID-19, totaling $1.6 million. Vancouver Clinic's Mot. at 15 n.4. Affiliated FM argues that Vancouver Clinic is entitled only to $200,000 total as each Communicable Disease provision has an annual aggregate of $100,000. Affiliated FM's Vancouver Clinic Mot. at 20–21.

---

[32] Additionally, the Parties debate the applicability of the Contamination exclusion. Affiliated FM argues that, even were coverage established under the Insurance Provided provision, coverage pursuant to a virus such as COVID-19 would be barred by the Contamination exclusion. *See* Affiliated FM's Vancouver Clinic Mot. at 17–19. Vancouver Clinic argues that the Contamination exclusion does not apply, and that Affiliated FM seeks to apply it inconsistently to bar coverage under the Insurance Provided provision but not the Communicable Disease provisions. *See* Vancouver Clinic's Mot. at 26–29. The Contamination exclusion operates similarly to the Virus exclusion discussed *supra* and applies equally. *See supra* at 28–31. Further, it is not applied inconsistently. The structure of the Policies leads to the conclusion that the Communicable Disease provisions are meant as an exception to the Policy's exclusions. In other words, as to both the Property Insured and Business Interruption extensions, the pattern is (1) losses insured through the Insurance Provided provision, including a physical loss or damage trigger; (2) exclusions, including the Contamination exclusion; and (3) extensions, including the Communicable Disease provisions. Thus, by the construction of the contract, the exclusions apply (including the Contamination exclusion) to the losses insured, except where modified by the subsequent extensions (including the Communicable Disease provisions). In terms of the circumstances at hand, this construction means that (1) COVID-19 does not trigger coverage because of a lack of physical loss or damage; (2) even if it did, the Contamination exclusion would exclude coverage; (3) but, since the terms of the Communicable Disease provisions are met, coverage is available under these provisions alone.

39

Reviewing the relevant sub-limits provided for in the Policy, it is clear that Vancouver Clinic is entitled to a maximum of $200,000. Both Communicable Disease provisions' caps state that they are subject to an annual aggregate. Vancouver Clinic Policy at 11, 12. "Annual aggerate" is a defined term within the Policy, to wit: "the Company's maximum amount payable during any policy year." *Id.* at 61. The language of this definition is clear; the insurance company will pay no more than the identified cap in a single year. It matters not whether COVID-19 was present at one or multiple Vancouver Clinic locations. The Policy's coverage maximum under each relevant provision is $100,000. As the Court has found that these are the only applicable coverage provisions within the Policy, coverage is set at $200,000 total.

### c. *Extra-Contractual Claims*

Finally, Vancouver Clinic advances Extra-Contractual Claims for insurance bad faith and violations of the WCPA and IFCA. Reviewing Vancouver Clinic's Complaint, the Court determines that its Extra-Contractual Claims are based on Affiliated FM's denial of coverage, an allegation of improper investigation, and conclusory claims that Affiliated FM violated industry standards or engaged in deceptive practices, none of which are supported by allegations in the Complaint. *See* Vancouver Clinic Compl. ¶¶ 75–76, 80, 84. Based on the Court's reasoning above, these claims will be dismissed.

### 3. *Aspen Lodging Plaintiffs*

Unlike Vancouver Clinic, Affiliated FM denies coverage to Aspen Lodging in total because Aspen Lodging has not plead the actual presence of the virus, which is a precondition to finding coverage under the Communicable Disease Provisions. *See* Affiliated FM's Aspen Lodging Mot. at 2.

40

Aspen Lodging adopts the arguments advanced by Vancouver Clinic regarding coverage under the broader Insurance Provided provision. *See* Aspen Lodging's Mot. at 1. In addition to those arguments, Aspen Lodging argues it is entitled to coverage under the Civil and Military Authority extension. *See id.* at 7–13.

Affiliated FM argues that the Civil and Military Authority extension does not provide independent coverage. Affiliated FM's Aspen Lodging Mot. at 6–7. Additionally, Affiliated FM raises a choice of law question on the grounds that the majority of Aspen Lodging's contacts are in the State of Oregon and, thus, Oregon law should control. Affiliated FM's Aspen Lodging Mot. at 7–15. The Court addresses the choice of law issue first.

    *a.* <u>Choice of Law</u>

It is unnecessary for the Court to conduct a choice of law analysis as Affiliated FM has failed to demonstrate an actual conflict between the laws of Washington and Oregon. When a federal district court sits in diversity, as here, it "must follow the choice-of-law rules of the State in which it sits." *Veridian Credit Union v. Eddie Bauer, LLC*, 295 F. Supp. 3d 1140, 1149 (W.D. Wash. 2017) (quoting *Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 65 (2013)). Washington choice of law rules follow a two-step process, first determining whether an actual conflict exists before determining which jurisdiction has the most significant relationship. *Id.* at 1149–50 (citing *Burnside v. Simpson Paper Co.*, 864 P.2d 937, 941 (Wash. 1994) and *Johnson v. Spider Staging Corp.*, 555 P.2d 997, 1000–01 (Wash. 1976)). If no conflict exists, Washington law applies. *Id.* at 1149. An "actual conflict" exists "when the states' laws could produce different outcomes on the same legal issue." *Id.* (quoting *Kelley v. Microsoft Corp.*, 251 F.R.D. 544, 550 (W.D. Wash. 2008)).

41

In support of its claim of "actual conflict" between Washington and Oregon law, Affiliated FM points to Washington Senate Bill 5351 currently pending in the Washington Legislature.  *See* S.B. 5351, 67th Leg., Reg. Sess. (Wash. 2021).[33]  Under its terms, Washington law would be amended to provide that the loss of the ability to use an insured property as a result of COVID-19 is considered a physical loss of or damage to the property, entitling the policyholder to coverage. *See* S.B. 5351, 67th Leg., Reg. Sess. (Wash. 2021).[34]  But, this Bill is not law, which means Affiliated FM's asserted conflict is purely hypothetical.  The Court is unaware of an Oregon Court ruling on this issue yet, let alone a ruling on this issue in a manner contrary to this Court's conclusions.  The Court, therefore, finds no conflict and will continue to apply Washington law as it presently exists.

    b. *Coverage*

Aspen Lodging's claims for coverage must fail.  Aspen Lodging is not entitled to coverage under the general Insurance Provided provision because it has not suffered physical loss of or damage to property.  It is not entitled to coverage under the Communicable Disease Provisions because it did not plead that the COVID-19 virus was found at any of its locations, a requirement for coverage under this extension.

Finally, Aspen Lodging's claim to coverage under the Civil and Military Authority

---

[33] Available at http://lawfilesext.leg.wa.gov/biennium/2021-22/Pdf/Bills/Senate%20Bills/5351.pdf?q=20210408122846

[34] Available at http://lawfilesext.leg.wa.gov/biennium/2021-22/Pdf/Bills/Senate%20Bills/5351.pdf?q=20210408122846

42

extension fails for all the reasons the Court discussed above. Specifically, Aspen Lodging's Civil and Military Authority extension requires that a property within five statute miles of covered property be affected by "physical damage of the type insured." As the Court has already held, COVID-19 does not cause such loss or damage, either to Aspen Lodging's properties or to properties nearby.

For these reasons, the Court will grant Affiliated FM's Motion and deny Aspen Lodging's Motion.

### c. _Extra-Contractual Claims_

Reviewing Aspen Lodging's Complaint, the Court determines that its Extra-Contractual Claims are based on Affiliated FM's denial of coverage, an allegation of improper investigation, and conclusory allegations. _See_ Aspen Lodging Compl. ¶¶ 61, 67, 71–76. Based on the Court's reasoning above, it will dismiss these claims.

## B. Defendant Aspen American Insurance Company (20-cv-00616)

### 1. _Case Background_

Prior to consolidation, five plaintiffs advanced claims against Aspen American Insurance Company.[35] The Court consolidated all five actions under the _Marler_ case. _See Marler_, Order of Consolidation, No. 20-cv-00616, Dkt. No. 41. After consolidation, four of the Plaintiffs (Marler, Aylen, Jagow, and Mikkelson) filed a consolidated amended class action complaint, advancing

---

[35] _See Marler v. Aspen Am. Ins. Co._, No. 20-cv-00616; _Karla Aylen DDS PLLC v. Aspen Am. Ins. Co._, No. 20-cv-00717; _Shokofeh Tabaraie DDS PLLC_ v. _Aspen Am. Ins. Co._, No. 20-cv-01035; _Jagow v. Aspen Am. Ins. Co._, No. 20-cv-01205; _Mikkelson_ v. _Aspen Am. Ins. Co._, No. 20-cv-05378

43

only two causes of action: declaratory judgment and breach of contract. *Marler*, Consolidated Am. Class Action Compl., No. 20-cv-00616, Dkt. No. 43 ¶¶ 87–99. Plaintiff Tabaraie filed a separate, non-class action complaint advancing causes of action for declaratory judgment, breach of contract, failure to act in good faith, and a claim under the WCPA. *Id.*, Pl. Tabaraie's Second Am. Compl., Dkt. No. 46 ¶¶ 102–134 ("Tabaraie Compl.").

After the original five Aspen American Plaintiffs filed their post-consolidation complaints, an additional case filed a class action complaint against Aspen American. *See Manley DDS v. Aspen Am. Ins. Co.*, No. 21-cv-00342. The case was reassigned to the undersigned, *id.*, Dkt. No. 4, and the Plaintiffs agreed to consolidation with *Marler* and adoption of the briefing already pending therein, *id.*, Resp., Dkt. No. 7 at 1. As such, the Court ordered *Manly* consolidated with *Marler* under case number 20-cv-00616. *Id.*, Min. Order, Dkt. No. 8.

    2. *Disposition*

        a. *Coverage*

All Plaintiffs advancing claims against Aspen America were issued the materially same insurance policy. *See Marler*, Def. Aspen Am. Ins. Co.'s Mot. to Dismiss Consolidated Class Action Compl. and Tabaraie Compl., No. 20-cv-00616, Dkt. No. 51 at 1, 3 ("Aspen's Mot."). For convenience, when referring to the relevant insurance policies, the Court will reference the policy of Wade K. Marler DDS. *Id.*, Decl. of Robin Wechkin, Ex. A, Dkt. No. 51-1 ("Marler Policy"). This Policy includes the familiar Coverage Agreement, which agrees to "pay for all direct physical damage to covered property at the premises described on the Declarations caused by or resulting from any covered cause of loss." *Id.* at 8. "Covered Cause of Loss" is defined as "ALL RISK OF DIRECT PHYSICAL LOSS except as excluded or limited in Section II. of this Coverage Part."

44

*Id.* at 25.  The Policy defines "Damage" to include "partial or total loss of or damage to your covered property."  *Id.* at 26.

The Policy also includes coverage for Practice Income, Extra Expense, and Extended Practice Income.  *Id.* at 10, 11.  All three provisions are contingent on direct physical loss or damage.[36]

The Policy also includes a Civil Authority provision, which in this instance acts as a coverage extension to the practice income coverage.  *See id.* at 11 ("We will also pay for the following expenses:"), 14 (Civil Authority: "We will pay for the actual loss of practice income and rents you sustain caused by action of civil authority that prohibits access to the described premises due to the direct physical damage to property, other than at the described premises, caused by or resulting from any covered cause of loss.").  Again, as demonstrated in this excerpt, physical loss or damage is a prerequisite to coverage under the Civil Authority.

As illustrated by the recitation of the policy provisions above, the Aspen American Plaintiffs' claims to coverage fail given the Court's finding that COVID-19 does not cause direct physical loss or damage.  All of the coverage provisions include requirements for "direct physical damage" caused by a "covered cause of loss," which, in turn, requires a "direct physical loss."

---

[36] *See* Marler Policy at 10 (Practice Income provision: "The suspension must be caused by direct physical damage to the building or blanket dental practice personal property at the described premises caused by or resulting from a covered cause of loss . . ."); 11 (Extra Expense provision: "Extra expense means the extra expenses necessarily incurred by you during the period of restoration to continue normal services and operations which are interrupted due to damage by a covered cause of loss to the premises described . . ."), 11 (Extended Practice Income provision: "Loss of practice income must be caused by direct physical damage at the described premises caused by or resulting from any covered cause of loss.").

45

### b. *Plaintiff Tabaraie's Extra-Contractual Claims*

Tabaraie's Extra-Contractual Claims (for Bad Faith and WCPA) fail as well. Reviewing the relevant Complaint, the Extra-Contractual Claims are premised on Aspen American's denial of coverage, an allegation of unreasonable investigation, and conclusory claims that Aspen American violated industry standards or engaged in deceptive practices, none of which are supported by allegations in the Complaint. *See* Tabaraie Compl. ¶¶ 116–118, 122–127.

The Court will grant Aspen American's Motion to Dismiss and dismiss all the claims against Aspen American Insurance Company.

## C. Defendant CNA Financial Corporation (20-cv-00809)

### 1. *Case Background*

This matter consists of five separate plaintiff groups (McCulloch, Noskenda, Hong DDS, Hong PLLC, and Owens Davies) and three separate insurance companies (Valley Forge Insurance Company, Transportation Insurance Company, and National Fire Insurance Company of Hartford) consolidated around a common parent company.[37]  As each of the three insurance companies named is a subsidiary of CNA Financial Corporation, the Court consolidated these matters under the *McCulloch* case. *See McCulloch*, Order on Consolidation, No. 20-cv-00809, Dkt. No. 38.

After consolidation, four of the five plaintiff groups, including McCulloch, Hong PLLC, Hong DDS, and Noskenda filed a consolidated class action Complaint. *See* Consolidated Am.

---

[37] Prior to consolidation, the constituent cases included *Kara McCulloch DMD MSD PLLC v. Valley Forge Ins. Co.*, No. 20-cv-00809; *Noskenda Inc v. Valley Forge Ins. Co.*, No. 20-cv-00854; *Jae Y. Hong DDS PS v. Valley Forge Ins. Co.*, No. 20-cv-00891; *Jae Y Hong PLLC v. Transportation Ins. Co.*, No 20-cv-05556; and *Owens Davies PS v. National Fire Ins. Co. of Hartford*, No. 20-cv-06155.

Class Action Compl., No. 20-cv-00809, Dkt. No. 40.

According to the consolidated Complaint, the Plaintiffs, four dental business and one print shop, *id.* ¶¶ 5–19, advance causes of action for declaratory relief and breach of contract, *id.* ¶¶ 91–103. The policies issued to each of the Plaintiffs represented by this Complaint are materially identical in most relevant respects. *See id.* at ¶ 22; *see also McCulloch*, Decl. of H. Christopher Boehning, Exs. A–D, No. 20-cv-00809, Dkt. Nos. 51-1–51-4 (Policies of McCulloch, Hong PLLC, Hong DDS, and Noskenda). The only difference in insurance policies is that the policy of Hong DDS includes an extra endorsement for Business Income for Interruption of Practice. *See McCulloch*, Decl. of H. Christopher Boehning, Ex. B, No. 20-cv-00809, Dkt. No. 51-2 at 88 ("Hong DDS Policy").

The fifth plaintiff group, Owens Davies, did not file a post-consolidation complaint and, thus, its pre-consolidation complaint remains operative. *See Owens Davies*, Compl., No. 20-cv-06155, Dkt. No. 1 ("Owens Davies Compl."). According to this complaint, Owens Davies owns and operates a law firm in Olympia, Washington. *Id.* ¶ 5. Its Complaint does not include class allegations. *See generally id.* Owens Davies advances causes of action for declaratory relief, breach of contract, insurance bad faith, negligence, and claims under the WCPA and IFCA, *id.* ¶¶ 70–91. The Firm's insurance policy does not materially differ from those of the first set of CNA Plaintiffs, except that it includes the same Business Income for Interruption of Practice endorsement as Hong DDS. *See McCulloch*, Defs.' Mot. to Dismiss Compl., No. 20-cv-00809, Dkt. No. 50 at 5–8 ("CNA's Mot. to Dismiss"); *McCulloch*, Decl. of H. Christopher Boehning, Ex. E, No. 20-cv-00809, Dkt. No. 51-5 at 83 ("Owens Davies Policy").

As the policies are materially the same, the Court will cite only to the Policy of Owens

47

Davies in describing the terms of insurance. In the Businessowners Special Coverage Form, the Coverage clause provides that the insurer "will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations cause by or resulting from a Covered Cause of Loss." Owens Davies Policy at 19. "Covered Cause of Loss" is defined as "RISKS OF DIRECT PHYSCIAL LOSS" unless otherwise excluded. *Id.* at 20.

The Policy also includes an endorsement (effectively an extension) for Business Income and Extra Expenses, including provisions for Business Income, *id.* at 41,[38] Extra Expense, *id.* at 42,[39] and Extended Business Income, *id.* at 42.[40] It also includes an endorsement for Civil Authority coverage. *Id.* at 67.[41]

---

[38] Stating

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.

[39] Stating

> Extra Expense means reasonable and necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss.

[40] Stating

> If the necessary "suspension" of your "operations" produces a Business Income loss payable under Paragraph 1. Business Income above, we will also pay for the actual loss of Business Income you sustain during the period that: . . .

> this extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of loss in the area where the described premises are located.

[41] Stating

> When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to the actual loss of Business Income you sustain and reasonable and necessary Extra Expense you incur caused by action of civil authority that prohibits access to the described

48

## 2.   *Disposition*

### a.   *Coverage*

Defendants argue there is no coverage under all of the aforementioned provisions based on the fact that COVID-19 does not cause physical loss or damage.  *See* CNA's Mot. to Dismiss at 11–18.  Given that the Court has already concluded that COVID-19 does not cause physical loss or damage, it finds no coverage under the terms of the insurance policies.

### b.   *Business Income for Interruption of Practice Endorsement*

Owens Davies and Hong DDS's arguments relevant to their Business Income for Interruption of Practice endorsement, *see* Omnibus Resp. at 51–3, also fail.  This provision states:

> This endorsement modifies insurance provided under the following:
>> BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM
>> BUSINESS INCOME AND EXTRA EXPENSE
>
> The following coverage is added to your Businessowners Special Property Coverage Form:
>
> Except as otherwise stated in this endorsement, the terms and conditions of the policy apply to the insurance stated below.
>
> This insurance applies only when Business Income Coverage is included with the policy.
>
>> 1. The following changes are made to the coverages of Business Income and Extra Expense, Civil Authority, and Utility Services - Time Element, if attached to this policy:
>>
>> For Loss of Business Income at each scheduled location affected by the suspension of your "operations" we will pay:

---

premises. The civil authority action must be due to direct physical loss of or damage to property at locations, other than described premises, caused by or resulting from a Covered Cause of Loss.

49

a. The daily limit shown in the Declarations without reduction for discontinuing expenses or rescheduled clients, but only for the initial 30 days of loss, or portion of a day, for each occurrence, or

b. The actual loss of Business Income during the "period of restoration."

For each occurrence you can select either a. or b. above. . . .

Owens Davies Policy at 83.

Owens Davies and Hong DDS claim that the Endorsement "expanded [the] coverage" provided by their policies and ties it to a "'suspension of operations,' regardless of whether [the insured] ha[s] also suffered a physical loss of or damage to property." Omnibus Resp. at 51. In other words, they claim the Endorsement provided a separate ground for establishing coverage not tied to the physical loss and damage requirements of the Business Income, Extra Expense, Extended Business Income, and Civil Authority provisions.

Reviewing the Endorsement, the Court determines that it does not establish independent grounds for coverage. As it makes clear, "[e]xcept as otherwise stated in this endorsement, the terms and conditions of the policy apply to the insurance stated below." *Id.* In other words, the Endorsement does not otherwise change the requirements of Business Income and Extra Expense coverage, including that physical loss or damage be present in order to trigger coverage.

Instead, as Defendants point out, a straightforward reading of the Endorsement leads to the conclusion that it "provides an alternative method for calculating lost income under the existing Business Income, Extra Expense, and Civil Authority coverages" all of which require physical loss or damage in the first instance. Omnibus Reply at 42; *see also id.* at 42–46. In other words, the Endorsement claims only to *modify* the coverage provided in the Business Owners Special Property Coverage Form by providing two options to calculate what the insurer will pay, including

50

(with further limitations) "a. the daily limit shown in the Declarations" or "b. the Actual loss of Business Income during the 'period of restoration'" and then gives the insured the opportunity "[f]or each occurrence you can select either a. or b. above." Owens Davies Policy at 83. Thus, Owens Davies and Hong DDS cannot rely on the Endorsement to provide coverage where the policy does not otherwise establish coverage.

### c. *Extra-Contractual Claims*

Only Owens Davies advances Extra-Contractual Claims (for bad faith, negligence, WCPA, and IFCA). Reviewing its Complaint, the Court determines that its Extra-Contractual Claims, in addition to wrongful denial of coverage, are based on allegations of incomplete investigation and unfair practices too conclusory to withstand dismissal. *See* Owens Davies Compl. ¶¶ 81, 83, 85, 87–88, 90.

Based on the foregoing, the Court will grant the CNA Defendants' Motion and dismiss these actions.

## D. Defendant Fireman's Fund Insurance Company (20-cv-01079)

### 1. *Case Background*

Prior to consolidation, four cases advanced claims against Fireman's Fund.[42] The Court consolidated these matters under *Vita Coffee*. See *Vita Coffee*, Order on Consolidation, 20-cv-01079, Dkt. No. 36.

---

[42] *See Vita Coffee LLC v. Fireman's Fund Ins. Co.*, 20-cv-01079; *ES Rest. Group Inc. v Fireman's Fund Ins. Co.*, 20-cv-01193; *Worthy Hotels Inc. v. Fireman's Fund Ins. Co.*, 20-cv-01515; *Naccarato Rest. Group Inc. v. Fireman's Fund Ins. Co.*, 20-cv-06108.

On January 8, 2021, Plaintiff Weimac LLC also filed suit against Fireman's Fund. *See Weimac LLC v. Fireman's Fund Ins. Co.*, No. 21-cv-0025. Based on the similarity in claims, the Court ordered the action consolidated with *Vita Coffee*. *See id.*, Min. Order, Dkt. 6.

None of these five plaintiff groups refiled their complaints after consolidation, so their pre-consolidation complaints remain operative.[43] All include Extra-Contractual Claims.[44] Additionally, none pleads the actual presence of COVID-19 on their premises.

Because each plaintiff group retained separate operative Complaints, Fireman's Fund filed separate Motions to Dismiss.[45] Fireman's Fund filed its Motion to Dismiss against ES Restaurant prior to consolidation and did not refile it post-consolidation. *ES Restaurant*, Def.'s Mot. to Dismiss Compl., No. 20-cv-01193, Dkt. No. 4 ("ES Mot. to Dismiss").[46]

After Fireman's Fund filed its Motions to Dismiss, one additional Plaintiff filed suit against it, *see Canlis Inc v. Fireman's Fund Ins. Co.*, No. 21-cv-00373, and another plaintiff group filed suit against National Surety Corporation, which is a subsidiary of Fireman's Fund, *see 13 Coins*

---

[43] *See Vita Coffee*, Compl., No. 20-cv-01079, Dkt. No. 1-1 ("Vita Coffee Compl."); *ES Rest. Group*, Compl., No. 20-cv-01193, Dkt. No. 1-1 ("ES Compl."); *Worthy Hotels*, Compl., No. 20-cv-01515, Dkt. No. 1 ("Worthy Compl."); *Naccarato Rest. Group*, Compl., No. 20-cv-06108, Dkt. No. 1 ("Naccarato Compl."); *Weimac LLC*, Compl., No. 21-cv-0025, Dkt. No. 1 ("Weimac Compl.").

[44] *See* Vita Coffee Compl. ¶¶ 4.1–4.4, 4.9–4.16 (IFCA and WCPA); ES Compl. ¶¶ 63–72, 75–81 (Bad Faith, WCPA, IFCA); Worthy Compl. ¶¶ 75–91, 97–101 (IFCA, Bad Faith, Negligence, CPA); Naccarato Compl. ¶¶ 47–56 (Bad Faith, WCPA); Weimac Compl. ¶¶ 70–85 (IFCA, WCPA, Bad Faith).

[45] *See Vita Coffee*, Mots. to Dismiss, No. 20-cv-01079, Dkt. Nos. 10 ("Vita Coffee Mot. to Dismiss"); 41 ("Worthy/Naccarato Mot. to Dismiss"); 51 ("Weimac Mot. to Dismiss").

[46] Additionally, three groups submitted a Motion to appear as Amicus on behalf of Plaintiffs. *Vita Coffee*, United Policyholders, Nat'l Indep. Venue Ass'n, and Wash. Hosp. Ass'n's Mot. for Leave to Appear as Amici Curiae in Support of Vita Coffee's Opp'n to Def.'s Mot. to Dismiss., No. 20-cv-01079, Dkt. No. 18. Fireman's Fund opposed leave. *Id.*, Def.'s Opp'n to Motion for Leave to Appear as Amici Curiae, Dkt. No. 23. As the Court resolves the Motions without reference to Amici's proposed brief, the Motion for Leave is denied as moot.

52

*Mgmt. LLC v. Nat'l Surety Corp.*, No. 21-cv-00178. The Plaintiffs in each of these actions agreed to consolidation with *Vita Coffee* and to be bound by the Court's rulings regarding the existing Motions.[47]

### 2. *Disposition*

Fireman's Fund's Motions raise many of the same arguments addressed in the General Findings section. For example, Fireman's Fund argues that Plaintiffs fail to establish a covered loss; that there is no coverage under Civil Authority provisions; and that Virus exclusions also bar coverage.[48] Additionally, Fireman's Fund asserts that ES Restaurant and Naccarato fail to establish coverage under a unique Crisis Event Business Income provision.[49]

In response, the Vita Coffee and Worthy Plaintiffs offered three other provisions—Communicable Disease Coverage, Dependent Property Coverage, and Business Access Coverage extensions—which they claim as independent grounds for coverage.[50]

### a. *Coverage*

The Court finds that the Policies at issue[51] do not differ from those examined in the General

---

[47] *See Canlis*, Stipulation and Joint Mot. to Consolidate Under LCR 42, No. 21-cv-00373, Dkt. No. 9; *13 Coins Mgmt.*, Stipulation and Joint Mot. to Consolidate Under LCR 42, No. 21-cv-00178, Dkt. No. 6; *see also Vita Coffee*, Order Granting Parties' Stipulated Mot., No. 20-cv-01079, Dkt. No. 64.

[48] *See* Vita Coffee Mot. to Dismiss at 11–24; ES Mot. to Dismiss at 9–21; Worthy/Naccarato Mot. to Dismiss at 11–21, 23–24; Weimac Mot. to Dismiss at 7–16.

[49] ES Mot. at 21–24; Worthy/Naccarato Mot. to Dismiss at 21–22.

[50] *See Vita Coffee*, Pl. Vita Coffee, LLC's Opp'n to Def. Fireman's Fund Ins. Co.'s Mot. to Dismiss. No. 20-cv-1079, Dkt. No. 21 at 18–22; *id.*, Pl. Worthy Hotels, Inc. et al., and Naccarato Rest. Group Inc.'s Consolidated Resp. to Def.'s Mot. to Dismiss, Dkt. No. 46 at 17.

[51] *See Vita Coffee,* Decl. of Anthony Todaro, Ex. A, No. 20-cv-01079, Dkt. No. 11-1 ("Vita Coffee Policy"); *id.* Decl. of Anthony Todaro, Ex. A, Dkt. No. 42-1 ("Worthy Policy"); *id.* Decl. of Anthony Todaro, Ex. B, Dkt. No.

53

1  Findings section and, thus, the same findings apply, namely that Plaintiffs have failed to show a

2  covered loss, there is no independent coverage under the Civil Authority provision, and the Virus

3  exclusion further bars coverage.

4      First, each of the Policies relies on "direct physical loss or damage" or "direct physical loss

5  of or damage to" covered property to trigger coverage. *See Vita Coffee Policy* at 30.[52]

6      Second, each of the Policies contains a Civil Authority provision which also requires direct

7  physical loss or damage. *See Vita Coffee Policy* at 42 ("Such prohibition of access to such location

8  by civil authority must: (1) Arise from direct physical loss or damage to property other than at

9  such location").[53]

10

11     Third, the Policies of Vita Coffee, Worthy, and Weimac contain applicable Virus

12  exclusions (here called "Mortality and Disease"). *See Vita Coffee Policy* at 32; Worthy Policy at

13  34; Weimac Policy at 43.

14     For all the reasons previously found, the policies do not provide coverage.

15     b.  *ES Restaurant and Naccarato's Crisis Event Business Income Provision*

16     The ES Restaurant and Naccarato Policies contain a unique Crises Event Business Income

17  extension, which provides:

18

19          We will pay for the actual loss of crisis event business income you sustain due to
            the necessary suspension of your operations during the crisis event period of
20          restoration. The suspension must be caused by or result from a covered crisis event

21

22

23  42-2 ("Naccarato Policy"); *id.*, Decl. of Anthony Todaro, Ex. A, Dkt. No. 52-1 ("Weimac Policy"); *ES Restaurant
    Group*, Decl. of Anthony Todaro, Ex. A, No. 20-cv-01193, Dkt. No. 5-1 ("ES Policy").

24  [52] *See also* Worthy Policy at 31; Naccarato Policy at 38; Weimac Policy at 41; ES Policy at 48.

25  [53] *See also* Worthy Policy at 45; Naccarato Policy at 61; Weimac Policy at 53; ES Policy at 71.

at your covered premises.

Naccarato Policy at 81; ES Policy at 91.

A "covered crisis event" includes:

b. Premises contamination. *Necessary closure* of your covered premises due to any sudden, accidental and unintentional contamination or impairment of the covered premises or other property on the covered premises which results in clear, identifiable, internal or external visible symptoms of bodily injury, illness, or death of any person(s). This includes covered premises contaminated by communicable disease, Legionnaires' disease, but does not include premises contaminated by other pollutants or fungi.

Naccarato Policy at 84; ES Policy at 94 (emphasis added).

Here, both ES Restaurant and Naccarato's Complaints fail to plead sufficient facts to show they fulfilled either requirement. Both Complaints fail to plead a "necessary closure." For example, while Naccarato's Complaint claims the restaurant permanently closed due to financial hardship, it also states that the restaurant was able to remain open for take-away orders. Naccarato Compl. ¶ 14. Thus, it cannot show a necessary closure as a result of COVID-19. Similarly, ES Restaurant's Complaint claims that it closed its restaurants on March 16, 2020 and switched to carry-out service at several of its locations. *See* ES Compl. ¶¶ 31, 42. The same then applies.

As such, there is no independent coverage established by the Crisis Event Business Income provision.

     c. *Communicable Disease Coverage, Dependent Property Coverage, and Business Access Coverage Extensions*

Finally, the Vita Coffee and Worthy Plaintiffs rely on three extensions to claim independent grounds for coverage.

First, the Communicable Disease Coverage extension provides

We will pay for direct physical loss or damage to Property Insured caused by or

55

resulting from a covered communicable disease event at a location including the following necessary costs incurred to:

(a) Tear out and replace any part of Property Insured in order to gain access to the communicable disease;

(b) Repair or rebuild Property Insured which has been damaged or destroyed by the communicable disease; and

(c) Mitigate, contain, remediate, treat, clean, detoxify, disinfect, neutralize, cleanup, remove, dispose of, test for, monitor, and assess the effects [of] the communicable disease.

Vita Coffee Policy at 45–46; Worthy Policy at 49–50.

The policy defines "communicable disease" as "any disease, bacteria, or virus that may be transmitted directly or indirectly from human or animal to human" and a "communicable disease event" as "an event in which a public health authority has ordered that a location be evacuated, decontaminated, or disinfected due to the outbreak of a communicable disease at such location." Vita Coffee Policy at 76; Worthy Policy at 83.

This Provision, however, fails to provide coverage for two reasons. First, it requires direct physical loss and damage, which COVID-19 does not cause when present. Second, neither Plaintiff has claimed the actual presence of COVID-19, which is required as a "communicable disease event" must take place at the "location" of "Property Insured." As neither business documented the presence of COVID-19 on their premises, no public health authority issued an order specifically evacuating either premises in order to decontaminate or disinfect a known outbreak.[54]

---

[54] In these two ways, Vita Coffee and Worthy's claims differ from those of Vancouver Clinic, whose Communicable Disease provisions provided coverage. *See supra* at 35, 37. Vancouver Clinic's provisions did not require physical loss or damage, where Vita Coffee and Worthy's policies do. Additionally, while Vancouver Clinic plead actual presence, Vita Coffee and Worthy did not.

56

Next, the Dependent Property Coverage extension provides:

(1) We will pay for actual loss of business income and necessary extra expense you sustain due to the necessary suspension of operations during the period of restoration at a location.
(2) The suspension must be due to direct physical loss or damage at the location of a dependent property, situated inside or outside of the Coverage Territory, caused by or resulting from a covered cause of loss.

Vita Coffee Policy at 42; Worthy Policy at 45.

Again, the Provision requires direct physical loss or damage, which the Court has held COVID-19 does not cause.

Finally, the Business Access Coverage extension is also unavailable because it too relies on physical loss or damage. As it provides,

We will pay for the actual loss of business income and necessary extra expense you sustain due to the necessary suspension of operations at a location if access to such location is impaired or obstructed. Such impairment or obstruction must: (1) Arise from direct physical loss or damage to property other than at such location; and (2) Be caused by or result from a covered cause of loss;

Vita Coffee Policy at 42; Worthy Policy at 44.

Based on the foregoing, none of the three extensions provide independent grounds for coverage. No Fireman's Fund Plaintiff has established a claim for coverage under its policy.

3. *Extra-Contractual Claims*

Reviewing the Fireman's Fund Plaintiffs' operative Complaints, the Court determines that none has plead conduct independent of unreasonable denial of claims, insufficient investigation, and conclusory claims of deceptive practices sufficient to support their Extra-Contractual Claims. *See* Vita Coffee Compl. ¶¶ 4.3, 4.13, 4.15; ES Compl. ¶¶ 65, 68–71, 79; Worthy Compl. ¶¶ 78–79, 86, 90, 98–99; Naccarato Compl. ¶¶ 49–51, 54; Weimac Compl. ¶¶ 71–73, 78–79, 84. As such, these claims also fail.

57

Based on the foregoing, the Court will grant Fireman Fund's Motions to Dismiss, and dismiss all claims against it.

## E. Defendant Hanover Insurance Group, Inc. (20-cv-05437)

### 1. *Case Background*

Two actions are advanced against Hanover subsidiaries. The first is *Caballero v. Mass. Bay Ins. Co.*, No. 20-cv-05437. As part of consolidated briefing, Massachusetts Bay filed its Motion to Dismiss Caballero's claims on January 15, 2021. *Id.*, Def.'s Rule 12 Mots. Against Pl.'s First Am. Compl., Dkt. No. 56 ("Mass. Bay's Mot. to Dismiss"). Caballero opposed this Motion through the Omnibus Response. *Id.*, Pls.' Omnibus Opp'n to Defs.' Mots. to Dismiss, Dkt. No. 63.

The second action is *Walker & Kraus DDS PLLC v. Citizens Ins. Co. of Am.*, No. 21-cv-00345, which was filed on March 12, 2021. As Massachusetts Bay's Motion to Dismiss was already pending in the *Caballero* action, and the claims were substantially similar, the Parties in *Walker & Kraus* agreed to consolidate with *Caballero*, adopt the Motion to Dismiss filed therein, and abide by this Court's ruling resolving the Motion. *Id.*, Dkt. No. 13 (Stipulation and Order on Consolidation).

### 2. *Disposition*

Massachusetts Bay's Motion raises all the familiar grounds: lack of direct physical loss or damage; lack of coverage under Extended Business Income Coverage, Civil Authority, Denial of Access Coverage extensions; and applicability of a Virus exclusion. Mass. Bay's Mot. to Dismiss at 7–16.

Examining Caballero's Policy, the Court finds all of its general findings apply. First, the

58

Policy requires "direct physical loss of or damage to a described premises" in order to trigger coverage. Caballero Policy at 66. The Extended Business Income and Civil Authority extensions require coverage for Business Income as a condition precedent. *Id.* at 67 (Extended Business Income: "If no Business Income Coverage is provided under this Coverage Form, then there is no Extended Business Income Coverage afforded under this Coverage Form"); 69 (Civil Authority: "When Business Income Coverage is provided under this Coverage Form. . .").

The Civil Authority and Denial of Access to Premises extensions also explicitly require "direct physical loss or damage to property within one mile of the described premises." *Id.* at 69; *see also id.* at 25 (Denial of Access to Premises extension).[55] Finally, the Policy includes an applicable Virus or Bacteria exclusion. *Id.* at 98. As such, the Policy does not provide coverage in these circumstances.

Caballero's Complaint does not include Extra-Contractual Claims. *See Caballero*, Compl.–Class Action, No. 20-cv-05437, Dkt. No. 1. The Court will grant Massachusetts Bay's Motion and dismiss the claims against Hanover in their entirety.

## F. Defendant The Hartford Financial Services Group (20-cv-00627)

### 1. *Case Background*

Prior to consolidation, twelve separate cases advanced claims against three Hartford

---

[55] Stating

> We will pay for the actual loss of Business income you sustain and necessary Extra Expense you incur when ingress to or egress from the described premises is prevented, due to direct physical loss of or damage to property that is away from but within 2000 feet of the described premises, caused by or resulting from any Covered Cause of Loss covered under this policy.

subsidiaries.[56]   The Court consolidated these matters under the *Chorak* case.  *Chorak*, Order on Consolidation, No. 20-cv-00627, Dkt. No. 38.  After consolidation, two additional cases filed suit against a Hartford subsidiary.  *See Seuk v. Sentinel Ins. Co. Ltd.*, 21-cv-00346; *MD Spektor DDS PLLC v. Sentinel Ins. Co. Ltd.*, 21-cv-00544.  The Parties in these additional cases stipulated to consolidation with *Chorak* and adoption of the briefing pending at that time.  *Seuk*, Stipulated Mot. and Order to Consolidate, 21-cv-00346, Dkt. No. 12; *MD Spektor*, Stipulated Mot. and Order to Consolidate, No. 21-cv-00544, Dkt. No. 9.

After consolidation, several Plaintiffs consolidated their Complaints into a single class action Complaint, while others chose to file amended Complaints in the consolidated action.  Other Plaintiffs chose not to refile complaints and, thus, their pre-consolidation Complaints remain operative.  The operative Complaints are as follows:

A.  Plaintiffs Chorak, Kim, Prato, Lee, Glow Medispa, LLC, and KCJ Studios LLC: *Chorak*, Consolidated Am. Class Action Compl., No. 20-cv-00627, Dkt. No. 40 ("Class Action Compl.");

B.  Plaintiff Strelow: *Chorak*, Pl. Strelow's Second Am. Compl. for Money Damages and Injunctive Relief, No. 20-cv-00627, Dkt. No. 48 ("Strelow Compl.");

C.  Plaintiff the Seattle Symphony Orchestra: *Chorak*, First Am. Compl., No. 20-cv-00627, Dkt. No. 49 ("Seattle Symphony Compl.");

D.  Plaintiff J Bells, LLC: *Chorak*, Pl. J Bells, LLC DBA Bishops Cuts and Colors'

---

[56] *See Chorak v. Hartford Cas. Ins. Co.*, 20-cv-00627; *Kim v. Sentinel Ins. Co. Ltd.*, 20-cv-00657; *Glow Medispa LLC v. Sentinel Ins. Co. Ltd.*, 20-cv-00712; *Strelow v. Hartford Cas. Ins. Co.*, 20-cv-00797; *KCJ Studios LLC al v. Sentinel Ins. Co. Ltd.*, 20-cv-01207; *Seattle Symphony Orchestra v. Hartford Fire Ins. Co.*, 20-cv-01252; *SCRBKR2017 LLC v. Sentinel Ins. Co. Ltd.*, 20-cv-01537; *Seattle Bakery LLC v. Sentinel Ins. Co. Ltd.*, 20-cv-01540; *Piroshky Piroshky Bakery LLC v. Sentinel Ins. Co. Ltd.*, 20-cv-01541; *Prato v. Sentinel Ins. Co. Ltd.*, 20-cv-05402; *Lee v. Sentinel Ins. Co. Ltd.*, 20-cv-05422; and *J Bells LLC v. Sentinel Ins. Co. Ltd.*, 20-cv-05820.

First Am. Compl., No. 20-cv-00627, Dkt. No. 50 ("J Bells Compl.");

E.  Plaintiff SCRBKR 2017 LLC: *SCRBKR2017 LLC*, Compl., No. 20-cv-01537, Dkt. No. 1-1 ("SCRBKR Compl.");

F.  Plaintiff Seattle Bakery LLC: *Seattle Bakery LLC*, Compl., No. 20-cv-01540, Dkt. No. 1-1 ("Seattle Bakery Compl."); and

G.  Plaintiff Piroshky Piroshky Bakery LLC: *Piroshky Piroshky Bakery LLC*, Compl., No. 20-cv-01541, Dkt. No. 1-1 ("Piroshky Piroshky Compl.").

Several of these complaints advance Extra-Contractual Claims.[57]

In response to these various complaints, Hartford filed a single Motion to Dismiss. *Chorak*, Defs. Hartford Cas. Ins. Co., Hartford Fire Ins. Co., and Sentinel Ins. Co., Ltd.'s Mot. to Dismiss and Motion for J. on the Pleadings, No. 20-cv-00627, Dkt. No. 56 ("Hartford's Mot. to Dismiss"). The Motion advances the familiar contentions that all Plaintiffs have failed to show direct physical loss or damage and that no independent coverage is provided by the Civil Authority provision located in each business's policy. *See id.* at 6–20. Additionally, the Motion addresses an argument made by Seattle Symphony regarding a write-off of a Virus exclusion located in its policy. *See id.* at 20; *see also* Seattle Symphony Compl. ¶¶ 15–16, 49–50.

All Hartford Plaintiffs participated in the Omnibus Response. *See Chorak*, Pls.' Omnibus Opp'n to Defs.' Mots. to Dismiss, No. 20-cv-00627, Dkt. No. 64. In addition to signing onto all of the general arguments made therein, Seattle Symphony responded to Hartford's claims

---

[57] *See* Strelow Compl. ¶¶ 112–139 (Bad Faith, WCPA, IFCA); Seattle Symphony Compl. ¶¶ 61–71 (Bad Faith, WCPA, IFCA, Negligence); J Bells Compl. ¶¶ 39–50 (WCPA, Bad Faith); SCRBKR Compl. ¶¶ 4.1–7.7 (Bad Faith WCPA, IFCA); Seattle Bakery Compl. ¶¶ 4.1–7.7 (Bad Faith, WCPA, IFCA); Piroshky Piroshky Compl. ¶¶ 4.1–7.7 (Bad Faith, WCPA, IFCA)

regarding its Virus exclusion write-off. *Id.* at 44–46. Also in the Omnibus Response, the "Piroshky Plaintiffs"[58] alleged independent grounds for coverage under two provisions in their policies: a Food Contamination Coverage and a Dependent Property Coverage provision. *Id.* at 47–50; *see also* SCRBKR Compl. ¶¶ 2.10, 2.12; Seattle Bakery Compl. ¶¶ 2.10, 2.12; Piroshky Piroshky Compl. ¶¶ 2.10, 2.12.

    2. *Coverage*

    The Hartford Defendants issued the same Spectrum Business Owner's Policies to most of the Plaintiffs. *See* Hartford's Mot. to Dismiss at 2–3 n.1. The only outlier is the policy of Seattle Symphony, which is a Special Multi-Flex Business Insurance Policy. *Id.* at 2–3 n.2. The Court will refer to the policy of Dr. Mario Chorak, DMD, PS to exemplify the Spectrum Business Owner's Policies, *see id.*, Ex. B, Dkt. No. 56-2 ("Chorak Policy"), as well as the Seattle Symphony's policy, *id.*, Ex. M, Dkt. No. 56-13 ("Seattle Symphony Policy").

    Both Policies rely on "direct physical loss of or damage to" covered property to trigger

---

[58] The "Piroshky Plaintiffs" consist of SCRBKR 2017, LLC; Seattle Bakery LLC and CSQBKR2018, LLC; and Piroshky Piroshky Bakery LLC and Piroshky Baking Company, LLC. Omnibus Resp. at iv. While these Plaintiffs filed separate actions and submitted separate Complaints, they run similar businesses selling piroshky and other baked goods at locations such as the South Center Mall, Columbia Center food court, and Pike Place Market. *See* SCRBKR Compl. ¶¶ 2.1; Seattle Bakery Compl. ¶¶ 2.1–2.2; Piroshky Piroshky Compl. ¶¶ 2.1–2.2. It is not clear from the face of the Complaints how inter-related these companies and businesses are.

coverage in the first instance.  Chorak Policy at 40;[59] Seattle Symphony Policy at 70.[60]  Further, both Policies' Civil Authority provisions require direct physical loss.  Chorak Policy at 32,[61] 41;[62] Seattle Symphony Policy at 56, 85.[63]

As such, for all the reasons detailed previously, the Court finds that the Policies fail to trigger coverage under either provision.

### 3.  *Seattle Symphony's Virus Exclusion*

Seattle Symphony's arguments regarding its Virus exclusion write-off are not persuasive.

---

[59] Stating

> We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration."  The suspension must be caused by direct physical loss of or physical damage to property at the "scheduled premises," including personal property in the open (or in a vehicle) within 1,000 feet of the "scheduled premises", caused by or resulting from a Covered Cause of Loss.

[60] Stating

> We will pay up to the Special Business Income Limit of Insurance stated in the Property Choice – Schedule of Premises and Coverages for the actual loss of Business Income you sustain and the actual, necessary and reasonable Extra Expense you incur due to the necessary interruption of your business operations during the Period of Restoration due to physical loss of or direct physical damage to property caused by or resulting from a Covered Cause of loss at "scheduled Premises" . . ..

[61] Stating

> 3. Covered Cause of Loss
>
> RISKS OF DIRECT PHYSICAL LOSS. . .

[62] Stating

> q. Civil Authority
>
> (1) This insurance is extended to apply to the actual loss of Business Income you sustain when access to your "scheduled premises" is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate are of your "scheduled premises."

[63] Stating the same as the Chorak Policy but defining Covered Cause of Loss as

> Covered Causes of Loss means direct physical loss or direct physical damage that occurs during the Policy Period and in the Coverage Territory unless the loss or damage is excluded or limited in this policy.

The policy in question contains a "Fungus, Wet Rot, Dry Rot, Bacteria or Virus" exclusion, which excludes damages caused by the "[p]resence, growth, proliferation, spread or any activity of 'fungus,' wet rot, dry rot, bacteria or virus." Seattle Symphony Policy at 86. The Policy, however, also includes a Washington State Specific Endorsement, which deletes this exclusion. *Id.* at 45.[64]

Seattle Symphony argues that the Endorsement's removal of the Virus exclusion demonstrates "that the average purchaser of insurance would reasonably interpret the Hartford policy to extend coverage for the 'physical loss of or damage to' property caused by a virus." Omnibus Resp. at 45; *see id.* at 44–46. The Symphony's argument is that the inclusion of the Virus exclusion in the first instance demonstrates that "physical loss or damage" covers harms by viruses, which must then be excluded. Further, the endorsement's removal of the Virus exclusion then demonstrates the Parties' intent that the Symphony's Policy should cover such losses.

Hartford rebuts the Symphony's arguments, contending that removal of an exclusion cannot, by itself, create coverage where none exists in the first place. Omnibus Reply at 35–36.

---

[64] Specifically, the Endorsement appears as follows:

"FUNGUS", WET ROT, DRY ROT, BACTERIA AND VIRUS – REMOVAL OF LIMITATIONS – WASHINGTON

This endorsement modifies insurance provided under the following:

PROPERTY CHOICE COVERAGE PART

The Following applies to insured risks situated in Washington:

. . .

B. Applicable to the PROPERTY CHOICE – COVERED CAUSES OF LOSS AND EXCLUSIONS FORM:

Specific Exclusion – "Fungus", Wet Rote, Dry Rot, Bacteria or Virus is deleted.

64

1    The Court agrees.

2           Reviewing the Policy, it is clear that the write-off does not seek to alter the requirement for

3    direct physical loss or damage.  Rather, it simply removes an exclusion.  Seattle Symphony seems

4    to concede as much, recognizing that the "endorsement deleting the virus exclusion [does not]

5    override the plain language of the Hartford policy."  Omnibus Resp. at 44.  Instead, its argument

6    is that the endorsement merely "provides further evidence that Hartford intended the policy to

7    extend coverage for 'physical loss of or damage to' property."  *Id.*  The Court, however, has found

8    that the term does not include the losses Seattle Symphony alleges, and deletion of an exclusion

9    does not provide sufficient evidence to conclude otherwise.

10          4.  *Piroshky Plaintiffs' Additional Grounds for Coverage*

11          The Piroshky Plaintiffs allege that additional grounds for coverage are found in the Food

12   Contamination Coverage and Dependent Property Coverage provisions located in their policies.[65]

13   *See* Omnibus Resp. at 47–50.  Hartford argues that neither provision creates independent grounds

14   for coverage.  *See* Omnibus Reply at 36–42.  Hartford is correct.

15          a.  *Food Contamination Coverage*

16          The Food Contamination Coverage provision states that

17          We will pay the actual loss of Business Income and Extra Expense if your
           "operations" at any "scheduled premises" are ordered by a government authority to
18         be suspended due to the discovery of or the suspicion of "food contamination."

19   Piroshky Policy at 143.

---

[65] The relevant provisions in each of the Piroshky Plaintiffs' policies do not differ.  As such, the Court will refer only to the Policy of Piroshky Piroshky Bakery, LLC.  *See Chorak*, Hartford's Mot. to Dismiss, Ex. I, Dkt. No. 56-9 ("Piroshky Policy").

The Policy defines "Food Contamination" as

The incidence of food poisoning to one or more of your patrons that is caused by or results from tainted food you purchased, improperly stored, handled or prepared, or a communicable disease that was transmitted by you or one or more of your employees.

*Id.*

The Piroshky Plaintiffs contend that the Food Contamination Coverage provision provides coverage independent of the presence of direct physical loss or damage and does not require actual food contamination, instead merely the suspicion of food contamination or the transmission directly from waiter to patron. Omnibus Resp. at 47–49. Hartford argues there is no coverage under the Food Contamination Coverage provision because (1) the restaurants' operations were not suspended as they continued to conduct carry out and delivery service throughout the pandemic; (2) they cannot show an incidence of "food poisoning"; and (3) the Governor's Proclamations were not based on the discovery or suspicion of a food contamination, but, instead, based on a global pandemic. Omnibus Reply at 36–39.

The Court finds the Provision inapplicable. COVID-19 is not a food-borne illness, as it is transmitted through exposure to the airborne respiratory fluids of contagious individuals. Adopting the Piroshky Plaintiffs' theory that a *food* contamination provision is applicable because of waiter-patron transmission regardless of the presence of a food-borne illness would strain the Provision beyond recognition. *See, e.g., Food Poisoning*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/food%20poisoning (last visited May 28, 2021) (defining food poisoning as "an acute gastrointestinal disorder caused by bacteria or their toxic products or by chemical residues in food."). Furthermore, Plaintiffs fail to point to any incidence

66

of food poisoning or food contamination.  *See Nashville Underground, LLC v. AMCO Ins. Co.*, No. 20-cv-00426, 2021 WL 826754, at *4–*11 (M.D. Tenn. Mar. 4, 2021) (finding similar Food Contamination provision did not provide coverage as a result of COVID-19); *see also Whiskey River on Vintage*, 2020 WL 7258575, at *17.

> b. *Dependent Property Coverage*

The Dependent Property Coverage provision states that

> We will pay for the actual loss of Business Income you sustain due to direct physical loss or physical damage at the premises of a dependent property caused by or resulting from a Covered Cause of Loss.

Piroshky Policy at 43.

The Piroshky Plaintiffs claim that the Dependent Property Coverage provision triggers coverage when COVID-19 positive clients (who are themselves suffering direct physical loss or damage from the virus) fail to frequent their restaurants due to the disease.  *Id.* at 49–50. Defendants argue the Dependent Property Coverage does not apply based on the fact that it too requires direct physical loss or damage.  Omnibus Reply at 39–42.

The Piroshky Plaintiffs' argument fails.  The Dependent Property Coverage provision relies on direct physical loss or physical damage, which the Court has held that COVID-19 does not cause to property.  Furthermore, Plaintiffs' strained theory that its clientele constitutes dependent property who are themselves suffering physical damage is untenable.  The Policy defines "Dependent Property" as "property owned, leased or operated by others whom you depend on to: . . . (b) Accept your products or services."  Piroshky Policy at 42.  This was clearly not intended to include restaurant patrons.

67

### 5. *Extra-Contractual Claims*

Based on the foregoing, the Court finds no coverage under any of the applicable policies. Reviewing the relevant Complaints, the Court determines that all of the plead Extra-Contractual Claims should also be dismissed as they are premised on allegations of unreasonable denial of coverage, incomplete investigations, and conclusory allegations of violations of consumer protection regulations which are unsupported by Plaintiffs' Complaints.[66]

The Court will grant Hartford's Motion to Dismiss in its entirety.

## G. Defendant Liberty Mutual Holding Company Inc. (20-cv-00620)

### 1. *Case Background*

Prior to consolidation, three plaintiffs (Pacific Endodontics PS, Hirbod H. Rowshan DDS PS, and Cascadia Dental Specialists Inc.) advanced claims against Liberty Mutual subsidiaries.[67] The Court consolidated these actions under the *Pacific Endodontics* case. *Pacific Endodontics*, Order on Consolidation, No. 20-cv-00629, Dkt. No. 37.

The Plaintiffs in these actions did not refile their Complaints post consolidation. As such, their pre-consolidation Complaints remain operative.[68] None advance Extra-Contractual Claims.

Liberty Mutual filed only one Motion for Judgment on the Pleadings to dismiss all three

---

[66] *See* Strelow Compl. ¶¶ 113–16, 120, 122–23, 135; Seattle Symphony Compl. ¶¶ 62, 64, 66–67, 70; J Bells Compl. ¶¶ 40–41; 45–48; SCRBKR Compl. ¶¶ 4.3, 4.5–4.7, 5.3–5.6, 6.3, 6.5, 7.2; Seattle Bakery Compl. ¶¶ 4.3, 4.5–4.7, 5.3–5.11, 6.3, 6.5, 7.2; Piroshky Piroshky Compl. ¶¶ 4.3, 4.5–4.7, 5.3–5.6, 6.3, 6.5, 7.2.

[67] *See Pacific Endodontics PS v. Ohio Cas. Ins. Co.*, No. 20-cv-00629; *Hirbod H Rowshan DDS PS v. Ohio Sec. Ins. Co.*, No. 20-cv-00730; *Cascadia Dental Specialists Inc. v. Am. Fire and Cas. Co.*, No. 20-cv-00732.

[68] *See Pacific Endodontics*, Am. Compl., No. 20-cv-00629, Dkt. No. 5; *Rowshan*, Compl., No. 20-cv-00730, Dkt. No. 1; *Cascadia Dental Specialists*, Compl., No. 20-cv-00732, Dkt. No. 1.

actions. *Pacific Endodontics*, Defs. Am. Fire and Cas. Co., the Ohio Ca. Ins. Co., and Ohio Sec. Ins. Co.'s Mot. for J on the Pleadings, No. 20-cv-00629, Dkt. No. 46 ("Liberty Mutual's Mot."). The Motion includes the familiar arguments regarding lack of direct physical loss or damage, Civil Authority coverage, and Virus exclusion. *Id.* at 7–21. All three Plaintiffs jointly filed the Omnibus Response in opposition. *Id.*, Omnibus Resp., Dkt. No. 53.

### 2. *Disposition*

All three policies fail to provide coverage.[69] All three Policies are contingent on "direct physical loss of or damage to Covered Property." Pacific Endodontics Policy at 39; Cascadia Policy at 37; Rowshan Policy at 41. The Policies' Civil Authority extensions also require physical loss or damage. Pacific Endodontics Policy at 48; Cascadia Policy at 46; Rowshan Policy at 50.[70] Additionally, the Policies include an applicable Virus exclusion. Pacific Endodontics Policy at 60; Cascadia Policy at 58; Rowshan Policy at 62.

The Court will grant Liberty Mutual's Motion and dismiss all claims against it.

## H. Defendant Dentists Insurance Company (20-cv-00661)

### 1. *Case Background*

Mark Germack DDS is the only plaintiff to file a claim against the Dentists Insurance

---

[69] *See* Liberty Mutual's Mot., Ex. A, Dkt. No. 46-1 ("Pacific Endodontics Policy"); *id.*, Ex. B, Dkt. No. 46-2 ("Cascadia Policy"); *id.*, Ex. C, Dkt. No. 46-3 ("Rowshan Policy").

[70] Specifically, the Civil Authority extension states that "[w]hen a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises." Pacific Endodontics Policy at 48. "Covered Cause of Loss" is defined as "[d]irect physical loss unless the loss is excluded or limited." *Id.* at 40. Thus, Civil Authority incorporates the requirements of loss and damage.

69

1    Company.  *See Germack v. Dentists Ins. Co.*, 20-cv-00661.  Germack's Complaint includes no

2    Extra-Contractual Claims.  *See generally id.*, Compl.–Class Action, Dkt. No. 1.

3         In response, Dentists filed two motions currently pending before the Court.  The first is a

4    Motion to Dismiss Germack's class action allegations for failure to meet the requirements of FRCP

5    23.  *Id.*, Mot. to Strike and Dismiss All Class Action Allegations in Pl.'s Compl., Dkt. No. 11.  The

6    second is a Motion for Summary Judgment, which seeks dismissal of Germack's claims *in totem*

7    based on the familiar grounds of lack of physical loss or damage, lack of independent grounds for

8    coverage in a Civil Authority provision, and presence of a Virus exclusion.  *Id.*, Def.'s Mot. for

9    Summ. J., Dkt. No. 35.

10        *2.  Disposition*

11        Germack's Policy does not provide coverage for all of the reasons already stated above.

12   *See Germack*, Decl. of Jeremy Fullenwider, Ex. B, No. 20-cv-0061, Dkt. No. 36-2 ("Germack

13   Policy").  Its terms for Business Income coverage require "direct physical loss of or damage to

14   property at the described premises."  *Id.* at 12.  Similarly, the Policy's Civil Authority provision

15   applies only where "an action of Civil Authority . . . prohibits access to the described premises

16   because of direct physical loss of or damage to property, other than at the described premises."  *Id.*

17   at 14.  Finally, the Policy includes an applicable Virus or Bacteria exclusion.  *Id.* at 31.

18        As such, the Court will grant Dentists' Mot for Summary Judgment and deny its Motion to

19   Dismiss as moot.

70

**I.  Defendant The Travelers Companies, Inc. (20-cv-00597)**

   *1.  Case Background*

   Prior to consolidation, six cases sought to recover against three Travelers subsidiaries.[71] These matters were consolidated under the *Nguyen* case.  *Nguyen*, Corrected Stipulated Mot. and Order, No. 20-cv-00597, Dkt. No. 33.

   After consolidation, all of the Travelers Plaintiffs filed a joint Complaint, which includes no Extra-Contractual Claims.  *Id.*, Consolidated Am. Class Action Compl., Dkt. No. 35 ("Consolidated Travelers Compl.").  Travelers filed a single Motion to Dismiss this Complaint. *Id.*, Defs.' Revised Mot. to Dismiss the Consolidated Am. Class Action Compl., Dkt. No. 53.  This Motion included the familiar grounds of lack of direct physical loss or damage, lack of independent Civil Authority coverage, and an applicable Virus exclusion.  *Id.* at 7–17.

   *2.  Disposition*

   Reviewing the Travelers Plaintiffs' policies,[72] the Policies contain the familiar requirement for "direct physical loss of or damage to" covered property.  Nguyen Policy at 165–66.  The Policies' Civil Authority extension is also contingent on direct physical loss or damage.  *Id.* at 178. Finally, the Policies contain an applicable Virus or Bacteria exclusion.  *Id.* at 290.

---

[71] *See Nguyen v. Travelers Cas. Ins. Co. of Am.*, No. 20-cv-00597; *Fox v. Travelers Cas. Ins. Co. of Am.*, No. 20-cv-00598; *Hsue v Travelers Cas. Ins. Co. of Am.*, 20-cv-00622; *Kashner v. Travelers Indem. Co. of Am.*, No. 20-cv-00625; *Stan's Bar-B-Q LLC v. The Charter Oak Fire Ins. Co.*, 20-cv-00613; *Bath v. Travelers Cas. Ins. Co. of Am.*, No. 20-cv-05489.

[72] All of the policies are identical in their relevant aspects.  *See* Consolidated Travelers Compl. ¶ 27.  As such, the Court will exclusively refer to the policy of Jennifer B Nguyen DDS PLLC.  *Nguyen*, Defs.' Mot. to Dismiss the Consolidated Am. Class Action Compl., Ex. A, No. 20-cv-00597, Dkt. No. 44-1 ("Nguyen Policy").

As such, the Court will grant Travelers' Motion to Dismiss.

## J. Defendant Tri-State Insurance Company of Minnesota (20-cv-01176)

### 1. *Case Background*

Only one business, La Cocina de Oaxaca, advances claims against Tri-State Insurance Company. *La Cocina de Oaxaca LLC v. Tri-State Ins. Co. of Minn.*, 20-cv-01176. La Cocina's Complaint does not include any Extra-Contractual Claims. *See id.*, Compl.–Class Action, Dkt. No. 1. Tri-State moved to dismiss this Complaint on January 15, 2021, *id.*, Def. Tri-State Ins. Co. of Minn.'s Motion to Dismiss the Compl., Dkt. No. 45 ("Tri-State's Mot. to Dismiss"), and La Cocina participated in the Omnibus Response, *id.*, Pls.' Omnibus Opp'n to Defs.' Mots. to Dismiss, Dkt. No. 52.

Tri-State's Motion includes all the familiar arguments of lack of direct physical loss and lack of coverage under a Civil Authority provision. Tri-State's Mot. to Dismiss at 7–16.

### 2. *Disposition*

La Cocina's Policy utilizes the familiar "direct physical loss of or damage to" covered property to trigger coverage. Tri-State's Mot. to Dismiss, Ex. A at 96. The Policy's Civil Authority provision also requires physical loss or damage. *Id.* at 114 ("When a Covered Cause of Loss causes damage to property other than property at the described premises. . ."); *id.* ("The action of civil authority is taken in response to dangerous physical conditions of the Covered Cause of Loss that caused damage. . ."); *id.* at 132 ("Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy.").

For all the reasons previously stated, the Court finds that La Cocina's Policy fails to provide coverage. The Court, therefore, will grant Tri-State's Motion to Dismiss.

## VI.    CONCLUSION

Based on the foregoing, the Court ORDERS as follows:

A.  ASPEN LODGING GROUP LLC V. AFFILIATED FM INSURANCE COMPANY, No. 20-cv-01038:

1. Vancouver Clinic's Motion for Partial Summary Judgment, Dkt. No. 33, is DENIED

2. Vancouver Clinic's Request for Judicial Notice, Dkt. No. 35, is DENIED as MOOT.

3. Affiliated FM's Cross-Motion for Partial Summary Judgment against Vancouver Clinic, Dkt. No. 36, is GRANTED.

4. Affiliated FM's Cross-Motion for Partial Summary Judgment against Aspen Lodging, Dkt. No. 39, is GRANTED.

5. Aspen Lodging's Motion for Partial Summary Judgement, Dkt. No. 42, is DENIED.

6. Aspen Lodging's Motion for Judicial Notice, Dkt. No. 44, is DENIED as MOOT.

7. This matter is DISMISSED with Prejudice.

B.  MARLER V. ASPEN AMERICAN INSURANCE COMPANY, No. 20-cv-00616:

1. Aspen American's Motion to Dismiss Consolidated Class Action Complaint and Tabaraie Complaint, Dkt. No. 51, is GRANTED.

2. This matter is DISMISSED with Prejudice.

C.  MCCULLOCH V. VALLEY FORGE INSURANCE COMPANY, No. 20-cv-00809:

1. CNA's Motion to Dismiss Complaints, Dkt. No. 50, is GRANTED.

2. This matter is DISMISSED with Prejudice.

D.  VITA COFFEE LLC V. FIREMAN'S FUND INSURANCE COMPANY, No. 20-cv-01079:

1. Fireman's Fund's Motion to Dismiss, Dkt. No. 10, is GRANTED.

2. United Policyholders, National Independent Venue Association, and Washington Hospitality Association's Motion for Leave to Appear as *Amici Curiae* in Support of Vita Coffee's Opposition to Defendant's Motion to Dismiss, Dkt. No. 18, is DENIED as MOOT.

3. Fireman's Fund's Consolidated Motion to Dismiss the Complaints of Worthy Hotels, Inc. and Naccarato Restaurant Group, Inc., Dkt. No. 41, is GRANTED.

4. Fireman's Fund's Motion to Dismiss Weimac LLC's Complaint, Dkt. No. 51, is GRANTED.

5. This matter is DISMISSED with Prejudice.

E. CABALLERO V. MASSACHUSETTS BAY INSURANCE COMPANY, No. 20-cv-05437:

1. Massachusetts Bay's Rule 12 Motions against Plaintiff's First Amended Complaint, Dkt. No. 56, is GRANTED.

2. This matter is DISMISSED with Prejudice.

F. CHORAK V. HARTFORD CASUALTY INSURANCE COMPANY, No. 20-cv-00627:

1. Hartford's Motion to Dismiss and Motion for Judgment on the Pleadings, Dkt. No. 56, is GRANTED.

2. This matter is DISMISSED with Prejudice.

G. PACIFIC ENDODONTICS PS V. OHIO CASUALTY INSURANCE COMPANY, No. 20-cv-00620:

1. Liberty Mutual's Motion for Judgment on the Pleadings, Dkt. No. 46, is GRANTED.

2. This matter is DISMISSED with Prejudice.

H. GERMACK V. DENTISTS INSURANCE COMPANY, No. 20-cv-00661:

1. Dentists' Motion to Strike and Dismiss all Class Action Allegations in Plaintiff's Complaint, Dkt. No. 11, is DENIED as MOOT.

2. Dentists' Motion for Summary Judgment, Dkt. No. 35, is GRANTED.

3. This matter is DISMISSED with Prejudice.

74

I.  NGUYEN V. TRAVELERS CASUALTY INSURANCE COMPANY OF
    AMERICA, No. 20-cv-00597:

1.  Travelers' Revised Motion to Dismiss the Consolidated Amended Class
    Action Complaint, Dkt. No. 53, is GRANTED.

2.  This matter is DISMISSED with Prejudice.

J.  *LA COCINA DE OAXACA LLC V. TRI-STATE INSURANCE COMPANY OF
    MINNESOTA*, No. 20-cv-01176:

1.  Tri-State's Motion to Dismiss the Complaint, Dkt. No. 45, is GRANTED.

2.  This matter is DISMISSED with Prejudice.


DATED this 28th day of May, 2021.


                              BARBARA J. ROTHSTEIN
                              UNITED STATES DISTRICT JUDGE

75

# EXHIBIT 3

Order denying reconsideration

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

VITA COFFEE LLC, *et al.*,

        *Plaintiffs*,

    v.

FIREMAN'S FUND INSURANCE
COMPANY, *et al.*,

        *Defendants*.

CASE NO. 2:20-cv-01079-BJR

ORDER DENYING MOTION FOR
RECONSIDERATION

## I.  INTRODUCTION

Before the Court is Plaintiffs ES Restaurant Group, 13 Coins Management, LLC, and Canlis, Inc.'s Motion for Reconsideration.  Mot. for Recons., Dkt. No. 69 ("Mot.").  Other Plaintiffs in this consolidated action joined the Motion after its submission.[1]  Having reviewed the Motion, the oppositions thereto, the record of the case, and the relevant legal authorities, the Court

---

[1] *See* Worthy Hotels, Inc. *et al.*, Vita Coffee, LLC, Naccarato Restaurant Group, Inc., and Weimac, LLC's Joinder in ES Restaurant Group, Inc., *et al.*'s Mot for Recons., Dkt. No. 72; Weimac LLC, *et al.*'s Joinder in ES Restaurant Group, Inc., *et al.*'s Mot for Recons., Dkt. No. 73.

1

will deny Plaintiffs' Motion.

## II.    BACKGROUND

This matter is one amongst a multitude of cases across the United States in which businesses are seeking coverage from their insurance companies for income lost due to the COVID-19 pandemic.  This District chose to assign all such matters to the undersigned who consolidated the earliest of these actions into ten cases based on insurance group.  *See* Order on Consolidation, Dkt. No. 36.  The Court recently published an Order addressing all ten consolidated cases, holding there was no coverage for losses due to COVID-19.  *See* Order Granting Mots. to Dismiss, Dkt. No. 66 ("Order on Consolidated Cases").[2]

In that Order, the Court held that all of the relevant policies required "direct physical loss of or damage to" covered property to trigger coverage and COVID-19 did not cause such loss or damage.  *Id.* at 15–25.  Additionally, the Court held that extension provisions, such as Extra Expense or Civil Authority, failed to provide independent grounds for coverage where coverage was not triggered in the first instance.  *Id.* at 25–28.  The Court addressed the specific claims of the Plaintiffs currently before the Court, who all purchased insurance from Defendant Fireman's Fund or an affiliate.  *Id.* at 51–58.  In addition to reaffirming its general findings that coverage was not available based on the lack of physical loss or damage, the Court rejected arguments that certain Plaintiffs were entitled to coverage under unique Crisis Event Business Income, Communicable Disease Coverage, Dependent Property Coverage, and Business Access Coverage

---

[2] Also available at *Nguyen, et al. v. Travelers Cas. Ins. Co., et al.*, No. 20-cv-00597, --- F. Supp. 3d ----, 2021 WL 2184878 (W.D. Wash. May 28, 2021).

2

provisions.  *Id.* at 54–57.

On June 11, 2021, ES Restaurant, 13 Coins, and Canlis submitted the now-pending Motion for Reconsideration.  Mot., Dkt. No. 69.  They claim the Court committed manifest error in three areas: (1) in relying on the wrong dictionary definition of "loss"; (2) in failing to properly consider Washington state precedent; and (3) in misapplying the Federal Rule of Civil Procedure 12(b)(6) standard.  Mot. at 3–8.

### III.     LEGAL STANDARD

"Motions for reconsideration are disfavored" and "[t]he court will ordinarily deny such motions in the absence of a showing of manifest error in the prior ruling or a showing of new facts or legal authority which could not have been brought to its attention earlier with reasonable diligence."  Local Rules W.D. Wash. LCR 7(h)(1); *see also* Standing Order for All Civil Cases, Dkt. No. 26 at 4 (stating that Motions for Reconsideration are "discouraged" and that "Motions which reassert prior arguments or raise new arguments that could have been made earlier will be summarily denied").

### IV.     DISCUSSION

#### A.  Direct Physical Loss or Damage

All of the relevant policies require "direct physical loss or damage" or "direct physical loss of or damage to" covered property to trigger coverage.  Order on Consolidated Cases at 53–54 (quoting Decl. of Anthony Todaro, Ex. A, Dkt. No. 11-1 at 30 (Policy of Vita Coffee, hereinafter "Vita Coffee Policy")).  In determining the meaning of "loss" in this undefined policy term, the Court turned to the dictionary to decipher its common meaning, finding helpful the definitions "the act or fact of being unable to keep or maintain something" or "the act of losing possession" of

3

something.  Order on Consolidated Cases at 18 (quoting *Loss*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/loss (last visited May 28, 2021)).  Based on its analysis, the Court determined that the relevant policies did not cover intangible loss of use, functionality, or, as the Court's Order termed, "purely economic losses." *Id.* at 19.

Plaintiffs' Motion for Reconsideration faults the Court for relying on these definitions, rather than adopting a more favorable one that would have included the loss of use or functionality, as in another definition provided by Webster's Dictionary.  Mot. at 3–4 (including the definition "the partial or complete deterioration of or absence of physical capability or function" (quoting *Loss*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/loss (last visited June 7, 2021))).

As the Court outlined in its previous Order, the Court gives undefined terms in an insurance policy their "plain, ordinary, and popular meaning."  Order on Consolidated Cases at 13 (quoting *Xia v. ProBuilders Specialty Ins. Co.*, 400 P.3d 1234, 1240 (Wash. 2017)).  This meaning is determined according to the "expectations of the average insurance purchaser" as, when "constru[ing] the language of an insurance policy, [the Court] give[s] it the same construction that an average person purchasing insurance would give the contract."  *McLaughlin v. Travelers Com. Ins. Co.*, 476 P.3d 1032, 1037 (Wash. 2020) (quoting *Woo v. Fireman's Fund Ins. Co.*, 164 P.3d 454, 459 (Wash. 2007)).  In determining ordinary meaning, the Court may make "reference to dictionary definitions."  *Kut Suen Lui v. Essex Ins. Co.*, 375 P.3d 596, 601 (Wash. 2016) (citing *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha*, 882 P.2d 703, 718 (Wash. 1994)).  If, after such an examination, the Court determines that the undefined term is ambiguous—or "'susceptible to more than one *reasonable* interpretation'"—the Court only then "adopt[s] the

4

definition that most favors the insured." *McLaughlin*, 476 P.3d at 1037 (emphasis added) (quoting *Holden v. Farmers Ins. Co. of Wash.*, 239 P.3d 344, 347 (Wash. 2010)).

Plaintiffs' argument fails because their preferred definition incorporating loss of intangible functionality is unreasonable given the context of the term. Washington law—as just outlined—provides no rule prioritizing or ranking dictionary definitions. Instead, the dictionary is a tool courts may use in determining the common meaning of an undefined term; its definitions are not "controlling." *Jack v. Standard Marine Ins. Co., of Liverpool, England*, 205 P.2d 351, 354 (Wash. 1949).

Merely because a single word may have multiple dictionary definitions designed to help a reader understand its bounds, does not make the word ambiguous when used in a contract. If this were the case, ambiguity would abound as the English language is often a many, varied, and enigmatic thing. Instead, the Court uses context, meaning, and usage to determine the intent the parties ascribed when utilizing certain commonly understood language. *See State Farm Fire & Cas. Co. v. Ham & Rye, L.L.C.*, 174 P.3d 1175, 1178 (Wash. Ct. App. 2007) ("Insurance policies are contracts, and courts seek to determine the contracting parties' intent by resorting to a fair, reasonable, and sensible construction of the contract's language, as the average insurance purchaser would understand it." (citing *Am. Nat. Fire Ins. Co. v. B & L Trucking & Constr. Co.*, 951 P.2d 250, 256 (Wash. 1998))). Singular words and terms cannot be understood in isolation, as policies must be construed holistically. *See Certification from U.S. Dist. Ct. ex rel. W. Dist. of Wash. v. GEICO Ins. Co.*, 366 P.3d 1237, 1239 (Wash. 2016).

Here, "loss" is modified by the preceding "physical," appears in close proximity to "damage," and affects real property. *See* Vita Coffee Policy at 83 (defining "Property Insured" as

5

"business real property, business personal property, or both"). This unique linguistic phrase appears throughout the relevant policies, promoting a consistent understanding of the term in context rather than one of "loss" in isolation. An understanding promoting an intangible "loss of use" cannot reasonably be squared with the use and construction of the phrase which requires a causal event to produce a physical effect similar to damage on real property, as the placement of "loss" in the phrase grammatically requires. This understanding fits with the purpose of property insurance as, after all, commercial property insurance is designed to insure, first and foremost, the business's physical property. *See* Vita Coffee Policy at 30 (beginning with Property Coverage, requiring "direct physical loss or damage to Property Insured," and, only after, providing Business Income and Extra Expense Coverage covering lost earnings "arising from direct physical loss or damage to property").

The Court went into greater depths in its previous Order, and will not do so again here. *See* Order on Consolidated Cases at 15–21. Suffice it to say, the Court finds no manifest error in discounting a non-controlling dictionary definition that does not comport with the actual use of the defined word in the insurance policy.

## B. Washington State Precedents

In construing the terms of an insurance policy, federal courts sitting in diversity, as this one does here, apply state substantive law, including the state substantive law regarding insurance policy construction. Order on Consolidated Cases at 13 (citing *Indian Harbor Ins. Co. v. City of Tacoma Dep't of Pub. Utils.*, 354 F. Supp. 3d 1204, 1212 (W.D. Wash. 2018)). In its Order on Consolidated Cases, the Court surveyed the relevant state caselaw regarding commercial property insurance and determined that no Washington Supreme Court precedent controlled, leading the

6

Court to predict how the Washington Supreme Court would hold. *Id.* at 22–25 ("Where the state's highest court has not squarely addressed an issue, [the Court] predict[s] how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." (quoting *Judd v. Weinstein*, 967 F.3d 952, 955–56 (9th Cir. 2020))). In reviewing the relevant precedent, the Court determined that, based on past caselaw, the "Washington Supreme Court would decide that the term 'physical loss' requires dispossession of property" rather than merely the loss of use of the property. *Id.* at 25.

Plaintiffs claim the Court overlooked *Neer v. Fireman's Fund American Life Insurance Co.*, 692 P.2d 830 (Wash. 1985), and *Graff v. Allstate Insurance Co.*, 54 P.3d 1266 (Wash. Ct. App. 2002), in this analysis. Mot. at 4–6. Plaintiffs are incorrect.

*Neer* examined whether a Loss of Life Accident Indemnity policy would cover injury sustained after the plaintiff fell 50 to 60 feet from a tree, severing his spinal cord and leaving him unable to use his feet. 692 P.2d at 831. The relevant policy covered "loss of both feet" and defined "loss" as "complete severance through or above the . . . ankle joint." *Id.* at 832. In reaching its decision that the policy provided the plaintiff coverage, the Supreme Court of Washington stated that, in this context, "Washington has adopted as a definition of loss, loss of use or function." *Id.*

In reaching this conclusion, the Supreme Court focused its attention on the term "severance" within the definition of loss, rejected an understanding that required dismemberment or amputation, and held that the plaintiff had lost his feet as a result of severance of his spine, which is above the ankle joint. *Id.* at 833–34.

As this recitation shows, the Supreme Court reached its coverage conclusion examining a

7

different policy, in a different realm of insurance, where the policy included a definition of "loss" and involved a different undefined term, under different factual circumstances. Under such conditions, the Court cannot say this holding controls the cases before it.

In *Graff*, the Washington Court of Appeals examined whether a landlord's insurance policy would cover damage caused by a tenant's methamphetamine laboratory under a vandalism clause, or whether such damage would be excluded under a contamination exclusion provision. 54 P.3d at 1267. That Court found coverage.

Again, the case presents a different factual scenario implicating policy provisions not at issue in this case. Thus, *Graff* does not control and is, at best, "datum" which the Court may utilize to determine what the Washington Supreme Court would hold if confronted by the situation before this Court. *See Fast Trak Inv. Co. v. Sax*, 962 F.3d 455, 465 (9th Cir. 2020) ("An intermediate state appellate court decision is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (quoting *Estrella v. Brandt*, 682 F.2d 814, 817 (9th Cir. 1982))).

## C. Findings of Facts Versus Conclusions of Law

Plaintiffs claim that in the course of reaching its conclusions, the Court engaged in several instances of impermissible fact finding contrary to the Rule 12(b)(6) standard. Mot. at 6–8. Specifically, Plaintiffs claim the Court made impermissible findings of fact regarding (1) the science behind COVID-19's causing of damage and mechanisms of loss, (2) whether the closing of their premises was "necessary," (3) the actual presence of the virus at their premises, and (4) the reasonableness of the Plaintiffs' Extra-Contractual Claims. Mot. at 7–8.

It is axiomatic that while reviewing a motion to dismiss under Rule 12(b)(6), the Court

8

accepts all factual allegations in the complaint as true and construes the pleadings in the light most favorable to the nonmoving party, here Plaintiffs. Order on Consolidated Cases at 11–12 (citing *Young v. State*, 992 F.3d 765, 778 (9th Cir. 2021)). At the same time, the Court need not accept "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008); *see also Wilson v. Craver*, 994 F.3d 1085, 1090 (9th Cir. 2021) ("[The Court] need not accept as true legal conclusions couched as factual allegations."). For example, the Court "need not accept as true legal conclusions or '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1176 (9th Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). As the Ninth Circuit recently summarized, the standard on a motion to dismiss "require[s] well-pleaded facts, not legal conclusions, that 'plausibly give rise to an entitlement to relief.'" *Whitaker*, 985 F.3d at 1176 (citations omitted) (first citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); and then quoting *Iqbal*, 556 U.S. at 679.

Reviewing Plaintiffs' alleged errors, the Court finds no cause to reconsider its previous conclusions.

### 1. *COVID-19 Science*

Plaintiffs point to several sections of Canlis and 13 Coins' operative Complaints which address the science of COVID-19's transmission, citing or quoting scientific studies. Mot. at 7. For example, they highlight:

(1) "SARS-CoV-2 can remain suspended in the air and travel far from the source on air currents due to HVAC systems and natural airflow." *13 Coins Mgmt. LLC et al v. Nat'l Surety Corp.*, Compl., No. 21-cv-00178, Dkt. No. 1-1 ¶ 57 (internal quotations and citations removed);

9

(2) Transmission also occurs from property to person when virus-containing droplets land on surfaces creating a "fomite," and a person comes into contact with the property and then touches their eyes, nose, or mouth. *Id.* ¶ 59 (internal citation removed); and

(3) SARS-CoV-2 can survive on surfaces for hours, days, or weeks, depending on the type of surface affected by the virus. *Canlis Inc. v. Fireman's Fund Ins. Co.*, Compl., No. 21-cv-00373, Dkt. No. 1-3 ¶ 40 ("Canlis Compl.").

These facts, however, do not contradict the Court's conclusions that COVID-19 does not damage the real property Plaintiffs' policies insured. *See* Order on Consolidated Motions at 16–17 (concluding that COVID-19 does not cause "direct physical damage"). Accepting these allegations as true, as the Court must and did, no damage can be shown to the underlying property itself, merely that, in some circumstances, inanimate objects can assist in the transmission of the virus. Again, the virus causes harm to people, not property.

### 2. *Necessary Closures*

Plaintiffs claim the Court erred in finding that Plaintiff ES Restaurant could not show a "necessary closure" because it was able to switch to carry out services. Mot. at 7 (citing *ES Rest. Grp. Inc. v Fireman's Fund Ins. Co.*, Compl., 20-cv-01193, Dkt. No. 1-1 ¶ 39) ("ES Compl."). This necessary closure was significant as ES Restaurant's insurance policy contains a unique Crisis Event Business Income Provision which requires such a closure to trigger coverage. *ES Rest. Grp.*,

Decl. of Anthony Todaro, Ex. A, No. 20-cv-01193, Dkt. No. 5-1 at 91,[3] 94[4] (Insurance Policy of

ES Restaurant Group, hereinafter "ES Policy") (emphasis added).

Here, the Court merely read ES Restaurant's Complaint and took it at face value.  While

its Complaint does claim the Group "closed its restaurants because of fortuitous premises

contamination and impairment to its Properties" on March 16, 2020,  ES Compl. ¶¶ 31, 39, the

Complaint also states that "ESR resumed its operations in part by offering small take-out menus

from selected locations during shortened hours," *id.* ¶ 42.  Such actions were in accordance with

the Governor's Proclamations which sought to stem the spread of COVID-19 by restricting access

to businesses, but never prohibiting food services businesses from conducting take out services.

*See* Wash. Proclamation No. 20-13 at 3 (Mar. 16, 2020)[5] ("This Proclamation does not prohibit

the sale of prepared food or beverages that are otherwise legally delivered or taken out of the venue

for consumption or the purchasing of groceries that are not consumed within the premises, more

---

[3] Stating

    1.  Crisis Event Business Income

    a.  We will pay for the actual loss of crisis event business income you sustain due to the necessary suspension of your operations during the crisis event period of restoration. The suspension must be caused by or result from a covered crisis event at your covered premises.

[4] Stating

    1.  Covered crisis event means the following:

    b.  Premises contamination. *Necessary closure* of your covered premises due to any sudden, accidental and unintentional contamination or impairment of the covered premises or other property on the covered premises which results in clear, identifiable, internal or external visible symptoms of bodily injury, illness, or death of any person(s). This includes covered premises contaminated by communicable disease, Legionnaires' disease, but does not include premises contaminated by other pollutants or fungi.

[5] Available at https://www.governor.wa.gov/sites/default/files/proclamations/20-13%20Coronavirus%20Restaurants-Bars%20%28tmp%29.pdf

11

commonly known as drive-through, take-out, and delivery services."); *see also* ES Compl. ¶ 25. Thus, taking the well-pleaded facts of the Complaint as true, the Group's restaurants were never necessarily closed.

"Necessary closure" or "necessary suspension," as the Provision requires, is critical as it informs the losses the Provision intends to cover, namely the "crisis event period of restoration." ES Policy at 91. This period of recovery is defined as beginning "[w]ith the date of the covered crisis event at your covered premises" and ending with "when the operations at your covered premises should be returned to the condition that would have existed had the covered crisis event not occurred using reasonable speed." *Id.* at 95. As Plaintiffs' pleadings make evident, there was no such period of recovery. Plaintiffs were able to keep utilizing their businesses for take out services, as permitted by the Governor's Proclamations. Further, there was no restoration to be accomplished as what is required for Plaintiffs to return to full services is for the Governor to lift COVID-19 restrictions, not the repair or remediation of their property. *See, e.g.*, *Star Buick GMC v. Sentry Ins. Grp.*, No. 20-cv-03023, 2021 WL 2134289, at *6 (E.D. Pa. May 26, 2021) ("[T]here is also no 'period of restoration' connected to the orders; rather, once government restrictions are lifted, the dealerships may reopen."); *Hair Studio 1208, LLC v. Hartford Underwriters Ins. Co.*, No. 20-cv-2171, 2021 WL 1945712, at *9 (E.D. Pa. May 14, 2021) ("In short, nothing in the Amended Complaint suggests that Plaintiff's Property needs to be repaired, rebuilt, replaced, or moved to a new location. Rather, Plaintiff's ability to operate fully depends solely on whether the Closure Orders are in effect at any particular time. Should the Closure Orders be lifted, Plaintiff may immediately reopen its business without any 'period of restoration.'").

12

### 3. *Actual Presence*

Third, Plaintiffs Canlis and ES Restaurant Group fault the Court for stating that they failed to plead the actual presence of COVID-19 on their premises. Mot. at 7. Upon closer examination, they are correct that both Complaints made at least passing refences to confirmed cases on the premises. *See* Canlis Compl. ¶ 58 (stating "several Canlis employees have tested positive for COVID-19"); ES Compl. ¶ 31 (stating "ESR has had at least three confirmed cases of COVID-19 on its Properties").

As the Court explained in its Order on Consolidated cases, however, pleading actual presence is immaterial as the virus, when present, does not damage real property for the purpose of triggering coverage. Order on Consolidated Case at 21. Additionally, as outlined above, actual presence does not trigger coverage under the Crisis Event Business Income provision. In this case, the closure of Plaintiffs' premises does not result from a specific event but, rather, a governmental decree. *See also* Canlis Compl. ¶¶ 59 (conducting take out and outdoor services), 60 (claiming COVID-19 caused physical damage from presence), 61 ("[the Governor's Proclamations] also caused the physical loss of Canlis's Property").

### 4. *Extra-Contractual Claims*

Plaintiffs claim the court erred in dismissing their Extra-Contractual Claims, such as Insurance Bad Faith, violations of the Washington Consumer Protection Action and Insurance Fair Conduct Act, and Negligence. Mot. at 7–8. Plaintiffs point to several errors made by Fireman's Fund in the course of denying Plaintiffs' coverage, citing incorrect quotations of a policy provision or stating that a policy contained a Virus exclusion, where it did not. Even accepting these allegations as true, where Fireman's Fund correctly denied coverage, Plaintiffs cannot establish

13

bad faith or negligence. As the Court stated in its previous order, "since the Court has found that COVID-19 does not cause physical loss or damage, denial of coverage on these grounds was reasonable" and any Extra-Contractual Claims premised on unreasonable denial "must fail." Order on Consolidated Cases at 32–33.

Based on the foregoing, the Court finds no manifest error in its application of the Rule 12(b)(6) standard.

## V.     CONCLUSION

Based on the foregoing, the Court hereby DENIES Plaintiffs' Motion for Reconsideration.


DATED this 21st day of July, 2021.


BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE

14